1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLORADO

3   Case No. 09-cv-02858-CMA-BNB

4   ═══════════════════════════════════════════════════

5   ILONA KIRZHNER,

6        Plaintiff,

7   vs.

8   DAVID SILVERSTEIN, et al.,

9        Defendants.

10  ═══════════════════════════════════════════════════

11        Proceedings before BOYD N. BOLAND, United States

12  Magistrate Judge, United States District Court for the

13  District of Colorado, commencing at 8:30 a.m., November 18,

14  2010, in the United States Courthouse, Denver, Colorado.

15  ═══════════════════════════════════════════════════

16        WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18  ═══════════════════════════════════════════════════

19                    APPEARANCES

20        THOMAS DEVINE, JR., Attorney at Law, appearing

21  for the plaintiff.

22        MARC PAPPALARDO and DANIEL GLASSER, Attorneys at

23  Law, appearing for the defendants.

24  ═══════════════════════════════════════════════════

25                   MOTION HEARING

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1               P R O C E E D I N G S

2          (Whereupon, the within electronically recorded

3     proceedings are herein transcribed, pursuant to order of

4     counsel.)

5          THE CLERK: Court is in session.

6          THE COURT: Thank you.  Please be seated.

7          We're here this morning in Case 09-cv-2858,

8     Kirzhner against Silverstein and others on the plaintiff's

9     motion to extend deadlines, also pending is the plaintiff's

10    motion to compel discovery.  May I have appearances, please.

11         MR. DEVINE: Your Honor, Tom DeVine on behalf of

12    the plaintiff, Ilona Kirzhner.

13         THE COURT: Thank you.

14         MR. PAPPALARDO: Good morning, Your Honor, Marc

15    Pappalardo appearing on behalf of David Silverstein, who's

16    seated here at the table, David Silverstein Investments,

17    LLC, and DSI Investments, LLC, Your Honor.

18         THE COURT: Thank you.  Welcome.

19         MR. GLASSER: David Glasser for Evergreen

20    Industries.

21         THE COURT: I've read the motion for extension and

22    the response.  Mr. DeVine, I'll hear anything more you have

23    to say.

24         MR. DEVINE: Your Honor, as the Court probably

25    knows by now, this litigation arises concerning a dispute

1    over a $5 million promissory note concerning the purchase of

2    stock   by   defendant   Silverstein   from   plaintiff,   Ilona

3    Kirzhner.   The original concept set forth in the plaintiff's

4    complaint   and   argued   in   the   motions   to   dismiss   was   that

5    defendant Silverstein set up closely held companies for the

6    purpose of transferring assets from BMGI, Inc. to either

7    devalue the stock of BMGI, Inc. or to create essentially a

8    valueless corporation so that plaintiff Kirzhner would not

9    have any security in her note, which was the stock of BMGI,

10    Inc.

11          We've recently had a chance to review 40,000 pages

12    of documents produced by the defendants and it revealed that

13    our original understanding of the case was just the tip of

14    the iceberg.   If I may approach.   I prepared a flow chart

15    which I think will help you understand the current status of

16    the facts in this case as we understand them.

17          THE COURT: All right, and you have copies for –

18          MR. DEVINE: I do.

19          THE COURT: Thank you.

20          MR. PAPPALARDO: Is this pertinent for the expert?

21          THE COURT: Thank you.

22          MR. DEVINE: Mr. Pappalardo asked whether this was

23    pertinent for the expert extension.   It relates to the good

24    cause  showing  that  we're  trying  to  amend  the  scheduling

25    order to extend the deadline.

1        Looking at the flow chart, what we've discovered
2    is that in June 6th -- or on June 6th of 2008 BMGI entered
3    into a business loan agreement with a company called First
4    National Bank for $2 million.  Three days later on June 9th
5    BMGI entered into another a loan agreement with First
6    Capital Partners for a $5 million line of credit.  We call
7    this the mezzanine line of credit because it's in second
8    position, above and behind the original line of credit.

9        Fast forward to the summer of 2009, from May to
10   July BMGI starts taking actions towards declaring bankruptcy
11   and seeking Chapter 7 -- or Chapter 7 bankruptcy protection
12   and, in fact, declares that the company is insolvent.
13   During that same period of insolvency, defendant Silverstein
14   formed DSI Investments, LLC, a defendant in this case.  DSI
15   is solely controlled by defendant Silverstine.  Silverstein,
16   I apologize.  I don't know (inaudible).

17       At the end of July of 2009, DSI starts negotiating
18   with First National Bank and First Capital Partners to
19   renegotiate the loan terms, or ultimately for DSI to buy out
20   First National Bank's first position $2 million line of
21   credit.  We believe that DSI Investments was formed by Mr.
22   Silverstein for specifically that purpose.

23       On August -- and then August 5th, 2009, DSI
24   purchases the First National Bank note using what we believe
25   were funds from a $2 million distribution from the First

1    Capital Partners' $5 million line of credit.  DSI is now in
2    control of the First National Bank debt that it owns against
3    BMGI and calls a default of the loan.  This scheme is
4    somewhat illusory since BMGI is solely held by defendant
5    Silverstein and DSI is solely held by defendant Silverstein,
6    but, nonetheless, he sends notice to himself of himself
7    being defaulted in his -- of his own loan.

8         On September 4th, 2009, Silverstein created two
9    Delaware entities, one is called BMGI Corp., not to be
10   confused with BMGI, Inc.  BMGI Corp. is a Delaware
11   corporation, which was, as I say, formed on September 4th,
12   2009, and he also formed a company called BMGI Holdings,
13   LLC, another Delaware limited liability company.

14        We fast forward to September 24th of 2009 where
15   DSI forecloses on BMGI, Inc., the Colorado corporation's
16   assets, and sells the assets of BMGI, Inc. to BMGI Corp.
17   Once again, since defendant Silverstein owns -- or closely
18   owns all three of these companies, he's foreclosing on
19   himself and selling back to himself.

20        On October 5th, 2009, DSI Investments, LLC and
21   First Capital Partners file UCC statements against BMGI
22   Corp. five minutes apart, each obtaining creditor positions
23   identical to the positions they had against BMGI, Inc., the
24   Colorado company.

25        So, as a result of this scheme, BMGI Corporation,

1    the  Delaware  entity,  is  open  for  business  with  a

2    substantially identical name, with the same office address

3    in Longmont, with the existing goodwill and name recognition

4    in the industry that BMGI had, since it's BMGI Corp. rather

5    than Inc., and using the same website domain of bmgi.com.

6    The only exception is that BMGI Corp. is not encumbered by

7    plaintiff Ilona Kirzhner's $5 million note against BMGI,

8    Inc.'s stock.

9         Let's talk about the discovery efforts that the

10    plaintiffs have undertaken in this case.  As a procedural

11    matter, the complaint was filed in Boulder County in

12    November of 2009, removed to this court in December of 2009,

13    and a motion to dismiss filed the next day, December 8th,

14    2009.  The motion to dismiss was pending before the Court

15    until the Court's order on July 23rd, 2010.  Within the time

16    that the motions to dismiss were pending, the Court held a

17    scheduling conference on March 24th, 2010, and on April 5th,

18    2010, the defendants filed a motion for protective order to

19    preclude any discovery pending the resolution of the motions

20    to dismiss.  So effectively from when the complaint was

21    filed in November of 2009, through July of 2010, no

22    discovery was undertaken because it was protected by a

23    protective order.

