**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:09-cv-2858-CMA-BNB

ILONA KIRZHNER,

    Plaintiff,

v.

DAVID SILVERSTEIN, an Individual,
EVERGREEN INDUSTRIES, INC., f/k/a BREAKTHROUGH MANAGEMENT GROUP INTERNATIONAL, INC., f/k/a BREAKTHROUGH MANAGEMENT GROUP, INC., a Colorado corporation,
DAVID SILVERSTEIN INVESTMENTS, LLC, a Colorado limited liability company, and
DSI INVESTMENTS, LLC, a Colorado limited liability company,

    Defendants.

---

**PLAINTIFF'S RESPONSES TO DEFENDANT DAVID SILVERSTEIN INVESTMENTS, LLC'S FIRST SET OF WRITTEN DISCOVERY TO PLAINTIFF**

---

    Plaintiff Ilona Kirzhner ("Plaintiff"), by and through her attorney, Thomas L. DeVine, Jr., Esq., hereby submits Plaintiff's Responses to Defendant David Silverstein Investments, LLC's First Set of Written Discovery to Plaintiff.

**GENERAL OBJECTIONS**

    A.    Objection is made to the extent the discovery seeks to impose a duty to respond beyond that provided in the Federal Rules of Civil Procedure.

    B.    Objection is made to the extent the discovery requests are vague, overbroad, ambiguous, or unduly burdensome.

    C.    Objection is made to the extent the discovery seeks information or materials protected from disclosure under the attorney-client privilege, the protection for work-product, or the protection for materials prepared in anticipation of litigation or for trial. Disclosure will not be made of such information or materials.

    D.    Plaintiff objects to each discovery request which is not limited in time so as to be

1        **EXHIBIT 1**

reasonably related to the issues pertinent in this case, on the ground that it is overly broad, unduly burdensome, and oppressive, and seeks information neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

   E. Discovery and investigation in this matter is ongoing. Plaintiff reserves the right to supplement its responses to the discovery requests. These responses are based upon information now known to Plaintiff; Plaintiff reserves the right to rely on any facts, documents or other changes in the law that may develop or come to Plaintiff's attention subsequent hereto. Plaintiff's responses to these discovery requests are therefore set forth without prejudice to Plaintiff's right to assert additional objections or supplemental responses, should Plaintiff discover additional documents, facts, or grounds for objection. Plaintiff reserves the right to amend, modify, or supplement these responses at any time prior to trial.

   F. Each response to every Interrogatory, Request for Admission and Request for Production of Documents is subject to the General Objections set forth above. These objections form a part of the response to each and every other request and are set forth herein to avoid the duplication and repetition of restating them for each response. These General Objections may be referred to specifically in a response to certain discovery requests for the purposes of special emphasis or in the interest of clarity. However, the failure to specifically incorporate a General Objection in a response shall not be construed as a waiver thereof. Similarly, the assertion of additional objections in a response to any particular discovery request shall not be construed as a waiver of any of Plaintiff's General Objections.

### OBJECTION TO BLOCKBUSTER AND CONTENTION DISCOVERY REQUESTS

   Plaintiff objects to "Blockbuster" or contention discovery requests that request Plaintiff to identify "each and every" instance, circumstance, or piece of evidence responsive to any interrogatory or request, as being overbroad and constituting an impermissible and presumptively unreasonable "blockbuster" interrogatory. Hilt v. SFC, Inc., 170 F.R.D. 182 (D. Kan. 1997), or to the extent the request is a premature contention interrogatory. In re Convergent Technologies, 108 F.R.D. 328 (N.D. Cal. 1985); Fischer & Porter Co. v. Tolson, 143 F.R.D. 93 (E.D. Pa. 1992).

### INTERROGATORIES

   **Interrogatory No. 1:** Describe in detail everything that the "Kirzhner's Representative" (identified in paragraphs 26 and 29 of YOUR Complaint) has told YOU was said by any person during the September 24, 2009 conversation described in paragraphs 26 and 29 of YOUR Complaint.

   **Response:** Plaintiff objects to this interrogatory as impermissibly seeking information protected by the attorney/client privilege. At all times material to this matter, "Kirzhner's Representative" was acting as Plaintiff's attorney. Any communications between the two of them necessarily included content concerning mental impressions, legal theories, courses of

2

conduct, and opinions that are expressly barred from discovery. Subject to and without waiving any objection, all non-privileged information responsive to this request is contained in correspondence from Tim Schafer to Ilona Kirzhner, dated September 24, 2009, identified by bates numbers KIRZ00145-46, produced herewith. Please see the introductory statement to the below Responses to the Requests for Production concerning production of this document.

**Interrogatory No. 2:** Identify each current or former employee of EVERGREEN other than SILVERSTEIN that YOU (which includes YOUR agents, servants, and attorneys) have COMMUNICATED with from January 1, 2009 to present regarding Evergreen or the 2009 sale of EVERGREEN'S assets, including the date of the COMMUNICATION, who participated in/were part of the COMMUNICATION, and a description of everything that was said or conveyed by each participant in the COMMUNICATION.