24         On July 23rd the Court denied for the most part

25    the defendants' motions to dismiss and the case was allowed

1    to proceed.  On August 5th, 2010, the defense filed their

2    answers.  On August 31st, 2010, the defendants (sic) served

3    written discovery on all four of the defendants.  The

4    defendants responded on October 4th, 2010, the documents

5    were actually received by our office three days later on

6    October 7th, and on October 18th, 2010, the defendants

7    propounded the approximately 40,000 pages of documents on

8    our office.

9          The voluminous nature of the documents originated

10    the motion to extend the discovery deadlines because we

11    needed an opportunity to review the documents.  Now, having

12    had the opportunity to review the documents, we realized

13    that because our understanding of the case was just the tip

14    of the iceberg, we actually now have good cause, based on

15    the documents that were produced, to file -- or to obtain an

16    expert and to endorse and disclose an expert to provide

17    business evaluation and forensic accounting services on our

18    behalf.

19          The documents themselves are not necessarily the

20    problem.  In any complex commercial litigation case this

21    number of documents is not necessarily concerning, in fact,

22    it's usual; however, the documents that were produced by the

23    defendants are in no sensical order.  They're not in

24    chronological order, they don't appear to be grouped by

25    subject matter and they're not indexed.  So in the

1    defendants' response they say that of all the documents that

2    were produced there are a very few number of documents that

3    are actually relevant to a business evaluation or forensic

4    accounting exercise.  However, because of the volume of

5    documents that were produced and the limited nature of the

6    documents that are actually relevant, it essentially becomes

7    a needle in the haystack situation where between 25 to 50

8    pages of the 40,000 pages are relevant.

9         Again, without an index or chronological order of

10   some kind we're left with two attorneys in our office and

11   plaintiff Kirzhner herself going through the documents

12   exhaustively to figure out what they contained and where the

13   important documents were.  It was only after the review of

14   the 40,000 pages of documents that we were able to

15   conclusively determine the flow chart set of facts that I

16   presented to you concerning the scheme, the entities, and

17   the Delaware entities specifically.

18        Moreover, the 40,000 documents, pages of documents

19   that were produced are not complete.  There were

20   representations that all of the financial records that we

21   would need were in the 40,000 pages, but that's not

22   necessarily correct.  The last financial information that

23   was provided to us was quarter three of 2009.  And, in fact,

24   of quarter three we don't have September or October.  The

25   financial documents run to a dead end in August of 2009,

1    which is a relatively critical part of this case which is

2    when the BMGI Delaware entities were created and when BMGI,

3    Inc. in Colorado was effectively shut down.

4            And a few days after the BMGI Delaware

5    corporations were set up, BMGI, Inc. in Colorado changed its

6    name to Evergreen, which we presume is an ongoing concern

7    based on our review of the Colorado Secretary of State

8    records, but we don't have any reason to believe that

9    because the financials that were produced don't go past

10   August of 2009.

11           So the documents that are missing that would be

12   pertinent to our business evaluation and forensic accounting

13   expert are the general ledger for Evergreen after quarter

14   three of 2009, consolidated financial statements, cash flow

15   statements, their 2009 tax returns, or any consolidated

16   financials of any kind following August of 2009.

17           In the deposition of Mr. Silverstein, which was

18   taken on Tuesday of this week, we discovered that the

19   defendants are now contending that BMGI Corp. and BMGI

20   Holdings, LLC, are effectively successor entities of BMGI,

21   Inc.  That's a curious contention given the nature of the

22   documents and the corporate setup that was required to

23   actually get those corporations up and running.  But if that

24   were true, then Evergreen should have done a number of

25   different things, and if I may approach again, Your Honor.

1       (Pause) Your Honor, I've just handed you the
2   defendants' disclosure statement pursuant to Local Rule 7.4
3   which requires the defendants to identify the corporate
4   entity for which they're defending.  As you can see, that
5   disclosure statement states that Mr. Glasser represents
6   Evergreen, formerly known as BMGI International, formerly
7   known as BMGI.  It does not state that Evergreen is now
8   known as BMGI Corp., a Delaware corporation.

9       Additionally, if it's true, as defendant
10  Silverstein contends that BMGI Corp. is a successor entity
11  to BMGI, Inc., they should have produced financial
12  documentation after quarter three of 2009, which, again, we
13  simply do not have.

14      I'm willing to go into the discovery responses as
15  far as you'd like me to, but, suffice it to say, the
16  plaintiff contends that there were numerous discovery
17  requests propounded on the defendants which should have
18  solicited the financials past quarter three of 2009 and BMGI
19  Corp. documents if, in fact, it is a successor entity to
20  BMGI, Inc. Without those documents our experts are going to
21  be unable to do a present business valuation of the company
22  because one of the claims for relief is that the defendants
23  have failed to maintain the value of defendant Kirzhner's
24  stock collateral interests, which includes through today, if
25  she has a stock interest in BMGI Corp., which we have no

1      idea what the current value of BMGI Corp. is.

2              THE   COURT:  So  I'm  not  quite  sure  why  this

3      successor corporation is so important, and I think it goes

4      more to the merits than to what I'm considering today and

5      I'll leave all that to Judge Arguello to sort through, but

6      I'm  just  curious  as  to  whether  you  have  the  corporate

7      minutes, for example, by which a corporation might change

8      its   name   so   that   then   you   would   become   a   successor

9      corporation.

10             MR. DEVINE: We do not, Your Honor.  Not concerning

11     BMGI Corp.  We have documentation concerning the change of

12     the   name   to   Evergreen   from   BMGI,   Inc.,   but   nothing

13     concerning the Delaware corporation whatsoever, no documents

14     period.

15             THE COURT: Were those within the scope of what you

16     requested?

17             MR.   DEVINE:  I'd  be  happy  to  go  through  the

18     discovery   responses   or   questions   with   you,   but,   for

19     instance, we asked for every entity that has a security

20     interest in your company, your company being BMGI, Inc., and

21     the   response   was   to   point   us   to   the   40,000   pages   of

22     documents,   which,   again,   end   in   quarter   three   of   2009.

23     Please specify the amount by which Evergreen is or has been

24     indebted  to  DSI.   Once  again,  we  know  that  DSI  has  a

25     security  interest  in  BMGI  Corp.,  but  the  response  mentions

1    in September of 2009 Evergreen is indebted to DSI to the
2    extent of $1.2 million.

3            Again, if BMGI Corp. is in fact a successor entity
4    -- and we know that DSI is a creditor for the loan -- or
5    lender to BMGI Corp. -- that interrogatory should have
6    solicited that response but it did not.  Identify every
7    person that currently holds a security interest in your
8    assets, "your" meaning Evergreen.  The response, once again,
9    points us to -- actually, this response does not provide us
10   any    information,    they    refused    to    respond    to    that
11   interrogatory.

12           Produce every document that evidences any security
13   interest you have granted in your assets to any lender or
14   creditor since September 15, 2004, once again pointing us to
15   the 40,000 pages of documents ending in quarter three of
16   2009.   We believe that those discovery questions fairly
17   should have solicited the existence of BMGI Corp., plus
18   documents concerning BMGI Corp.  And like I say, we haven't
19   gotten anything concerning BMGI Corp.

20           The requested extension is not going to interfere
21   with the Court's administration of this matter or interfere
22   with the docket.   This matter is set for final pretrial
23   conference on March 18th of 2011.  If BMGI Corp. and BMGI
24   Holdings are indeed successor entities combined into the
25   same scheme or same entity as BMGI, Inc., there won't be a

1    need for new counsel and any efforts concerning obtaining

2    additional documents will be the same effort that was

3    required of the original defendants and information

4    concerning those entities will not affect these parties'

5    ability to prepare for or go to trial in 2011.