**Response:** Plaintiff objects to this Interrogatory because the request to provide "a description of everything that was said or conveyed by each participant" in any communication that may be responsive is overbroad and unduly burdensome. Without waiving any objection, Plaintiff responds as follows:

When Plaintiff was informed of the "auction" on Sept 17, 2009, she reached out mostly via AIM to several BMGI employees including Jill Mead, Lynda Williams, Luis Ramirez, David Mansfield, and Gayle Howard. With each she asked if they knew what was going on and why this was taking place. It was clear that Jill, Lynda, and Luis did not know anything. She spoke to Gayle and it was clear she had knowledge but refused to provide any substantive information. Ms. Howard merely stated, "You need to call Dave. You just need to call him." In October of 2009 at the DoD conference in Lansdowne, VA, Plaintiff had a 30-minute face-to-face discussion with David Mansfield. At that time he informed her of the following:

1) The stock to which Plaintiff had rights was now basically worthless because David Silverstein had moved assets out of that entity and into other entities.
2) He mentioned a new Delaware company.
3) BMGI was in violation of covenant agreements with its lender(s). He needed to force either one or both of the lenders to change the covenants. Mr. Mansfield, Mr. Pappalardo, and some outside attorneys schemed this faux auction to make Dave himself the senior lender to BMGI.

Since this litigation began, Plaintiff and/or her counsel have spoken to the following people who provided the following information:

**1. Mark Menghini**

<u>Participants</u>: Mark Menghini, Ilona Kirzhner, Charles Westby.
<u>Date</u>: October 22, 2010.
<u>Description</u>: Mr. Menghini stated that he had advised Ms. Kirzhner that he felt he should tell David Silverstein he was going to talk to Plaintiff and her counsel. Mr. Menghini stated that

3

he did so. Mr. Menghini stated that Mr. Silverstein urged him not to talk to us. Mr. Menghini stated that Mr. Pappalardo then called him and told him he was under a confidentiality agreement with BMGI. Mr. Menghini stated that he thinks this confidentiality agreement is one that employees of BMGI were asked to sign when they got hired. He thinks he signed one in 2001 and then another one at some point later. Mr. Menghini was advised to speak to an attorney about the confidentiality agreement. He declined. Mr. Menghini was advised by Plaintiff's counsel that no questions would be asked that would involve any trade secrets of BMGI. Mr. Menghini stated that he agreed to continue with the conversation.

Regarding Mr. Menghini's departure from BMGI, he stated that he left BMGI because he got a job offer with a different company. He was seeking other employment because he thought he could get a better opportunity elsewhere. He left BMGI in mid-April 2010.

Regarding what was said at BMGI regarding its financial condition when he was employed there, Mr. Menghini stated that there were telephone conferences that occurred routinely the last couple of years about the financial state of the company. Layoffs occurred. Mr. Silverstein wanted to assure the remaining employees that even though the economy was not doing well and the business was struggling, it would survive. Mr. Menghini stated that Mr. Silverstein's message was, "We'll get through this."

Regarding the Auction, Mr. Menghini stated that word got around the company concerning the auction that was to take place on September 24, 2009. He thinks an employee saw a notice about the auction in a local newspaper. A conference call took place with employees in which the auction was discussed. It was explained that the company was going through a tough time and needed the auction to renegotiate its debt. By doing so, the company would survive. This took place via conference call because the consultants BMGI had on staff were located in other parts of the country. Mr. Menghini stated that he thinks David Silverstein was on the call and probably Gayle Howard. Mr. Menghini also would not state for certain whether it was Mr. Silverstein doing the talking or someone else. It was explained that BMGI did not have money to pay its debts and had to have the auction to renegotiate its debt with the lenders. The intent was stated that the auction was necessary to force the lenders to renegotiate the debt. Mr. Menghini stated that there was a rumor going around that Mr. Silverstein was both the buyer and the seller of BMGI's assets. No such details were provided in the telephone conference about the auction. Mr. Menghini emphasized that this was rumor and second hand information. Mr. Menghini stated that no other detail as to the renegotiation of the debt was offered. There was no specific identification of the lenders involved. Mr. Menghini did not know the precise timing between the telephone conference about the auction and word getting around about the auction, though it seemed clear that the telephone conference occurred after word had gotten around about the auction. Mr. Menghini stated that concern about the company's financial condition was heightened when employees heard about the auction. He also mentioned that employees thought it was humorous that the barbeque pit was up for sale.

Mr. Menghini stated that he never heard about BMGI filing bankruptcy and doesn't know anything about that issue. Mr. Menghini stated that he does not think he talked to Chris Taylor

4

about the auction or the financial condition of BMGI because he hardly ever talked to Mr. Taylor. Mr. Menghini stated that he did not talk to David Silverstein about the auction or the financial condition of the company.

Mr. Menghini stated that he had been increasingly marginalized within the company in the last couple of years. There was a point in time when he thought something had happened with Mr. Silverstein when the marginalization began to occur. The "inner circle" began to shrink and he was more and more kept out of the loop he had been in before.

Mr. Menghini stated that he knew of Marc Pappalardo as in-house counsel for BMGI and as an employee. As far as he knew, Mr. Pappalardo was still in-house counsel and an employee when Mr. Menghini left BMGI in mid-April 2010.

Mr. Menghini stated that he was not aware of the Raptor deal.

Mr. Menghini stated that Wes Waldo was Chief Operating Officer for the company and resided in Colorado. He wasn't sure if Mr. Waldo is still there.

### 2. Russ Kiehl

Participants: Russ Kiehl, Ilona Kirzhner, Charles Westby.
Date: October 14, 2010.
Description: Mr. Kiehl stated that he was a former employee of BMGI. He came to BMGI through Vincent Ruscello in September 2000 after the last shut down with Life Technologies. With respect to his departure from BMGI, Mr. Kiehl stated that Tom Jones called him one morning, July 10, 2009. It was a week before the last day with New Page. He was put on contractor status by BMGI, rather than employee status. BMGI sent him a severance package. BMGI, as far as he recalled, did not communicate anything to him about stock options.