6         So based on the information that we recently

7    discovered in this matter, the missing documents or

8    documentation from the defendants' produced documents, the

9    volume of the documents themselves and the timing of the

10   documents, when they were disclosed, and the inadequate

11   discovery responses which should have fairly solicited this

12   information prior to October 18th of 2010, we believe that

13   the plaintiffs have good cause for the Court to amend the

14   scheduling order to permit an extension of time on the

15   discovery, expert disclosures, through January 6th of 2010,

16   and, therefore, the plaintiff requests leave from the Court

17   to amend the scheduling order to permit such an extension.

18        THE COURT: So you want principal experts extended

19   until January 6th, and then I supposed rebuttal experts

20   would be extended a month as well –

21        MR. DEVINE: That's true.  I suppose –

22        THE COURT: -- to February 7th, right?

23        MR. DEVINE: I apologize.  The January 6th

24   deadline, of course, presupposes that the defendants are

25   going to produce financial documentation concerning BMGI

14

1    Corp. in the short term.

2         THE COURT: All right.  And then the discovery

3    cutoff would have to be extended at least for purposes of

4    experts, so perhaps to March 1, and the dispositive motion

5    deadline similarly extended to March 1.  Is that sort of the

6    schedule going forward that you have in mind?

7         MR. DEVINE: I believe so.  Again, assuming that we

8    get the documentation that we need in short order.

9         THE COURT: Okay.

10        MR. DEVINE: Thank you.

11        THE COURT: Thank you.

12        Mr. Pappalardo?

13        MR. PAPPALARDO: Thank you, Your Honor.

14        Looking at the exhibit that Mr. DeVine showed you,

15   I'd just like to just briefly touch on the facts and then

16   I'd go -- because only the facts that really deal with this

17   issue, and that is, Your Honor, in this case Ms. Kirzhner

18   has brought a claim for breach of the expressed and implied

19   covenant of good faith and fair dealing against Mr.

20   Silverstein and Mr. Evergreen and also breach of the

21   valuation covenant.

22        She has also brought a claim alleging that there

23   was a fraudulent transfer in this case.  Now, even there was

24   no obligation to do so, in June of 2008 when this loan with

25   First Capital Partners, FCP, was entered, Mr. Silverstein

1  advised Ms. Kirzhner that he was taking a $2 million
2  distribution out of that, that wasn't -- Ms. Kirzhner did
3  not in her deposition deny that and that's what Mr.
4  Silverstein testified to.
5       Ms. Kirzhner also does not challenge the fact that
6  BMGI or Evergreen faced significant financial troubles
7  because of this financial crisis.  And during that time,
8  Your Honor, one of the things I guess I take issue with is
9  Evergreen never filed bankruptcy, never said it was
10 insolvent, it had a $1 million lawsuit against it by its
11 landlord and so it prepared papers for the prospects of
12 potentially filing bankruptcy if it was unable to resolve
13 its dispute with its landlord.  It was able to on the eve of
14 trial.  The landlord said, I'm not going to have any
15 agreement with you, Evergreen.  Dave Silverstein, you must
16 personally guarantee this loan, you must form a new entity,
17 that must be in the lease, and so because of that DSI was
18 formed in July of 2009.
19      It continued to face financial troubles, so Dave
20 Silverstein used the remainder of that $2 million
21 shareholder distribution and then purchased the first
22 position of First National Bank, which was in the best
23 interests of Ms. Kirzhner because it was used, as you heard
24 from Mr. DeVine, used to ultimately preserve her collateral.
25 He purchased that first position and foreclosed on the

1    assets and called for a foreclosure sale.  At that

2    foreclosure sale on September 24th, 2009, which Ms.

3    Kirzhner's attorney attended in secret pretending to be a

4    furniture dealer, we have an e-mail from Mr. Sweetbaum and

5    Mr. Schafer on June 24th, 2009 -- and again, this is --

6    you're going to see other motions, so this actually deals

7    with a lot of things that you're going to be seeing -- is in

8    this case is Mr. Schafer, who was deposed last week, stopped

9    his deposition -- you're going to see a motion on this --

10   and refused to answer questions and asked for an attorney,

11   and the reason being is in September of 2009 Mr. Sweetbaum

12   and Mr. Schafer orchestrated this plan where Mr. Schafer

13   would go in undercover at this auction and misrepresent that

14   he was a furniture dealer.  That's just not my client saying

15   that, one of the documents they hid under the ground of

16   privilege, which they eventually gave up on when it came to

17   a third party, shows that right after that, hours after Mr.

18   Schafer is e-mailing Mr. Sweetbaum and saying, he thought I

19   was a furniture dealer.  And again, in this complaint it is

20   Mr. Schafer's opinion that this was a sham auction.

21        Now, Mr. Schafer testified he knew that Mr.

22   Silverstein was represented by counsel.  Still, he went

23   forward, didn't say who he was representing and had contact

24   with my client for the purpose of gathering evidence.  Now,

25   this sale did go forward, there's no question about that,

1    and in this sale that went forward all of the assets were

2    sold to BMGI Corporation, no one's disputing that.

3              In addition, what happened is BMGI Corporation is

4    a  successor  company  to  Evergreen.   It's  not  the  same

5    company, they are still two separate entities, there still

6    is Evergreen and there still is BMGI Corporation.

7              THE COURT: Well, how can you be a successor then?

8              MR. PAPPALARDO: Well, it's called a Sub F reorg

9    and --

10             THE COURT: A Sub --

11             MR. PAPPALARDO: A Sub F reorg, a reorganization,

12   and really what happens is -- and I guess to explain it on

13   a business level is if you know that you are trying to not

14   defraud everybody but take everybody, have the same debts as

15   before and you want to make sure you're the same company,

16   because once you start the wheels of an Article 9 sale if

17   you're  going  to  back  out  there  might  be  people  who  are

18   bidding saying that there's collusion, things like that, so

19   you go forward with the sale.

20             And when you go forward with the sale, now you

21   have to obviously face potential liabilities.  Well, if Mr.

22   Silverstein treats this as a true sale then there is a tax

23   burden  on  the  sale.  Mr.  Silverstein  was  not  the  only

24   shareholder of Evergreen, there was also an Employee Stock

25   Ownership Program, so if they're wiped out there's potential

1    liability for that.  So obviously, I think Mr. Silverstein

2    testified he didn't want to get sued by the ESOP by wiping

3    out the ESOP of Evergreen, didn't want the tax burden of a

4    sale, didn't want the tax burden of a debt forgiveness from

5    First Capital Partners, so under the IRS Code under what's

6    called a Sub F reorg, which is basically the equivalent of

7    a  statutory  merger,  is  you  basically  treat  these  two

8    companies  exactly  the  same.   And  if  you  look  at  BMGI

9    Corporation's minutes it says we are a successor, we assume

10   all debts, we assume all collateral, we assume all security

11   interests, including Ms. Kirzhner.

12         Now, really where it impacts this motion and where

13   we're going is, first of all, you never heard Mr. DeVine say

14   we were unaware of BMGI Corporation, you didn't hear it.

15   When they filed a motion to disqualify me they even, you

16   know, showed stuff on BMGI Corporation.  They produced

17   documents on their own, not from us, on their own about BMGI

18   Corporation.  Evergreen is a world-wide company.  There are

19   a large number of entities which they knew about.  And they

20   mentioned it, a large number of entities.  BMGI Corporation

21   is not a parent to Evergreen, it's a successor, it's a

22   totally separate entity, it's a -- it's assumed all of the

23   debts, it's assumed all of the liabilities, which, frankly,

24   should make Ms. Kirzhner happy.