Mr. Kiehl stated that about a year before his lay-off, BMGI officers showed the employees a "metric" regarding BMGI's performance. This was a PowerPoint presentation. It stated that BMGI needed a certain amount of cash flow to meet its debt obligations and that current revenue streams were falling below what was needed. Cash flow was tight. BMGI managers began asking employees to take furloughs for a couple weeks time. On-going layoffs began due to BMGI's economic conditions.

Mr. Kiehl did not have any firsthand knowledge about any new corporation being formed. He didn't know who Marc Pappalardo was. Mr. Kiehl heard about the purported auction through a person named Amy, who lives in Montreal.

### 3. Bob Bulow

Participants: Bob Bulow, Ilona Kirzhner, Charles Westby.
Date: October 14, 2010.

5

<u>Description</u>: Mr. Bulow stated that he was introduced to Plaintiff through Gary Cone. Plaintiff introduced him to Mr. Silverstein in the winter of 2001. Mr. Bulow stated that he interviewed with Mr. Silverstein and a week later was hired.

Mr. Bulow stated that he was first hired as a financial manager. Mr. Silverstein was in the process of transitioning the accounting department for the Company from Phoenix to Denver. Mr. Bulow took over QuickBooks and progressed into an accounting role (more than just entering debits/credits) to preparing financial documents and the Company's tax returns. As the Company grew, he became controller and then CFO. He was CFO until someone else was brought in who had a stronger skill set. He was demoted to consultant/trainer. Mr. Bulow stated that his replacement eventually left and Mr. Bulow was promoted again to be acting CFO. Mr. Bulow stated that he left BMGI in 2006.

Mr. Bulow's Departure from BMGI occurred after Mr. Silverstein had a conversation with some outside auditors. Mr. Silverstein indicated to Mr. Bulow that he no longer had confidence that Mr. Bulow could lead the Company into the future as CFO. Mr. Bulow left on what he characterized as amicable terms. Mr. Bulow stated that he thinks that Mr. Silverstein grew weary of his leadership.

Mr. Bulow stated that he disagreed with some decisions Mr. Silverstein had made. One such decision was to purchase the Raptor software. Mr. Bulow stated that Mr. Silverstein did not approach such decisions collaboratively. He thinks BMGI purchased the Raptor software for $3.5 Million and shares of BMGI stock. The lender that supplied the $3.5 Million was First Capital Partners.

Mr. Bulow stated that Mr. Silverstein's payments to Plaintiff pursuant to the Note were being processed through BMGI's accounts. Mr. Bulow was causing such payments to be made according to the schedule in the Purchase Agreement. Payments to Plaintiff were accounted for by BMGI as a distribution to Mr. Silverstein. This would show up on Mr. Silverstein's K-1 from BMGI and BMGI's P&L's and Balance Sheets. He does not know for sure if Mr. Silverstein paid taxes on these distributions but he does think they were accounted for on the K-1s. Mr. Bulow did not agree when Silverstein instructed him to stop paying Plaintiff due to a loan accounting discrepancy.

Mr. Bulow stated that Mr. Silverstein took a draw from BMGI in early 2005 to pay back the 2003 partners' loan used to reduce 2003 tax burden. He did not offer the same courtesy to Ms. Kirzhner. Instead he abruptly without notice discontinued her note payments. He then directed Mr. Bulow to charge Ms. Kirzhner interest to repay her loan to BMG. He then made a payment back to BMGI from his draw.

Mr. Bulow stated that Wells Fargo held the line of credit. Mr. Bulow was not sure if Mr. Silverstein set up any other entities. The ones he is aware of internationally were usually arranged such that BMGI held a 100% ownership interest in them.

6

Mr. Bulow stated that as soon as Marc Pappalardo was brought into the financial loop, he began trying to figure out how Mr. Silverstein and BMGI could get out of their debt structure.

### 4. Walt Tarpley

<u>Participants</u>: Walt Tarpley, Ilona Kirzhner, Charles Westby.
<u>Date</u>: October 14, 2010.
<u>Description</u>: Mr. Tarpley stated that Plaintiff brought him to BMGI. It was when First Data Corp was being broken up. Mr. Silverstein needed Mr. Tarpley's expertise in LEAN. Mr. Silverstein used Mr. Tarpley for longer engagements with healthcare providers and utilities. Mr. Tarpley also was used to fill in gaps with different manufacturing deployments.

Mr. Tarpley thought he had a basic agreement with Mr. Silverstein when Mr. Silverstein was ramping up BMGI's business in 2007. Mr. Silverstein wanted Mr. Tarpley on the road all the time and to be 100% billable except for Christmas and New Year. Mr. Tarpley said he would agree to that in exchange for Mr. Silverstein rewarding his loyalty by keeping him on if the business started scaling back. Mr. Tarpley remembers having three separate conversations with Mr. Silverstein about this. Mr. Tarpley stated that Mr. Silverstein "swore on a stack of Bibles" that he would do so. Mr. Tarpley was released in late 2008 when the business started scaling back.

Mr. Tarpley stated that he got word from BMGI on Oct 16, 2008 that he was being let go as an employee. He was on a client engagement in Orlando, FL. He was getting an award related to the consulting he was doing. The next day, he was cut by BMGI. Mr. Tarpley stated that he feels Mr. Silverstein lied to him just to get him to ramp up Mr. Silverstein's business.

Mr. Silverstein immediately sent a severance package to his house. Mr. Silverstein maintained that BMGI was close to going out of business. He promised to pay Mr. Tarpley until the end of the year. Mr. Silverstein only ended up paying for Cobra with the money he had promised to pay in salary.