25         You know, you heard Mr. Silverstein testify when

1    he   testified   on   Tuesday   saying   that   she   is   fully
2    collateralized.  The agreement, the stock purchase agreement
3    in this case states that the value of the company as a whole
4    as determined by the company's independent auditors, plus
5    any replacement collateral, shall be equal to at least what
6    she's owed under the note.  We are taking the position here
7    -- and we've never taken an inconsistent position -- that
8    she   is   fully   collateralized,   that   this   company,   BMGI
9    Corporation, which is a successor company, again filed with
10   the IRS, filed with -- you know, you have the ESOP with
11   everybody showing that we are the same exact company, that
12   she  is  fully  collateralized,  she  has  the  security  in  the
13   stock, that, you know, this is the same company for every
14   purpose and respect.
15          Now, where it comes down to this motion is five
16   weeks, and you've never heard about that time, but after
17   this protective order was lifted and after the motion to
18   dismiss was ruled upon they waited five weeks, they did
19   absolutely nothing, and why that's important is in February
20   when this scheduling order was set forth they advised this
21   Court, I need an valuation expert.  We're like, great, you
22   need a valuation expert.  They chose to sit on their hands
23   and do nothing for five weeks.  To this date, just to make
24   this clear, they have never served BMGI Corporation with a
25   single subpoena asking for its financial records.  They know

1      it's a separate entity, they know it's in Delaware.   They

2      never chose to even sue BMGI Corporation.   They knew about

3      it, they just chose not to.

4           What this comes down to -- and in Ms. Kirzhner's,

5      you know, deposition, she said it over and over, she never

6      wanted her stock back under any circumstance.   She does not

7      -- it's very unusual that you have a company coming up here

8      and saying we're a successor company, we're assuming all of

9      the obligations for Evergreen under the note.   The stock

10     purchase agreement even says that, you know, that any

11     successors of Evergreen are bound by it.   It's very unusual

12     to have somebody saying we don't want you to be a successor,

13     but that's really what you have.   They're not the same

14     entities, but they are for their legal purposes of this

15     lawsuit, they are -- they are the same for liability

16     purposes. Any liability against Evergreen, I'm saying it on

17     the record now, is a liability of BMGI Corporation, but

18     they're separate entities.

19          The Evergreen and BMGI Corporation, they have

20     entities all over the world.   They have a number of

21     different operating entities, they've never served any of

22     those, they never got their financial statements.   They're

23     not complaining about, for example, not getting China's

24     financial statements, they've never served a request.   We've

25     never said we're not going to make them go through their

1      hoops of serving in a foreign country.  I'm telling you on

2      the record, if they want China's financial statements, we'll

3      get them to them.  But they want to create this appearance

4      that they were unaware of BMGI Corporation, but he won't sit

5      up here and say we'd didn't know it.  They knew about these

6      companies, they decided to wait five weeks to conduct any

7      discovery, and to this day they still have not served BMGI

8      Corporation with any request for financial statements.  To

9      this  day  they  have  not  requested  BMGI  Corporation's

10     corporate minutes.  To this day -- and, again, we're talking

11     about the valuation of a company – BMGI Corporation has

12     approximately $15 million in revenue from January 1st to

13     October of this year, in the first three quarters, we're not

14     talking about an insolvent company.

15          Evergreen  --  you  know,  as  you  know,  there's

16     different definitions of insolvency.  If you have a huge,

17     you know, million-dollar judgment, you're unable to pay your

18     debts when due, it doesn't mean your assets and your value

19     is less than that.  In this case in September of 2009 there

20     was over $5 million paid for this company.  Again, and there

21     was less than $4 million owed under the note.

22          So when we circle full around is on this issue of

23     expert witnesses.  They knew they needed this expert for the

24     purpose of valuation.   There is no excuse, and they're

25     giving -- they're saying no reason why they waited five

1    weeks to serve Evergreen with any discovery.  They're not

2    standing up here and saying any reason why they never served

3    to this day BMGI Corporation with discovery.  And again, the

4    financial statements are easy, it's not difficult to find a

5    financial statement.  If they couldn't find them and they

6    said   that   they   couldn't   find   Evergreen's   financial

7    statements, pick up the phone and call me, say show me the

8    exact numbers where Evergreen's financial statements are,

9    I'll tell you.

10           And when they say they weren't produced with rhyme

11   or reason, there was rhyme or reason.  They are -- and if

12   you look at them, they do go in order.  I mean, I went

13   through them.  I mean, they're not -- they're not labeled

14   and Bates stamped saying, you know, these next hundred

15   documents are here, but they all do go in logical order and

16   most of them are actually in chronological order because of

17   how they're pulled.  But, again, where we're coming to is

18   why didn't they serve Evergreen -- why didn't they serve

19   BMGI Corporation if they needed its financial statements?

20   Why didn't they serve Evergreen five weeks later so they

21   would still have enough time?

22           You know, why did -- you know, they didn't have to

23   wait to receive the answer in this case to serve this simple

24   pointed  discovery  request  of,  Evergreen,  give  me  your

25   financial statements.  They didn't have to wait till this

1    date today even to serve BMGI Corporation with a subpoena

2    and say give me your financial statements, I need to do a

3    valuation.

4            Do you have any further questions for me, Your

5    Honor?

6            THE COURT: I don't think I do.  Thank you.

7            Mr. Glasser?

8            MR. GLASSER: Your Honor, the only point that I

9    want to add is that I think the key question the Court needs

10   to address today is who is suing whom and for what and what

11   discovery is needed in order to prove those claims.  I think

12   that the essence of the case is that Mr. Sweetbaum's firm

13   believed that they had was a fraudulent transfer case, and

14   I think that when he stood up here during our scheduling

15   conference and said, yes, I definitely want a valuation

16   expert, I think what he was getting at is I need to know the

17   value of the company and, you know, the value of the assets

18   that were transferred and so on, so he clearly contemplated

19   that at the time.

20           What I'm not hearing today is a cogent theory

21   under which plaintiff intends to move forward and the

22   evidence that she's missing that is going to require some

23   additional time in order for her to get expert testimony.

24   The only thing that comes close is there's a covenant in the

25   stock purchase agreement that says the value of the company

1     must remain above the remaining stock that secures this

2     note, because Mr. Silverstein agreed to pay her personally

3     and the value of the company had to remain at a certain

4     level, otherwise, that would be a breach of the agreement.

5          So there may be some question there, but I'm not

6     even hearing that.  And if there -- let's assume that for

7     one day the value dips below the 3 million bucks or so that

8     Ms. Kirzhner is owed, one day, what's her damage?  And is

9     that theory of this case and do we really need to delay the

10    adjudication of this matter so that, you know, we can go

11    through months of discovery just to get to that issue.  It's

12    important to know who's suing whom and for what and why do

13    we need to go through this discovery process and do we

14    really need the time to bring experts in to testify about

15    anything.

16              THE COURT: Thank you.

17              Mr. DeVine, anything more?

18              MR. DEVINE: Thank you, Your Honor.

19         I will represent to the Court that the flow chart

20    that's in front of you is something that evolved in our

21    office as a result of a review of the documents.  That was

22    not known to us prior to going through the documents.

23         I don't understand what Mr. Pappalardo was trying

24    to say concerning BMGI Corp. being a successor entity, a

25    separate entity but the same entity.  It doesn't make sense,

1   it's talking out of both sides of the mouth, and it  -- as

2   I stand here I'm at a loss as to how BMGI Corp. can say it's

3   a successor entity but was not obligated to respond to

4   discovery propounded on its prior entity, which is the same

5   company but a different company.