Mr. Tarpley stated that the following Monday he got a call from Tom Jones. Mr. Jones told him that BMGI had a contract in South Africa. Mr. Jones told him BMGI would pay $600.00/day plus expenses. BMGI and Mr. Tarpley entered into a contract. Mr. Tarpley went to South Africa. The contract provided that BMGI would pay Mr. Tarpley every two weeks. Mr. Tarpley kept checking his bank but there was no payment, not even after 8 weeks. Mr. Tarpley stated that when he got back to the U.S., Mr. Silverstein "held him hostage" with the back pay that was due by stating that if he wanted to get paid he would have to do some additional work for Silverstein and BMGI. That was about 8 weeks worth of work. In March of 2009, BMGI finally paid him about 60% of what he was owed from the South Africa deal. Mr. Tarpley stated that he never was paid for the work he did when he got back. He confronted Mr. Silverstein about this. Mr. Silverstein stated that if he wanted to get paid, he would have to sue.

Mr. Tarpley stated that he thinks BMGI filed bankruptcy in May of 2009. In connection

7

with that, he thinks that BMGI had a fire sale in which Mr. Silverstein sold the assets to himself. Mr. Tarpley stated that he thinks he learned about the bankruptcy through Chris Taylor, Larry Kasta, and Mark Menghini.

Mr. Tarpley stated that he thinks that Mr. Silverstein sold BMGI's web site and some furniture to himself through another entity called BMG International. He also thinks Mr. Silverstein had money tucked away in the South African accounts. Mr. Tarpley stated that he thinks he used that money to buy BMGIs assets.

Mr. Tarpley stated that Marc Pappalardo had been working on Mr. Silverstein's scheme before Mr. Tarpley had left the company. Mr. Pappalardo was spending most of the time working on how to protect Mr. Silverstein's interests.

Mr. Tarpley stated that he thinks that Mr. Silverstein is a smooth talking salesman who will say whatever he needs to get what he wants. His word and his agreements mean nothing. He thinks that almost everything Mr. Silverstein said to him turned out to be a lie. Mr. Tarpley stated that he would characterize Mr. Silverstein as being good at lying.

Mr. Tarpley stated that in September 2008, BMG started laying people off. For those who were left, they booked them 100% of the year and told them they had to stay on the road. Mr. Tarpley stated that, at the Christmas party in 2007, Mr. Mansfield told Mr. Tarpley about his experience with a scheme involving the creation of other entities.

### 5. Louis Vincent Ruscello

Participants: Louis Vincent Ruscello, Ilona Kirzhner, Charles Westby.
Date: October 12, 2010.
Description: Mr. Ruscello stated that was employed by BMGI as a Master Blackbelt. Mr. Ruscello stated that he left BMG involuntarily in May 2009. He states he was fired because BMGI was downsizing for lack of business. Mr. Ruscello suspects that he was let go because Plaintiff had brought Mr. Ruscello into the company and Mr. Ruscello was not a yes-man to Mr. Silverstein.

Mr. Ruscello continued a business relationship with BMGI as an independent contractor to finish up some contracts that he had brought to BMGI. One such contract was with Rollins College. In that connection, Tabitha Garland of BMGI asked him to sign a new contract agreement with BMGI. He was told that the old contractor agreement was no longer valid because it was with the "old BMG" not the "new BMGI." He was sent a form of the new contract that he never signed.

Mr. Ruscello stated that he thinks Silverstein lied to him about BMG's need to downsize because for 6 weeks before he was let go, there were rumblings about downsizing. Mr. Ruscello stated that BMGI had arranged to have Don Wilson lined up to teach the class at Rollins College in case Mr. Ruscello decided not to do so. Mr. Ruscello stated that this indicated to Mr. Ruscello

8

that Mr. Silverstein lied to him about BMGI not having the money to follow-through with the class at Rollins College.

Mr. Ruscello stated that Plaintiff had given Mr. Ruscello stock options in BMGI when she first hired him but Mr. Ruscello never exercised them. After he was fired, Mr. Ruscello stated that BMGI sent him a letter stating that they had never advised him before that he had stock options in the company but that now that he was fired, he couldn't exercise them. He received this letter in late May or June 2009. Mr. Ruscello stated that he thinks that this is an example of the dishonest business dealings of Mr. Silverstein.

Mr. Ruscello stated that when he heard from BMGI that they were going to cancel the class at Rollins College, he called Mr. Silverstein to talk to him about it. Mr. Ruscello stated that Mr. Silverstein told him not to worry, that the class would continue because he (Mr. Silverstein) was going to buy all of the assets of BMGI so BMGI could stay in business. This involved Mr. Silverstein buying out the debt of BMGI's major creditor and then working a "buyout" so BMGI could stay in business.

In connection with the buyout, Mr. Ruscello stated that he had heard that Mr. Silverstein bought out BMGI's major debt so that he could force BMGI into receivership by being BMGI's largest creditor. He was not sure whether he heard this from Mr. Silverstein or from what other people had told him.

Mr. Ruscello stated that he was warned by Sharon of BMGI not to communicate with Plaintiff through the BMGI email system. Mr. Rusello stated that many employees knew of instances when Mr. Silverstein read employees emails.

### 6. Don Redinius

Participants: Don Redinius, Ilona Kirzhner, Charles Westby.
Date: October 14, 2010.
Description: Mr. Redinius stated that he met David Silverstein at Seagate Technology. Mr. Redinius was a VP at Seagate and was starting a Six Sigma initiative at Seagate. Mr. Silverstein was one of the employees designated to do support for the Six Sigma deployment effort.