6        At a minimum, we should have the opportunity to

7   review BMGI Corp.'s information.  I'll represent to the

8   Court that the counsel for the parties have conferred, or

9   are in the process of conferring concerning a motion to

10  amend the complaint to add BMGI Corp.  If BMGI Corp. is in

11  fact a successor entity, it is a proper party in interest to

12  this case, in which case a subpoena on BMGI Corp. is not the

13  appropriate remedy but a disclosure process followed by

14  discovery. I hope to have the motion to amend filed

15  unopposed within the next week, but I can't say to the Court

16  that that is going to be happening.

17       Concerning the documents that go in chronological

18  order.

19       THE COURT: Go through the organization again as

20  you understand Mr. Pappalardo to assert.

21       I'll give you another chance, Mr. Pappalardo.

22       MR. PAPPALARDO: I'm sorry, I thought you said my

23  name.

24       MR. DEVINE: The scheme that I understand it to be

25  is that BMGI, Inc. was foreclosed upon by DSI and that DSI

1    sold the assets and complete value of BMGI, Inc. to BMGI

2    Corp.  The result of that transaction as a legal matter in

3    terms of corporate forms and entities cut plaintiff, Ilona

4    Kirzhner, out of the assets and interests of BMGI Corp.

5    What we've heard today is that there a Sub F

6    reorganization under the IRS Code, the Sub F reorganization,

7    we learned from defendant Silverstein in his deposition,

8    occurred during the pendency of this lawsuit, and the Sub F

9    reorganization documents were not produced or disclosed and,

10   as you saw, pursuant to Local Rule 7.4, there was no

11   amendment to Evergreen's position that Evergreen is the

12   appropriate named party in this case.

13        Concerning Mr. Pappalardo's contention that they

14   are at once separate entities but successor entities, I'll

15   leave it to him to explain to the Court what he means by

16   that and how BMGI Corp. is not obligated to be producing

17   documents in a subpoena -- or in written discovery requests

18   to BMGI, Inc., if BMGI Corp. is in fact a successor entity.

19        The last matter, and I'll be brief, is the issue

20   of the five weeks between July 23rd and August 31st, July

21   23rd being the court order, August 31st being the date of

22   the written discovery responses.  Recognize that in the

23   middle of that time frame the answer was filed by the

24   defendants.  It wasn't a five-week period, it was a 24-day

25   period after which the answer was served, or filed, and we

1    served our written discovery.  I'll represent to the Court

2    that -- or I'll request that the Court find that 24 days in

3    a case of this magnitude, multi-million dollars, with the

4    documents and information and varying claims for relief,

5    that waiting 24 days to serve written discovery on a party

6    after the answer was filed is an unreasonable delay.

7         `    THE COURT: Now, we went through a schedule which

8    I might -- which I am entertaining, discovery cutoff of

9    March 1st, dispositive motions of March 1st, expert

10   disclosures of January 6th, rebuttal experts of February

11   7th, and you said, okay, provided we get documents in a

12   timely way.  What documents is it that you need a timely

13   way?

14        MR. DEVINE: We require BMGI Corp.'s financial

15   documentation, which will include their general ledger,

16   since they came into existence in the third quarter of 2009,

17   consolidated financial statements; which are the documents

18   that in the defendants' response brief say are the key

19   critical documents that are short and brief, that don't

20   require volumes to understand the assets of the company;

21   cash flow statements; and then the 2009 tax returns for

22   Evergreen if they exist.

23        And then at the same time we need anything from

24   Evergreen -- if Evergreen is in fact a different corporation

25   to entity than BMGI Corp. -- concerning their consolidated

1    financials, general ledger, et cetera, following the August
2    2009 documents which was the cutoff of the documents that
3    were produced.  So it's two tracks, we need the BMGI Corp.
4    financials and we need Evergreen since 2009.
5            THE COURT: And are there outstanding requests for
6    those?
7            MR. DEVINE: No, there's a motion to compel which
8    was filed yesterday which handles part of the request.  But
9    Mr. Glasser and I have been conferring and Mr. Glasser's
10   client Evergreen was not a subject to the motion to compel,
11   because I believe Mr. Glasser and I have an opportunity to
12   confer and resolve the issue without court intervention,
13   though I might require court intervention concerning a
14   deadline of some kind.
15           THE COURT: So, Mr. Pappalardo, go through the
16   corporate organization as you argue it exists.
17           MR. PAPPALARDO: The corporate -- Your Honor,
18   again, the sale took place in September of 2009 of
19   Evergreen's assets, it was purchased by BMGI Corporation, a
20   Delaware --
21           THE COURT: Well, let me back up.  There was an
22   obligation to Ms. Kirzhner from Inc., correct?
23           MR. PAPPALARDO: There was.  Well, first of all,
24   there is no -- Ms. Kirzhner is not a creditor of Evergreen.
25           THE COURT: I know, I want -- I want to do it --

1          MR. PAPPALARDO: It was David Silverstein --

2          THE COURT: -- I want to do it my way.

3          MR. PAPPALARDO: Yes.

4          THE COURT: I want to do it my way.

5          MR. PAPPALARDO: Okay, sure.

6          THE COURT: There was an obligation owed to Inc. --

7     owed from Inc. to Ms. Kirzhner, correct?

8          MR.    PAPPALARDO:    No.    David    Silverstein

9     individually purchased the stock.

10         THE COURT: Is -- does -- is there any successor

11    corporation to Inc.?

12         MR. PAPPALARDO: Well, I want to make it clear,

13    David   Silverstein,   on   the   stock   purchase   agreement,

14    individually purchased the stock.  There was two obligations

15    for   Evergreen,   or   whatever   --   you   know,   we   call   it

16    Evergreen.  Call it Old Co., New Co., if it's easier.  Old

17    Co., Old Co. was a party to the stock purchase agreement and

18    it only had two obligations.  One, the valuation covenant,

19    and, two, to act in good faith.  Every other obligation in

20    the   stock   purchase   agreement   is   David   Silverstein

21    individually.

22         The  stock  purchase  agreement  had  a  clause  in

23    section 201 that stated that this valuation -- it says:  The

24    valuation   of   Evergreen,   as   determined   by   Evergreen's

25    independent auditors, plus the value of any replacement

1    collateral -- so it contemplated that there might be

2    different collateral -- shall be at least the unpaid

3    purchase amount of the stock. Evergreen agreed to be bound

4    by that clause.

5           The agreement also states that the agreement,

6    including Evergreen's obligations, are -- are any successor

7    of Evergreen is subject to it at Section 12 of the stock

8    purchase agreement. So what we have here is we have an

9    agreement with a valuation covenant that contemplates both

10    that it's not just Evergreen, it's the value of any

11    successor, plus it's the value of any replacement

12    collateral.

13           In this case -- again, I just want to make this

14    clear, is Mr. DeVine and Mr. Sweetbaum's law firm was 100

15    percent aware of BMGI Corporation. They knew that they had

16    this November 1st expert witness discovery deadline, and

17    they set the schedule. Mr. Silverstein didn't delay his

18    deposition, they did not want to depose him until November

19    15th, that's 15 days after the expert witness deadline.

20    They could have asked to depose him before. And they said

21    they didn't learn things, they should have asked for his

22    deposition right away, they should have served written

23    discovery right away.

24           But again, BMGI Corporation is a successor

25    company, it's not a parent, it shouldn't be disclosed on

1    that document.   BMGI Corporation doesn't own Evergreen.