Mr. Redinius described the beginning of BMGI. Mr. Redinius stated that Seagate had hired Six Sigma Academy. Roxanne O'Brasky was involved with that. Seagate was dissatisfied with the Academy with respect to customer service focus. Roxanne O'Brasky suggested starting a company that delivered Six Sigma in a more customer service focused manner. Subsequently, Mr. Redinius and Ms. O'Brasky were eating lunch at a Seagate function in Scottsdale, Ariz. Mr. Silverstein approached them and asked if they would like to join Mr. Silverstein and Plaintiff in a new business venture. Mr. Silverstein claimed that he had a $6 Million deal with Philips lined up. Mr. Redinius, Ms. O'Brasky, and Mr. Silverstein then formed BMGI. Mr. Redinius stated that the name was Ms. O'Brasky's idea.

9

Mr. Redinius stated that he did not initially want to get involved in a business venture with Mr. Silverstein. Mr. Redinius stated that Mr. Silverstein had a reputation at Seagate such that no one wanted him on their team. Mr. Redinius stated that he did not like Mr. Silverstein's integrity or how he operated. Mr. Redinius stated that he had philosophical differences with Mr. Silverstein with respect to what he observed of his philosophy at Seagate. Nevertheless, he conceded starting a business with Mr. Silverstein, largely because of Ms. O'Brasky's involvement.

Mr. Redinius stated that shortly after BMGI was formed, Arnie Alfonzo had a "deployment" going with which he needed additional help to deliver some classes. He gave BMGI six classes that created an immediate and significant cash flow to BMGI. Neither Mr. Silverstein, Ms. O'Brasky, or Mr. Redinius contributed any cash to BMGI upon formation. Mr. Redinius stated that BMGI got off the ground due to the classes Alfonzo provided. Mr. Redinius stated that things between Mr. Redinius and Mr. Silverstein began to deteriorate when Mr. Redinius had a deployment with Toshiba, in which a conflict of interest was apparently developing. Mr. Redinius stated that Mr. Silverstein sent an email to Toshiba that was "indicting" of Mr. Redinius. Mr. Redinius stated that Mr. Silverstein had then hired Marc Pappalardo to figure out a way to maneuver Mr. Redinius and Ms. O'Brasky aggressively out of the business. Mr. Redinius believes the maneuvering was made possible by changes that were made to the Company's operating agreement without his knowledge. The changes pertained to provisions regarding the management and ownership split of the Company.

Mr. Redinius stated that Mr. Silverstein drew up a proposed buy-out agreement with respect to Mr. Redinius leaving the Company. The agreement was for Mr. Silverstein to pay Mr. Redinius $1,000,000. Mr. Redinius stated that the original draft was prepared so tightly that "if someone sneezed," Mr. Silverstein would be relieved of his payment obligation. Mr. Redinius stated that all Mr. Silverstein needed to do was provide some evidence that the business was not performing well enough so he could avoid his payments. The buy-out occurred in the summer of 2001.

Mr. Redinius stated that Mr. Silverstein started making monthly payments but then stopped. Mr. Redinius stated that Mr. Silverstein threw a temper tantrum. Mr. Redinius stated that he only got paid $75,000. Mr. Redinius stated that he understood Ms. OBrasky was paid $1,200,000.

Mr. Redinius stated that he believes Mr. Silverstein is paranoid. Mr. Redinius stated that Mr. Silverstein would "barge into" meetings Mr. Redinius was having with others because Mr. Silverstein was paranoid about what was going on. Mr. Redinius thinks Mr. Silverstein has "image reciprocity": he believes other people are doing to him what he would do to them. Mr. Redinius stated that he does not hold Mr. Silverstein in high esteem.

Mr. Redinius stated that he thinks that Mr. Silverstein overextended the Company with the Raptor software deal.

7.   **David Mansfield**

Participants: Ilona Kirzhner, David Mansfield
Date: October 21, 2010.
Description: Ms. Kirzhner reached out to Mr. Mansfield via TXT. They then connected via phone. Mr. Mansfield informed Ms. Kirzhner that he was leaving BMGI. He also stated that just as soon as he announced his departure that a new CFO was named before he even left. He stated that over the last while his access rights to company financial documents located on the finance drive were gradually reduced. All of a sudden documents he had access to one day would disappear from his view the next day. He also stated that he had knowledge of at least half a dozen incriminating documents that could assist Ms. Kirzhner in putting together the maze of activity and schemes that Mr. Silverstein, Mr. Pappalardo, and Ms. Howard were all privy to. He also agreed to chat with Ms. Kirzhner's attorney. Lastly Mr. Mansfield suggested that Ms. Kirzhner should contact Mr. McLeese of 1st Capital Partners to see if she and they would have a mutual interest in helping each other.

8.   **John Biedry**

Participants: Ilona Kirzhner, John Biedry
Date: Nov. 1, 2010.
Description: Ms. Kirzhner spoke with Mr. Biedry about many topics, including the direction of the industry, their respective current work obligations, and their families. In regards to the auction Mr. Biedry said that employees were not told of the auction in advance and were basically in the dark. Mr. Biedry stated that he came to understand that Mr. Silverstein needed to get out of some debt obligations and this was the means to do so.

9.   **Charles Fred**

Participants: Ilona Kirzhner, Charles Fred
Date: Oct. 11, 2010.
Description: Ms. Kirzhner had a brief conversation in which Mr. Fred stated his disrespect, distrust, and general negative opinion of Mr. Silverstein. He expressed his sympathy for Ms. Kirzhner's situation. Mr. Fred stated that he did not serve in any formal or informal capacity as a mediator or negotiator between Plaintiff and Defendants in Sept 2004.