2    Once we had the sale, and this wasn't something that's newly

3    created in 2010, in 2009, once you did the sale, everything

4    was put in process, all of the documents were put in process

5    to create and have BMGI Corporation be a successor.   They

6    knew that BM -- they knew that BMGI Corporation was

7    operating this business, they knew it, they saw the website,

8    they produced stuff in the motion to disqualify that this

9    business was still existing, they produced it in their own

10   discovery to us that this BGMI Corporation, they just chose

11   not to serve any discovery on BMGI Corporation.

12        I mean, you would think that if you're bringing a

13   claim and you know that there's a new business operating and

14   you know that there's a successor business and you know that

15   somebody had purchased the assets, which is all throughout

16   their complaint, and they know that -- they know that a

17   company purchased it, you would think they would have named

18   it in their original complaint.   They did not want to

19   because we are in the very unique and unusual situation that

20   you actually are going to hear a party argue that there is

21   not a successor.   She does not want to be a successor, she

22   does not want BMGI Corp. to be a successor because she does

23   not want her remedy, which is take the stock back, even

24   though the stock has a value.

25        Now, to come up here and pretend that we had no

1      idea that BMGI Corporation was a successor, we had no idea

2      that BMGI Corporation existed, we had no idea that we didn't

3      get BMGI Corporation's financial statements when they didn't

4      subpoena them, they didn't sue them, they knew all this.

5              THE COURT: So who is BMGI Corp. a successor of?

6              MR. PAPPALARDO: Evergreen --

7              THE COURT: And –

8              MR. PAPPALARDO: Which is -- which is Breakthrough

9      Management Group, Inc., which later changed its name to

10     Breakthrough Management Group International, Inc., which

11     later changed its name to Evergreen Industries, Inc.

12             Evergreen –

13             THE COURT: So if this -- if a production request

14     is served on BMGI, Inc., then Corp. would have an obligation

15     to respond?

16             MR. PAPPALARDO: They're separate legal entities,

17     Your Honor, one's in Delaware, one's in Colorado.

18             THE COURT: But one is a successor to the other?

19             MR. PAPPALARDO: It's a -- it's a successor for the

20     purposes of all liability, but it was not a statutory merger

21     where they were turned into one for the purpose of entities.

22     They still separately exist, they're not parents, they're

23     not -- they're not -- there's no parent-child relationship.

24     They are like this:  They are two companies and they both --

25     by the way, they have the same exact stock ownership.  Just

1    to clarify, David Silverstein personally owns 95 percent,

2    and this is where it's an important fact, the other owner of

3    both of them is the Employee Stock Ownership Plan.   Now,

4    what's important about that, by the way, is the Employee

5    Stock Ownership Plan, which is, you know, like a trust in

6    ESOP, which is a trust, is employees -- are employees of

7    Evergreen who never worked for BMGI Corporation, ever.   Some

8    of them were fired before or terminated before or quit

9    before, so these are two separate legal entities.

10        Now, again, if they claim today that they didn't

11   know that, you know, what the structure is, then they should

12   have scheduled David Silverstein's deposition beforehand if

13   they had questions, but they knew about this new company

14   operating.

15        THE COURT: They are two separate organizations but

16   they have the same ownership, the same assets, and the same

17   liability?

18        MR. PAPPALARDO: They -- slightly -- they have the

19   same exact ownership, identical, no different ownership.

20   They have -- BMGI Corporation purchased -- or acquired --

21   all of Evergreen's assets.   So Evergreen does not have the

22   assets that BMGI Corporation has.   BMGI Corporation assumed

23   all of the liabilities.   So every creditor, everything, it

24   assumed and took it all on.

25        Now, again, they knew about this new company, they

1    knew about this new operation, they just chose not to sue or

2    subpoena.   They chose not to schedule Mr. Silverstein's

3    deposition until more than two weeks after the expert

4    witness disclosure deadline.  If they had questions about

5    their ability to go in and get -- you know, to do a

6    valuation report, which, by the way, as I suggested in our

7    motion, I don't think they want a valuation report, I truly

8    don't, because this company at all times has been worth, you

9    know, well in excess of what she's owed under the note.

10   That, you know, whether you might face a million dollar

11   judgment and threaten to file bankruptcy, it doesn't mean

12   your assets -- I mean, we have a purchase here for over $5

13   million.   Mr. Silverstein put up, you know -- Mr.

14   Silverstein and other people put up their own money to make

15   sure that this transaction took place.  And again, when you

16   talk about good faith to preserve her collateral, and we're

17   -- I mean, I understand the concepts of law of the case,

18   Your Honor, I'm telling you on the record, Evergreen -- I'm

19   sorry, BMGI Corporation has assumed all of Evergreen's

20   liabilities, all of the security interests.

21        Again, Ms. Kirzhner didn't have a security

22   interest, let's make this clear, in any of Evergreen's

23   assets, she never did.  She never filed a UCC-1 on it, the

24   stock purchase agreement.  They're not arguing that Ms.

25   Kirzhner had any security interest in Evergreen or BMGI

1    Corporation, they can't, because, again, Mr. Silverstein

2    purchased it alone.  Their only security interest was in the

3    stock that Mr. Silverstein owned, stock which she chose not

4    to take possession of, but, you know, she did file a UCC-1,

5    but she had no security interest in anything of Evergreen.

6          And so just to clarify on this -- again, this is

7    -- I'm not trying to talk out of both sides of my mouth, but

8    this is the way that it is, is you have a Colorado entity

9    that still exists, you have a Delaware entity that still

10    exists, we didn't hide the fact that this company exists,

11    they knew about it, and you have separate legal persons

12    under the law in different jurisdictions.  And if they

13    wanted to conduct a valuation, if they truly do, which I

14    question, but, if they truly do, then serve BMGI Corporation

15    with a subpoena.  Or, you know what, even talk to us and

16    say, you know what, give me some documents on BMGI

17    Corporation.  Or when they draft written discovery saying we

18    want -- we want written discovery on Evergreen and any

19    successor company, or we want any documents on BMGI

20    Corporation, you know, serve it on us.

21          But, you know, they are separate, they knew it was

22    separate, they knew that they were legally separate people,

23    and under the doctrine of successor liability, even if we

24    wouldn't have filed these things in 2009 stating that we're

25    a successor company, Your Honor, is there is -- there is

1    obviously a large body of case law that basically says that

2    when you purchase a company and you have the same officers,

3    the same directors, the same shareholders, they're going to

4    be deemed to be a successor company.  That doesn't mean

5    they're deemed to be the same entity, it just means that

6    they're deemed to be a successor for the purposes of

7    liability.  But that same successor liability does not make

8    them a party to a lawsuit automatically, which is I assume

9    why now they want to go in and add them to the complaint.

10   I mean, if they were saying that successor company means

11   same entity there would be no need to add BMGI Corporation

12   to the complaint.

13        Lastly, Your Honor, I guess at the end of this I'd

14   really like to be heard with respect to the motion to compel

15   and the duty to confer.  If you'd like me to do that

16   after --

17        THE COURT: When we get to it.

18        MR. PAPPALARDO: Sure.

19        MR. GLASSER: Your Honor, the point that I want to

20   make is the one that I raised earlier, and let me try to

21   simplify this case as much as I can.  Mr. Silverstein bought

22   stock that Ms. Kirzhner used to own, that was a deal between

23   the two of them.  He agrees to pay her 5 million bucks, it's

24   his personal obligation.  The only reason Evergreen is

25   linked at all is because the stock of Evergreen is her sole

1    collateral.  Now –

2              THE COURT: Sole remedy.

3              MR.  GLASSER:  Yes,  and  her  sole  remedy.    And

4    remember, that's a key piece of this case, because she has

5    refused from the outset to exercise her sole remedy and take

6    the stock back.  Mr. Silverstein sat down with her in D.C.