**Interrogatory No. 3:**   Identify each current or former employee of any PROCESS IMPROVEMENT COMPANY that YOU (which includes YOUR agents, servants, and attorneys) have COMMUNICATED with from January 1, 2009 to present regarding Evergreen or the 2009 sale of EVERGREEN'S assets, including the date of the COMMUNICATION, who participated in/were part of the COMMUNICATION, and a description of everything that was said or conveyed by each participant in the COMMUNICATION.

**Response:**   Plaintiff objects to this Interrogatory because the request to provide "a

11

description of everything that was said or conveyed by each participant" in any communication that may be responsive is overbroad and unduly burdensome. No recording of any telephone communication that may be responsive was taken with the result that no transcript of any such communication is available. In addition, Plaintiff has spoken to some of the individuals mentioned below on numerous occasions for reasons that having nothing to do with BMGI. Plaintiff has not kept a record or notes of all of the occasions she may have spoken with the below identified individuals. As a result, it is nearly impossible for Plaintiff to identify the dates, times, and contents of all of the communications. In addition, to ask for a description of "everything" that may have been said is overbroad and unduly burdensome because no recording of any conversation has been done. Without waiving said objection, Plaintiff responds as follows:

Plaintiff has spoken in very general terms to Larry Goldman, Mike Carnell, Gary Cone, Ginger & Ed Evans, and Robert Blaha about BMGI and the September 2009 Auction. Plaintiff speaks with some of these individuals regularly for reasons not involving this matter and they usually inquire about the status of the BMGI relationship/buyout.

In addition, Robert Blaha, Ilona Kirzhner, and Charles Westby, Esq., spoke on October 15, 2010. Mr. Blaha stated that he has known Mr. Silverstein since BMGI was formed. He remembered meeting with Plaintiff and Roxanne O'Brasky in Phoenix in the 1999-2000 timeframe. Mr. Blaha stated that he has kept up intermittent contact with Mr. Silverstein. The last time he talked to Mr. Silverstein was a few months ago.

In the last conversation, Mr. Blaha stated that Mr. Silverstein alluded to things at BMGI not going as he wanted and the Company possibly needing to be re-structured.

Mr. Blaha stated that he heard about the action at about the same time as his last contact with Mr. Silverstein. Mr. Blaha stated that he had heard that Mr. Silverstein somehow broke up BMGI and then bought it back but he does not know specifically how he did that. Mr. Blaha stated that he is of the general impression that something very wrong has taken place with respect to what Mr. Silverstein has done with BMGI.

Mr. Blaha stated that Mr. Silverstein has paid him the money he has owed him. Mr. Blaha stated that he thinks that Mr. Silverstein is a "difficult guy."

In addition Ms. Kirzhner has spoken to Larry Goldman in Sept of 2009 and late October of 2010. On Oct 28, 2010 Mr. Goldman chatted with Ms. Kirzhner via phone. He agreed to resend Ms. Kirzhner their original Sept 2009 email exchange regarding the BMGI auction. He also agreed to send potentially relevant emails between he and Wendy St. Clair regarding the auction. He also agreed to forward other relevant communications regarding the auction. The following day Mr. Tim Kelly, the attorney for the company, called Ms. Kirzhner. He provided general information on why the company did not elect to bid on any of the BMGI assets.

**Interrogatory No. 4:** Identify each current or former employee of any client/customer of EVERGREEN that YOU (which includes YOUR agents, servants, and attorneys) have COMMUNICATED with from January 1, 2009 to present regarding Evergreen or the 2009 sale of EVERGREEN'S assets, including the date of the COMMUNICATION, who participated in/were part of the COMMUNICATION, and a description of everything that was said or conveyed by each participant in the COMMUNICATION.

**Response:** Plaintiff objects to this Interrogatory because the request to provide "a description of everything that was said or conveyed by each participant" in any communication that may be responsive is overbroad and unduly burdensome. No recording of any telephone communication that may be responsive was taken with the result that no transcript of any such communication is available. In addition, Plaintiff has spoken to the individual mentioned below on numerous occasions for reasons that having nothing to do with BMGI. Plaintiff has not kept a record or notes of all of the occasions she may have spoken with the below identified individuals. As a result, it is nearly impossible for Plaintiff to identify the dates, times, and contents of all of the communications. In addition, to ask for a description of "everything" that may have been said is overbroad and unduly burdensome because no recording of any conversation has been done. Without waiving said objection, Plaintiff responds as follows:

Plaintiff speaks to Bob Crescenzi regularly. They speak in general terms about Mr. Silverstein's approach to doing business and the status of Plaintiff's buyout. There may have been other clients that Ms Kirzhner connects with intermittently and generalities about her departure from BMG and current involvement with BMG are discussed.

### REQUESTS FOR PRODUCTION OF DOCUMENTS

All documents that have been identified below in Plaintiff's responses to these Requests for Production are available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

Served contemporaneously herewith please find Plaintiff's Privilege Log of Plaintiff's Responses to Defendant David Silverstein Investments, LLC's First Set of Written Discovery to Plaintiff. The privilege log sets forth in specificity any redactions made within a produced document. Please note that the majority of the documents produced herewith were provided in native email format, Microsoft Outlook specifically. When printed from counsel's computer, each printed email contains an email receipt and recipient stamp from counsel's computer, identifying the date, time, and recipients of the produced email. In that regard, in every circumstance, the printed email contains information protected by the work product doctrine and/or the attorney/client privilege. Moreover, the email receipt and recipient stamp from counsel's computer is not relevant to any fact alleged with particularity in the pleadings, and is therefore irrelevant and nonresponsive to these Requests. For these reasons, Plaintiff has redacted the email receipt and recipient stamp from counsel's computer from each produced email, and has not included a description of the redaction within the Privilege Log served contemporaneously herewith.