7    at  the  time  he  was  contemplating  filing  bankruptcy  for

8    Evergreen and said, Ilona, you need to be a shareholder in

9    this  company  because  if  you  don't  we're  going  to  file

10   bankruptcy and it's going to be a mess for you, take your

11   stock back.  She says, nope, I view this as an investment,

12   just like any investment in the stock market, companies go

13   up, companies go down, we'll just see how this all plays

14   out.

15             The only reason that Evergreen is a party here,

16   and I said this the first time, Evergreen had the obligation

17   under the stock purchase agreement to maintain its value at

18   a level as determined by its auditors that was equal to the

19   amount that Mr. Silverstein owed to Kirzhner, okay?  That's

20   the only commitment so that her stock stays on par with

21   what's she's owed so she has meaningful collateral, that's

22   the only reason that Evergreen is in the case.

23             In a typical -- now, remember, they sued for fraud

24   when this case was filed, common law fraud, and we came in

25   and said who represented -- who lied to you, who concealed

1    anything from you, where's your claim?  And the judge in

2    response to that argument said, you know, I really think

3    it's a fraudulent transfer claim.  I think what plaintiff is

4    trying to say, even though she said fraud she really meant

5    fraudulent transfer.   So here we find ourselves trying to

6    resolve a discovery dispute where, quite frankly, Judge, I

7    don't understand the claim, okay?  In a typical fraudulent

8    transfer claim, let's say that Silverstein knows he owes her

9    3 million bucks and he starts transferring his house, his

10   cars, he starts giving stuff away for less than reasonable

11   equivalent value, that's a normal fraudulent transfer case.

12   That is not what we're dealing with here.  We're dealing

13   with a case where he has a personal obligation to Kirzhner

14   under the stock purchase agreement and the question is

15   whether or not she can exercise whatever remedy she wants.

16   Can she sue him, can she exercise her right to take the

17   stock back, if so, what is the stock worth?  And I think

18   what Mr. Pappalardo is saying to you is she can take her

19   stock back today.  You know, he holds stock in a successor

20   entity so she's fully collateralized.

21        So what does she want?  Where I'm struggling with

22   this discovery issue is I do not understand what Mr. DeVine

23   needs in order to prove his case, that's where I'm coming

24   from.   So if we're going to delay this case -- and the

25   schedule that he's proposed is going to do so very

1    significantly -- it would be helpful to understand who he's

2    suing  and  for  what  and  why  he  needs  the  information.

3    Because it's not a normal fraudulent transfer case where you

4    look  at  reasonably  equivalent  value,  fair  market  value,

5    whatever, I don't hear him saying that at all.  The only

6    thing that I can hear him say at all is we might want to

7    know what Evergreen's value was to determine whether there

8    was a breach at some point, and then my question is, you

9    know, what are the damages and do we really need an expert,

10   and, if we do, why did you wait until now to get an expert

11   in here, you had the documents, and I really don't think

12   it's necessary.

13         So  unless  you  have  any  other  questions  for  me,

14   that's all I have to add.

15         THE COURT: I have no more questions.  Thank you.

16         I'm going to grant the plaintiff's motion for

17   extension of time.  In doing that I find that the plaintiff

18   has  acted  with  reasonable  diligence  and  that  through

19   circumstances  beyond  her  control,  some  attributable  to

20   actions by the defendants, some attributable to the Court,

21   she  was  not  able  to  meet  the  deadlines  for  experts

22   previously set.

23         The  defendants  did  file  a  motion  to  stay  all

24   discovery while the motion to dismiss was pending.  So a

25   delay  in  discovery  during  the  pendency  of  that  motion  to

1    stay must be some -- the defendants must take some

2    responsibility for that.   There was a period of months

3    during which that motion to stay and the motion to dismiss

4    that it was tied to were pending, and I and Judge Arguello

5    must take some responsibility for that.   But none of those

6    things are the plaintiff's fault, and so there was a delay

7    of the case while the motion to dismiss was pending.

8         I don't find the 24 days to be -- to show a lack

9    of diligence.   Even if it's five weeks, I don't find that to

10   be a lack of diligence.   So I think that there is good cause

11   to extend the deadline.   I'm going to extend the deadline

12   even more substantially than the plaintiff requests, but I'm

13   doing it with the expressed statement that I will not extend

14   this schedule again.   So if there are disputes which need to

15   be brought to my attention, they must be brought promptly.

16   I'll set them for hearing quickly and will get them

17   resolved, but this schedule is not going to change.

18        The expert disclosures must be made by March 1st,

19   2011, rebuttal disclosures by April 1st, 2011, the discovery

20   cutoff is April 29th, 2011, and the dispositive motion

21   deadline is May 13th, 2011.   Experts, March 1st; rebuttal,

22   April 1st; discovery cutoff, April 29; dispositive motions,

23   May 13th.

24        There is also the motion to compel discovery filed

25   yesterday, it's document 83, and I have seen the discussion

1    about 7.1A compliance and I have seen the November 9th

2    letter which Mr. DeVine sent to Mr. Pappalardo.  Mr. DeVine,

3    did you call Mr. Pappalardo?

4         MR. DEVINE: No, Your Honor, we exchanged e-mails

5    the next day wherein Mr. Pappalardo said that he did not yet

6    have the opportunity to review the letter, and then there

7    was another on other pending issues that were discussed.  I

8    had the opportunity on the next day to speak with Mr.

9    Glasser.  During that conversation Mr. Glasser advised me

10   that he and Mr. Pappalardo are not the same person, or the

11   same team, and that they represent different parties.  Mr.

12   Glasser represented to me he'd be willing to cooperate with

13   me to reasonably get me whatever discovery I required.

14        On Wednesday morning of this week, yesterday

15   morning, I spoke with Mr. Glasser again.  Mr. Glasser said,

16   we will get you whatever you need, obviously, within reason.

17   I took that to mean that Mr. Glasser was speaking on behalf

18   of himself and on behalf of Evergreen, and at no point

19   during the conversation did Mr. Glasser state I'm authorized

20   to make these same representations on behalf of Mr.

21   Pappalardo.  At the end of the day yesterday after the

22   motion was filed, Mr. Pappalardo contacted me and expressed

23   that he believed that he and his clients fell within the

24   same ambit of cooperation that Mr. Glasser had represented

25   to me.

1          I confess that Mr. Pappalardo demanded that I pull

2     the motion, otherwise, he was going to seek sanctions.  I

3     did not agree to that option.  What I told him was I'm glad

4     to either withdraw the motion or extend deadlines, pending

5     you are actually willing to comply with me.  Mr. Pappalardo

6     did not seem to think that was a reasonable concession or

7     compromise, and I did hang up the phone on him when he

8     interrupted me for the third time demanding that I pull the

9     motion or he'll seek sanctions.

10          So that is currently the status of the conferral.

11    My offer remains that I will pull the motion immediately

12    when Mr. Glasser provides the documents which are the

13    subject of the motion to compel, and I will waive all rights

14    to sanctions if indeed Mr. Pappalardo will agree to comply

15    as Mr. Glasser stated that Mr. Glasser was willing to

16    comply.