1. All COMMUNICATIONS between YOU and the "Kirzhner Representative" identified in paragraphs 26-29 of YOUR Complaint that detail or describe anything that was said in the September 24, 2009 conversation described in YOUR Complaint between SILVERSTEIN and the "Kirzhner Representative."

**Response**: Plaintiff incorporates the documents originally identified and produced in Plaintiff's F.R.C.P. 26 Initial Disclosures. Additionally, please see the documents identified by bates numbers KIRZ00145-46 produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

2. All audio and/or video recordings and any transcripts of any recordings, if available, of any MEETING or conversation between any person and SILVERSTEIN that occurred from January 1, 2008 to the present.

**Response**: There are none.

3. All audio and/or video recordings and any transcripts of any recordings, if available, of any MEETING or conversation between any person and any current or former employee or officer of EVERGREEN that occurred from January 1, 2008 to present.

**Response**: The recording of a conversation responsive to this request is available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

4. ALL DOCUMENTS (which includes COMMUNICATIONS that report, describe, summarize, discuss or comment on any conversation that Tim Schafer or any YOUR representatives or agents had with SILVERSTEIN in September 2009, and to the extent that any such responsive DOCUMENT contains privileged matter, please (a) redact the privileged portion of the communication and maintain the portion to the extent that it reports, describes, discusses or comments about what SILVERSTEIN said in that conversation(s) and (b) as with all other Discovery Requests, please comply with instruction No. 2 to this Request.

**Response**: Please see Plaintiff's response to Request for Production No. 1. Plaintiff incorporates into this Response the documents provided directly by Mr. Schafer pursuant to Subpoena, with Bates label prefix "Schaf."

5. ALL DOCUMENTS (which includes COMMUNICATIONS) that report, describe, summarize, discuss or comment on any conversation that Tim Schafer or any YOUR [sic] representatives or agents had with any current or former officer or employee of EVERGREEN in September 2009, and to the extent that any such responsive DOCUMENT contains privileged matter, please (a) redact the privileged portion of the communication and maintain the portion to the extent that it reports, describes, discusses or comments about what SILVERSTEIN said in that conversation(s) and (b) as with all other Discovery Requests, please comply with instruction No. 2 to this Request.

**Response**: Please see the document identified by bates number KIRZ00147 produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

6. ALL DOCUMENTS that report, describe, summarize, discuss or comment on any conversation that YOU have had with SILVERSTEIN between January 1, 2008 to present.

**Response**: Plaintiff notes that "conversation" is not a defined term within this Defendant's written discovery, is subject to multiple and competing definitions and interpretations, and is therefore vague and ambiguous. However, in the spirit of full and fair discovery and disclosure, Plaintiff states that there are no documents in Plaintiff's possession, custody, or control that document any "conversation" she may have had with Mr. Silverstein since January 1, 2008. To the extent that "conversation" may be interpreted to include this Defendant's expansive definition of the term "COMMUNICATIONS", Plaintiff refers Defendant to Plaintiff's response to Request for Production No. 11, below as well as Evergreen's own production of documents.

7. ALL DOCUMENTS that report, describe, summarize, discuss or comment on any conversation that YOU have had with any former officer or employee of EVERGREEN between January 1, 2008 to present.

**Response**: Plaintiff notes that "conversation" is not a defined term within this Defendant's written discovery, is subject to multiple and competing definitions and interpretations, and is therefore vague and ambiguous. However, in the spirit of full and fair discovery and disclosure, to the extent that "conversation" may be interpreted to include this Defendant's expansive definition of the term "COMMUNICATIONS", notes taken by Charles Westby of the conversations identified in response to Interrogatory No. 2 are responsive to this Request and are identified by bates numbers KIRZ00148-160, produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C. These documents have been redacted to eliminate any mental impressions, conclusions, opinions, or legal theories of Plaintiff's attorney.

8. ALL DOCUMENTS concerning or related to the financial condition or financial performance of EVERGREEN between August 1, 2004 and present.

**Response**: Plaintiff incorporates the documents originally identified and produced in Plaintiff's F.R.C.P. 26 Initial Disclosures. Additionally, please see the documents identified by bates numbers KIRZ161-251 produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C. as well as Evergreen's own production of documents.

9. ALL COMMUNICATIONS between YOU and any other person, excluding YOUR attorneys, regarding the PURCHASE AGREEMENT or NOTE.

**Response**: With the exception of any email correspondence Plaintiff has had with Mr. Silverstein regarding the Purchase Agreement or the Note, there are none. All such email correspondence that is in the possession, custody, or control of Plaintiff has been either identified herein or in Plaintiff's initial disclosures or has been since deleted with regular maintenance of email logs.

10. ALL COMMUNICATIONS between YOU and any other person, excluding YOUR attorneys, regarding the financial condition or financial performance of EVERGREEN.

**Response**: Please see Plaintiff's response to Request for Production No. 8 above.

11. ALL COMMUNICATIONS between YOU and any current or former officer or employee of EVERGREEN.

**Response**: Plaintiff objects to this request as being overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence and therefore irrelevant. Moreover, Plaintiff objects to this request because Plaintiff has an ongoing business relationship with many individuals completely unrelated to any fact alleged with particularity in the pleadings in this matter, and the request, apart from being irrelevant, seeks proprietary or otherwise protected documentation. Finally, Plaintiff notes that the primary manner and method of communicating with current or former officers or employees of Evergreen is via her personal email account, which she cleans out by deleting said emails. Plaintiff is thus not in the possession, custody, or control of the deleted emails. Subject to and without waiving these objections, Plaintiff hereby voluntarily produces all documents in her possession, custody, and control responsive to this request. Please see the documents identified by bates numbers KIRZ252-368, produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

12. ALL DOCUMENTS concerning or relating to the acquisition, sale, transfer, donation, or foreclosure of the assets of EVERGREEN.