17          THE COURT: Mr. Pappalardo?

18          MR. PAPPALARDO: Thank you, Your Honor.

19          I have a copy of Mr. DeVine's letter if you'd like

20    to see it or –

21          THE COURT: I have the letter.

22          MR. PAPPALARDO: So just to set the stage, on

23    November 9th at 4:20 p.m. and at 4:09 p.m., respectively,

24    Mr.  DeVine sent us a three- and four-page letter, not

25    saying what documents he's missing, objecting to our

43

1    objections to the discovery response.  Now, it's important

2    to remember that November 9th is an important date, because

3    that's Tuesday, the next day depositions were starting.  We

4    had depositions of Mr. Schafer, and then we had depositions

5    on Monday, Tuesday and Wednesday scheduled for Mr.

6    Silverstein, Ms. Kirzhner and somebody else.

7            So I have a copy of the letter, which is -- may I

8    approach, Your Honor?

9            THE COURT: You may.

10           MR. PAPPALARDO: On November 9th, which is the same

11   exact day that Mr. DeVine sent us document, this long

12   document, not saying I want document X, Y, Z, but just

13   objecting to objections, Mr. Glasser sends an e-mail to him

14   at 5:40 p.m. saying, I don't have time to review this

15   because we're in depositions, basically just to paraphrase,

16   but if you have a dispute, let's talk about it, but we'll

17   respond to you next week, which is this week.

18           I also sent him an e-mail saying, Tom, I want to

19   echo Mr. Glasser's comments.  You know, if you have a

20   discovery dispute, great, I'll respond to you in detail.  I

21   don't have time to respond to you right now, but if we have

22   a dispute, let's hold off Mr. Silverstein's deposition.  You

23   know, we can easily reschedule, because I don't want him to

24   be deposed twice.

25           Now, I'm in depositions with Mr. Sweetbaum on

```
1    Wednesday, who's not here, he doesn't mention anything about
2    a motion to compel.  I'm in depositions with him on Monday,
3    he doesn't mention anything with the motion to compel.  I'm
4    in depositions with him on Tuesday and on the record he asks
5    for  certain  documents  and  we  tell  him  we'll  get  you
6    everything.  And then there's a phone call with Mr. Glasser
7    Wednesday when we're finally done with depositions, we've
8    been in depositions, we had a deposition get canceled on
9    Wednesday, but -- and Mr. Glasser tells Mr. DeVine, you're
10   going to get the documents.  He doesn't call me up to say,
11   hey, Marc, are you also going to go for the documents?  We
12   didn't get our time to respond to his letter.  Again, he
13   knows we're in deposition, instead, he's preparing this 19-
14   page -- you know, this 19-page motion to compel.  And
15   there's a reason, Your Honor, and the reason why you have
16   this  19-page  motion  to  compel  beforehand  is  when  Mr.
17   Schafer's  deposition  was  stopped  there  was  some  very
18   egregious things that came out of that, some very egregious
19   ethical violations, and it's not just, you know, Mr. Schafer
20   admitted  on  the  stand  he  violated  an  ethical  rule  by
21   contacting  my  client,  he  misrepresented,  and  we  have
22   documents showing that.  They knew that we have a number of
23   motions coming forward regarding that, and I believe this is
24   just  a  preemptive  strike  to  basically  deflect  attention
25   away.
```

Case 1:09-cv-02858-CMA -BNB   Document 111   Filed 12/17/10   USDC Colorado   Page 45 of 48

1         You know, we don't have a discovery dispute.   If
2    they want documents, let me go through here and read them.
3    As Mr. Glasser told him yesterday before he filed his
4    motion, this is before, if you want documents, we'll get
5    them to you, we're not going to hold anything back.   But
6    they still filed that motion.   Well, how can you file a
7    motion go compel when, first of all, I didn't get a chance
8    to formally respond?  And I said I would respond this week.
9    Mr. Glasser didn't get a chance to formally respond.   And
10   the only thing they hear is Mr. Glasser on Wednesday on the
11   phone stating that you're going to get the documents and me
12   telling Mr. Sweetbaum on Tuesday, and this is on the record
13   in a deposition, we'll get you documents, we're not going to
14   hide them.

15        Now, also, I didn't threaten to file a sanctions
16   motion, I also want to make that clear.  What I said was I'm
17   going to bring it to the Court's attention tomorrow morning.
18   I leave it to this Court to do whatever this Court thinks is
19   appropriate, but the rules on duty to confer are there for
20   a reason.   We have a 19-page motion, I don't even think
21   we're going to have a discovery dispute, but, if we are, you
22   have to give me a chance to figure out exactly what you want
23   and I'll get you the documents.

24        THE COURT: The motion to compel is denied for
25   failure meaningfully to confer under Rule 7.1A.   In a case

1    called Hoelzel, H-O-E-L-Z-E-L, 214 F.R.D. 634, I talked

2    about the requirement of Rule 7.1A, and I said this:   The

3    language of  Rule 7.1A is important.  It requires that a

4    moving party before filing a motion to confer, or make a

5    reasonable effort to confer.   The requirement is not

6    satisfied by a party making a demand for compliance.   To

7    confer means to hold a conference, compare views, consult

8    together.  The rule is not satisfied by one party sending a

9    single e-mail to another party, and particularly not where,

10   as in that case, the e-mail merely indicates an intention to

11   file a motion to compel and does not suggest any negotiation

12   or compromise.  Nor in my view would a single letter or a

13   single voice message satisfy the requirements of Rule 7.1A.

14           Rather, to satisfy the requirements of Rule 7.1A,

15   the parties must hold a conference, possibly through the

16   exchange of correspondence, but preferably through person-

17   to-person telephone calls or face-to-face meetings and must

18   compare views and attempt to reach an agreement, including

19   by compromise, if appropriate.

20           That was not done here.  I am aware that Rule 7.1A

21   sometimes is used as a sword to prevent discovery and the

22   conference period is stretched out interminably so that

23   there becomes a scheduling problem.  I don't require that,

24   what I require is a meaningful conference.  What I think is

25   the right way to go about it, it's not mandatory, but the

1     right way to go about it is to send a letter, not unlike Mr.

2     DeVine's letter of November 9, and then within in a few

3     days, certainly within a week, to hold a conference, face-

4     to-face preferably, if not, then by telephone, and to try to

5     work out the discovery problem.

6          If that can't be done and if there is this good

7     faith effort to try to work it out, to try to compromise,

8     then that's when a motion can be filed, but that's not what

9     happened here.   There appears to me to be some lack of

10    clarity about whether Mr. DeVine must confer with both Mr.

11    Pappalardo and Mr. Glasser, or whether they are speaking as

12    a team or not, work that out, figure it out.   I don't care

13    what the answer is, know how it works.

14         There also appears to be -- and it's been apparent

15    to me before in this case -- a failure of the lawyers to

16    assume   their   truly   professional   position   of   being

17    intermediaries and instead they seem to be taking on the

18    causes of their clients as their own.   You are professionals

19    and you are intermediaries and that carries with it an

20    obligation to remain in some ways above the fray, while at

21    the same time zealously representing your client.   I expect

22    you to show respect to one another.   I expect that not

23    because of who the other people are but because of who you

24    are.

25         Thank you very much.   We're in recess.

1          THE CLERK: All rise.  Court is in recess.

2

3          (Whereupon,  the  within  hearing  was  then  in

4     conclusion at 9:34 a.m. on November 18, 2010.)

5

6          I  certify  that  the  foregoing  is  a  correct

7     transcript, to the best of my knowledge and belief, from the

8     record of proceedings in the above-entitled matter.

9

10         /s/ Bonnie Nikolas                November 30, 2010

11         Signature of Transcriber              Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305