**Response**: Plaintiff incorporates the documents originally identified and produced in Plaintiff's F.R.C.P. 26 Initial Disclosures. Additionally, please see the documents identified by bates numbers KIRZ369-390 produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

13. ALL COMMUNICATIONS between YOU and any other person, excluding YOUR attorneys, concerning or relating to the acquisition, sale, transfer, donation, or foreclosure of the assets of EVERGREEN.

**Response**: Plaintiff incorporates its responses to Request for Production Nos. 4 and 11, which include communications requested by this request.

14. ALL COMMUNICATIONS between YOU and any other person, excluding YOUR attorneys, concerning or relating to DSI.

**Response**:   Please see the documents identified in Plaintiff's rule 26 disclosures and that have been produced according thereto.

15.   ALL COMMUNICATIONS between YOU and any other person, excluding YOUR attorneys, concerning or relating to Silverstein Investments.

**Response**:   Please see the documents identified on Plaintiff's rule 26 disclosures and that have been produced according thereto.

16.   ALL COMMUNICATIONS between YOU and current or former lender or creditor of EVERGREEN regarding EVERGREEN.

**Response**:   There are none.

17.   ALL COMMUNICATIONS between YOU and current or former client or customer of EVERGREEN regarding EVERGREEN.

**Response**:   Plaintiff incorporates the documents originally identified and produced in Plaintiff's F.R.C.P. 26 Initial Disclosures. Additionally, please see the document identified by bates number KIRZ00391 produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

18.   ALL COMMUNICATIONS between YOU and Michael Cyger regarding EVERGREEN.

**Response**:   Plaintiff incorporates the documents originally identified and produced in Plaintiff's F.R.C.P. 26 Initial Disclosures. Additionally, please see the documents identified by bates numbers KIRZ00392-93 produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

19.   ALL COMMUNICATIONS between YOU and any PROCESS IMPROVEMENT COMPANY regarding EVERGREEN.

**Response**:   Plaintiff incorporates its responses to Request for Production No. 12, which include communications requested by this request.

20.   ALL prior drafts, revisions, and proposed changes to the STOCK PURCHASE AGREEMENT and NOTE.

**Response**:   Plaintiff is not in possession, custody, or control of any documents responsive to this request.

21.   ALL DOCUMENTS concerning or relating to SILVERSTEIN INVESTMENTS.

**Response**:   Please see Plaintiff's initial disclosures and the documents produced according thereto.

22.     ALL DOCUMENTS concerning or relating to DSI.

**Response**:   Please see Plaintiff's initial disclosures and the documents produced according thereto.

23.     ALL DOCUMENTS concerning or relating to EVERGREEN.

**Response**:   Please see Plaintiff's initial disclosures and the documents produced according thereto.

24.     Any electronic copies (in native Microsoft Word format (.doc or .docx), if available, and if unavailable in any other native electronic format), of any drafts, revisions and/or proposed changes to the NOTE. To the extent that any such responsive DOCUMENT contains privileged matter, please (a) redact the privileged portion of the communication and (b) as with all other Discovery Requests, please comply with instruction No. 2.

**Response**:   Plaintiff is not in possession, custody, or control of any documents responsive to this request.

25.     ALL COMMUNICATIONS with Charles Fred regarding the transaction that was memorialized in the STOCK PURCHASE AGREEMENT and the NOTE.

**Response**:   Plaintiff is not in possession, custody, or control of any documents responsive to this request.

26.     ALL COMMUNICATIONS with Chares Fred regarding EVERGREEN.

**Response:**   Plaintiff is not in possession, custody, or control of any documents responsive to this request.

27.     ALL COMMUNICATIONS with Charles Fred regarding SILVERSTEIN.

**Response:**   Please see the document identified by bates number KIRZ00394 produced herewith, available for copying and/or inspection at the law offices of Sweetbaum, Levin & Sands, P.C.

28.     Any electronic copies (in native Microsoft Word format (.doc or .docx), if available, and if unavailable in any other native electronic format), of any drafts, revisions and/or proposed changes to the STOCK PURCHASE AGREEMENT. To the extent that any such responsive DOCUMENT contains privileged matter, please (a) redact the privileged portion of the communication and (b) as with all other Discovery Requests, please comply with instruction No. 2.

**Response**:   Plaintiff is not in possession, custody, or control of any documents responsive to this request.

        Respectfully submitted,

        AS TO OBJECTIONS AND RESPONSES TO THE REQUESTS FOR PRODUCTION OF DOCUMENTS

        _____

        Thomas L. DeVine, Jr., Esq.
        Sweetbaum, Levin & Sands, P.C.
        1125 Seventeenth Street, Suite 2100
        Denver, CO 80202
        (303) 296-3377
        tdevine@sweetbaumlevinsands.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of November 2010, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT DAVID SILVERSTEIN INVESTMENTS, LLC'S FIRST SET OF WRITTEN DISCOVERY TO PLAINTIFF** was served by U.S. Mail, postage prepaid and addressed to:

Marc F. Pappalardo, Esq.
Pappalardo Law Group, LLC
1921 Corporate Center Circle, 3F
Longmont, CO 80501

Daniel W. Glasser, Esq.
Glasser Law Group, LLC
4582 S. Ulster Street Parkway, Suite 1650
Denver, CO 80237

                                                            _____
                                                            Megan MacLennan