Exhibit C

**AGREN BLANDO COURT REPORTING & VIDEO INC**

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 1:09-CV-2858-CMA-BNB

DEPOSITION OF ILONA KIRZHNER   November 15, 2010

ILONA KIRZHNER,
Plaintiff,
vs.
DAVID SILVERSTEIN, an Individual,
EVERGREEN INDUSTRIES, INC., f/k/a BREAKTHROUGH
MANAGEMENT GROUP INTERNATIONAL, INC., f/k/a
BREAKTHROUGH MANAGEMENT GROUP, INC., a Colorado
corporation,
DAVID SILVERSTEIN INVESTMENTS, LLC, a Colorado
limited liability company, and
DSI INVESTMENTS, LLC, a Colorado limited liability
company,
Defendants.

---

**Page 2**

1  APPEARANCES:
2  SWEETBAUM, LEVIN & SANDS, PC
     By Alan D. Sweetbaum, Esq.
3       1125 Seventeenth Street
        Suite 2100
4       Denver, CO 80202
        Phone: 303.296.3377
5       Fax: 303.296.7343
        asweetbaum@fslpc.com
6       Appearing on behalf of the
        Plaintiff
7
8  GLASSER LAW GROUP, LLC
     By Daniel Glasser, Esq. (For portion)
9       4582 S. Ulster Street Parkway
        Suite 1650
10      Denver, CO 80237
        Phone: 720.963.7555
11      Fax: 720.488.7711
        dglasser@glasserlawgroup.com
        and
12
13 PAPPALARDO LAW GROUP
     By Marc F. Pappalardo, Esq.
14      1921 Corporate Center Circle
        Suite 3A
15      Longmont, CO 80501
        Phone: 303.250.1507
16      Fax: 775.429.4091
        marc@pappalardolawgroup.com
17      Appearing on behalf of the
        Defendants
18
    Also Present: David Silverstein
19
20
21
22
23
24
25

---

**Page 3**

1       Pursuant to Notice and the Federal Rules of
2  Civil Procedure, the deposition of ILONA KIRZHNER,
3  called by Defendants, was taken on Monday,
4  November 15, 2010, commencing at 9:00 a.m., at
5  4582 South Ulster Street Parkway, Suite 1650, Denver,
6  Colorado, before Kelly A. Mackereth, Certified
7  Shorthand Reporter, Registered Professional Reporter,
8  Certified Realtime Reporter and Notary Public within
9  Colorado, Court Reporting Office of Agren Blando
10 Court Reporting & Video, Inc., 216-16th Street, Suite
11 650, Denver, Colorado 80202.
12

               * * * * * * *
13

             I N D E X
14

15 EXAMINATION                    PAGE
16   BY MR. PAPPALARDO               6
17

   PRODUCTION REQUEST(S):
18
     None
19
20
21
22
23
24
25

---

**Page 4**

1           INDEX OF EXHIBITS
2
                 INITIAL
3  DESCRIPTION              REFERENCE
4
5  Exhibit 8  Redacted Telephone Conference   11
              Notes, KIRZ00158-160
6  Exhibit 9  Telephone Conference Notes,     17
              KIRZ00149-150
7
8  Exhibit 10  E-mail re Trouble..., DS       25
               25475-25476
9  Exhibit 11  Stock Purchase and Sale        124
               Agreement, KIRZ00005-16
10
11 Exhibit 12  E-mail re Current state of     49
               things..., KIRZ00056-57
12 Exhibit 13  E-mail chain re Need some help, 73
               DS 25570-25571
13
14 Exhibit 14  E-mail chain re A Bunch of     97
               Stuff, KIRZ00143-144
15 Exhibit 15  Verified Complaint             147
16 Exhibit 16  Order Granting In Part and     149
               Denying In Part Defendants'
17             Motions To Dismiss and Denying
               Motions For Rule 11 Sanctions
18
19 Exhibit 17  Promissory Note Secured By Stock 175
               Pledge, KIRZ00001-4
20 Exhibit 18  E-mail chain re UCC-1 Issue, DS 178
               27329-27330
21
    Exhibit 19  E-mail chain re BMG update,    181
22              KIRZ00261
23 Exhibit 20  5/19/09 letter to Ilona Kirzhner 189
               from David Silverstein, with
24             attachments, DS 25608-25612
25

---

Pages 1 to 4

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 5

```
 1
                           INITIAL
 2   DESCRIPTION                   REFERENCE
 3
     Exhibit 21  6/19/09 letter from Ilona        189
 4              Kirzhner to David Silverstein,
                DS 25632
 5
     Exhibit 22  E-mail chain re Revised Purchase 200
 6              and Sale Agreement,
                DS 22374-22375
 7
     Exhibit 23  E-mail re Possible Meeting,       201
 8              DS 21262-21263
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1   frame, somewhere in there.
 2       Q    You said kind of anointed.  What do you
 3   mean by that?
 4       A    There is no one industry organization that
 5   provides official certification in the space.  So
 6   that organization provided me what they felt was an
 7   informal master black belt certification.
 8       Q    Did you go through classes with them?
 9       A    I don't recall.  I kind of co-taught with
10   other teachers and then went out by myself.
11       Q    Have you ever had your deposition taken
12   before?
13       A    Yes.
14       Q    How many times?
15       A    Once.
16       Q    When was that?
17       A    I don't recall the dates.  I would say it
18   was in late '90s.
19       Q    Can you tell me what that case involved?
20       A    It involved breach of a noncompete.
21       Q    Have you ever testified in any type of
22   trial?
23       A    No.
24       Q    Have you had an opportunity to talk to
25   your lawyer to prepare for this deposition?
```

Page 6

```
 1                  * * * * * * *
 2              P R O C E E D I N G S
 3                 ILONA KIRZHNER,
 4   having been first duly sworn, was examined and
 5   testified as follows:
 6                 EXAMINATION
 7   BY MR. PAPPALARDO:
 8       Q    Can you please state your name.
 9       A    Ilona Kirzhner.
10       Q    Can you please tell me about your college
11   and postgraduate education.
12       A    Graduate of the Ohio State University, BS
13   double E in 1993, master of science from Harvard
14   University, 1994.  MBA, 2006 from the College of
15   William & Mary.
16       Q    And what do you do for a living?
17       A    I'm an independent contractor in the Lean
18   Six Sigma space.
19       Q    Do you have your master black belt
20   certification, either Lean or Six Sigma?
21       A    I guess the answer to that would be yes.
22       Q    When did you receive your certification?
23       A    I was kind of anointed by Six Sigma
24   Consultants as a master black belt in roughly 2005
25   maybe, 2000 -- no, wrong decade.  1996, '97 time
```

Page 8

```
 1       A    Yes.
 2       Q    How long did you prepare for this
 3   deposition?
 4       A    I didn't add up the hours.
 5       Q    Can you give me a rough estimate?
 6       A    A day.
 7       Q    When did you arrive in town, in Denver,
 8   Colorado?
 9       A    Last night.
10       Q    Did you review any documents in
11   preparation for this deposition?
12       A    Yeah.
13       Q    Can you tell me which documents you
14   reviewed?
15       A    I don't have a running list.
16       Q    Do you recall any specific documents you
17   reviewed?
18       A    E-mails, communications, many of those
19   that you sent over for discovery.
20       Q    Are you aware that Breakthrough Management
21   Group, Inc. changed its name after 2004 to
22   Breakthrough Management Group International, Inc.?
23       A    Yes.
24       Q    And you're aware that Breakthrough
25   Management Group International, Inc. changed its name
```

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 9

1  in 2009 to Evergreen Industries, Inc.?
2      A    Yes.
3      Q    Now for convenience sake, can we agree
4  that when I'm referring to Evergreen that I mean
5  Breakthrough Management Group International, Inc.,
6  Breakthrough Management Group, Inc. and Evergreen
7  Industries, Inc., okay?
8      A    Sure.
9      Q    You've brought various claims related to a
10  stock purchase agreement and a promissory note,
11  correct?
12      A    Yes.
13      Q    Now, for convenience sake, can we agree
14  when I say the term stock purchase agreement, I'm
15  referring to the agreement that you signed in 2004
16  that is the basis of some of your claims in the
17  complaint, okay?
18      A    Yes.
19      Q    And for convenience sake, can we agree
20  that when I say the term note that I'm referring to
21  the promissory note that was delivered to you in 2004
22  as part of the stock purchase agreement?
23      A    Yes.
24      Q    And for convenience sake, when I say the
25  term auction, can we agree I'm referring to the

Page 10

1  September 24th, 2009 asset auction involving
2  Evergreen assets that forms the basis for your
3  complaint?
4      A    Sure.
5      Q    And similarly, when I refer to the term
6  asset sale, I'm referring to the 2009 sale of
7  Evergreen's assets that also forms the basis of your
8  complaint.
9      A    Okay.
10      Q    And do you believe that Dave Silverstein
11  defrauded you?
12      A    Yes.
13      Q    And you spoke to a number of people in an
14  effort to obtain evidence against David Silverstein,
15  correct?
16      A    Yes.
17      Q    How many times did you speak to Mark
18  Menghini in 2010?
19      A    At least twice.
20      Q    Did you ever record any of your
21  conversations with Mark Menghini?
22      A    No.
23      Q    You would agree with me that you told Mark
24  Menghini, in at least one of your conversations, that
25  you believe that David Silverstein defrauded you?

Page 11

1      A    No, I do not agree with that.
2      Q    Did you tell Mark Menghini anything about
3  what you believed David Silverstein did to you?
4      A    I don't recall saying that, no.
5      Q    Did you tell Mark Menghini the purpose of
6  your call?
7      A    Yes.
8      Q    And what did you tell him?
9      A    That I was in legal battles with
10  Mr. Silverstein over my buyout.
11      Q    Did you tell him anything that you believe
12  David Silverstein did?
13      A    I honestly do not recall.
14      Q    And you wanted to try to discover
15  information about Evergreen and the sale of its
16  assets that you did not know.  That's why you called
17  him, correct?
18      A    Yes.
19      Q    You would agree with me that you tried to
20  learn from Mark Menghini information about Evergreen
21  that wasn't publicly available?
22      A    I'm not sure what was and wasn't publicly
23  available.  I asked him questions about what may have
24  been communicated to the employees.
25          (Exhibit 8 marked.)

Page 12

1      Q    (BY MR. PAPPALARDO)  I'm going to hand you
2  what has been marked as Exhibit No. 8.  Can you
3  please read Exhibit No. 8 to yourself and after
4  you've had a chance to review it, or if you're
5  familiar with it, please tell me.
6          On approximately October 22nd, 2010, you
7  had a conversation with Mark Menghini and Charles
8  Westby, correct?
9      A    That's correct.
10      Q    And that was by telephone call?
11      A    Yes, it was.
12      Q    Is there anything that Mark Menghini told
13  you on October 22nd, 2010 that is not referred to in
14  Exhibit 8, that you can recall?
15      A    No.
16      Q    And during your October 22nd conversation
17  with Mark Menghini, did Mark Menghini tell you that
18  he would send a copy of the confidentiality agreement
19  to your attorneys?
20      A    I do not recall.
21      Q    Do you recall whether your attorney asked
22  Mr. Menghini to send a copy of a confidentiality
23  agreement to him?
24      A    I do not recall.
25      Q    Are you aware of whether Mark Menghini

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 13

1  sent a copy of the confidentiality agreement to your
2  attorney?
3      A   No, I'm not.
4      Q   You're aware that when you worked for
5  Evergreen that every employee signed a
6  confidentiality agreement, correct?
7      A   No, I was not aware.  At the time I was at
8  BMG that was not common practice.
9      Q   So it's your testimony that -- well,
10  strike that.
11         You left the employ of Evergreen in 2004,
12  correct?
13     A   Yes.
14     Q   And when you left the employ of Evergreen,
15  you were the company's chief operating officer,
16  correct?
17     A   Correct.
18     Q   And you were basically the second in
19  command there, would you agree?
20     A   Yes.
21     Q   And you're aware that -- so is it your
22  testimony that you're not aware that every single
23  employee at Evergreen, as of the time you left,
24  signed a confidentiality agreement with the exception
25  of you and David Silverstein?

Page 14

1      A   I was not aware of that.
2      Q   Are you aware that Mark Menghini's
3  confidentiality agreement was signed when you were
4  still Evergreen's chief operating officer?
5      A   No, I was not aware of that.
6      Q   Were you aware that at least some people
7  signed confidentiality agreements while you were at
8  Evergreen?
9      A   I do not recall ever being informed of
10  people signing or not signing agreements,
11  confidentiality agreements.
12     Q   So is it your testimony that you're
13  unaware of any employee who signed a confidentiality
14  agreement while you were at Evergreen?
15     A   Could you repeat that, please?
16     Q   Sure.  Is it your testimony that you're
17  unaware of any person who signed a confidentiality
18  agreement while you were at Evergreen?
19     A   I'm having trouble with the word any.  I
20  was not actively involved in the hiring, contractual
21  piece.  I certainly decided on who was hired and at
22  what rate and who they worked for, but I didn't
23  usually review formal agreements that employees
24  signed.
25         So could there have been some that signed

Page 15

1  and some that didn't and who they were, I'm not aware
2  of that.
3      Q   You're aware that when you -- at least up
4  from the time you left the employ of Evergreen, that
5  employees were required to sign an agreement with the
6  company, correct?
7      A   Again, Marc, I didn't see those agreements
8  passing through me.  So I'm not aware that we
9  actually had people sign on the bottom line.  They
10  filled out HR paperwork, benefits paperwork, and that
11  required signatures.  I didn't know we had employee
12  employment contracts.
13     Q   Are you aware that Evergreen had a
14  confidentiality agreement that protected any non-
15  public information that was not just limited to trade
16  secrets?
17     A   No.
18     Q   You also spoke with Robert Bulow?
19     A   Yes.
20     Q   And did you record any conversations with
21  Mr. Bulow?
22     A   No.
23     Q   Did you take any notes of any of your
24  conversations with Mr. Bulow?
25     A   No.

Page 16

1      Q   How many times have you spoken with
2  Mr. Bulow in 2010?
3      A   Twice, I think.
4      Q   And at least one of the conversations,
5  your attorney was also on the phone call, correct?
6      A   That's correct.
7      Q   And you're aware that Mr. Bulow signed
8  a -- well, strike that.
9          Did Mr. Bulow advise you that he signed a
10  confidentiality agreement with Evergreen while you
11  were still the company's chief operating officer?
12     A   I do not recall that he mentioned that on
13  the call, no.
14     Q   Going back to Mr. Menghini, Mr. Menghini
15  did advise you that he was bound by a confidentiality
16  agreement with Evergreen, correct?
17     A   He advised me that you called him and told
18  him he was.
19     Q   Did the two of you discuss this
20  confidentiality agreement at all?
21     A   Other than what I just mentioned, no.
22     Q   Did you ever call Mr. Westby discussing
23  the confidentiality agreement with Mr. Menghini?
24     A   I think he may have mentioned something
25  about it.

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 17

1    Q    So, would you agree with me, it's your
2  understanding that when you spoke to Mr. Bulow, on at
3  least one of the occasions, you were aware that
4  Mr. Bulow was bound by a confidentiality agreement
5  with Evergreen?
6    A    I think you just asked me that question
7  and I think I said no, I was not aware.
8    Q    But during your conversation with
9  Mr. Bulow, do you believe Mr. Bulow advised you that
10  he did sign a confidentiality agreement with
11  Evergreen, correct?
12    A    I think you just asked me that and I said
13  no.
14    Q    Oh, I'm sorry.
15    A    I do not recall having conversations about
16  any confidentiality agreement on the call with
17  Mr. Bulow.
18    Q    All right.  Mr. Bulow, when you talked to
19  Mr. Bulow, one of the things you discussed was
20  Raptor, correct?
21    A    I do not recall specifically discussing
22  Raptor in any detail with Mr. Bulow.
23        (Exhibit 9 marked.)
24    Q    (BY MR. PAPPALARDO)  I'm going to hand you
25  what is going to be marked as Exhibit No. 9.

Page 18

1    A    Okay.
2    Q    Exhibit No. 9 is typed notes that you have
3  produced in this case, correct?
4    A    I believe that's correct.  I've made some
5  corrections that are not here.
6    Q    And what corrections did you make that are
7  in Exhibit 9 that are not here?
8    A    The name of the gentleman in number 1
9  should be Gary Kohn, not Jerry Kohm.
10    Q    And going specifically down to -- so --
11    A    Can I review this quickly?
12    Q    Sure.
13    A    Thank you.
14    Q    You can take as much time as you need.
15    A    I'm going to just grab my jacket.  I'm a
16  little chilly here.
17        MR. GLASSER:  Do either of you need
18  anything, water or coffee or anything like that?
19        THE DEPONENT:  You know, maybe in a few
20  minutes a hot tea would be great.
21    Q    (BY MR. PAPPALARDO)  So on October 14th,
22  2010, you had a conversation involving yourself,
23  Mr. Westby and Mr. Bulow, correct?
24    A    I believe that's the date.
25    Q    And the purpose of that conversation was

Page 19

1  trying to discover some evidence that might be useful
2  in this case, correct?
3    A    Yes.
4    Q    And if you look at bullet number 4,
5  Mr. Bulow provided you some information regarding a
6  purchase of a company called Raptor, correct?
7    A    Yes.
8    Q    And Mr. Bulow told you that the purchase
9  price was $3.5 million, correct?
10    A    I do not recall that from the
11  conversation, but I believe this transcript to be
12  correct.
13    Q    And you're not aware of whether the
14  purchase price of Raptor was publicly available
15  information, are you?
16    A    I'm not aware that it was or was not.
17    Q    And are you aware of whether the --
18  whether the lender for the Raptor transaction was
19  publicly available information?
20    A    I am not aware that it was or was not.
21    Q    Are you aware of anywhere where it was
22  publicly available?
23    A    I'm neither aware nor unaware.
24    Q    Mr. Bulow also talked to you about some
25  shareholder distributions that Mr. Silverstein took,

Page 20

1  correct?
2    A    Yes.
3    Q    Are you aware --
4    A    Which I was aware of any way in regards to
5  the one that he discussed.
6    Q    And what shareholder distribution did
7  Mr. Silverstein -- Mr. Bulow discuss?
8    A    The one that he used to pay tax
9  liabilities for 2003 loans that we took, that he then
10  used post-2004 dividends to pay, but mandated that he
11  lower my buyout payments to cover mine.
12    Q    Did you have any discussions with
13  Mr. Bulow regarding any other shareholder
14  distributions that Mr. Silverstein took?
15    A    I do not recall that, no.
16    Q    Do you recall Mr. Bulow discussing
17  anything that is not contained in Exhibit No. 9?
18    A    No.
19    Q    Besides any conversations that you may
20  have had with David Mansfield, have you recorded any
21  conversations of any current or former employees of
22  Evergreen?
23    A    No.
24    Q    Besides David Mansfield, did you record
25  any conversations with anyone that you contacted in

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 21

1 an effort to learn information about Evergreen?
2    A    No.
3    Q    Or the assets of?
4    A    No.
5    Q    You spoke with David Mansfield in 2010,
6 correct?
7    A    Yes.
8    Q    Can you tell me approximately how many
9 times?
10    A    In 2010, at least twice.
11    Q    And you recorded at least one conversation
12 that you had with Mr. Mansfield, correct?
13    A    Only one.
14    Q    And you contacted Mr. Mansfield in an
15 effort to discover information that might be useful
16 in this case, correct?
17    A    Absolutely.
18    Q    And you asked Mr. Mansfield if he would be
19 willing to talk to your attorneys, correct?
20    A    Yes.
21    Q    And what did Mr. Mansfield say?
22    A    He agreed to talk to me and my attorney,
23 and then subsequently, after conversations with
24 either you and/or Mr. Silverstein, agreed to talk to
25 me without the presence of my attorney.

Page 22

1    Q    Why do you say that after either talking
2 to me or Mr. Silverstein, he refused?
3    A    I said that because that's what happened.
4    Q    How do you know that?
5    A    Because he told me that he spoke to you
6 all, and then he asked that my attorney not
7 participate in the conversation.
8    Q    Was Mr. Mansfield upset that you secretly
9 recorded him?
10    A    I have no idea.
11    Q    And why didn't you tell Mr. Mansfield that
12 you were recording this conversation?
13    A    I don't know.
14    Q    Are you aware that when you were -- did
15 you tell your attorneys that you were planning to
16 record Mr. Mansfield?
17    A    No.
18         MR. SWEETBAUM: Actually, I need to object
19 to that question.
20         MR. PAPPALARDO: I'll agree to have
21 that --
22         MR. SWEETBAUM: Thank you.
23         MR. PAPPALARDO: I'll agree to have that
24 stricken for the record.
25         MR. SWEETBAUM: That was privileged

Page 23

1 communication.
2         MR. PAPPALARDO: You know where I was
3 going with that.
4         MR. SWEETBAUM: No problem, I appreciate
5 your doing that for me.
6    Q    (BY MR. PAPPALARDO)  Let me rephrase it
7 better.  Did anyone know that you were recording the
8 conversation besides your attorney?
9    A    Before I did it?
10    Q    Yes.
11    A    You mean my husband.
12    Q    Are you aware that when you recorded
13 Mr. Mansfield's conversation that he was in
14 Philadelphia, correct?
15    A    I think he was en route somewhere, I don't
16 know the exact location.
17    Q    In your conversation he advised you that
18 he was in Philadelphia, on his way to Baltimore.
19 Does that sound familiar?
20    A    It sounds familiar.  I don't know the
21 starting point.  I think the ending point sounds more
22 familiar than the starting point.
23    Q    Were you given any training or -- strike
24 that.
25         You currently have security clearance

Page 24

1 with the Department of Defense, correct?
2    A    Yes.
3    Q    Were you given any training or instruction
4 on the wiretap laws in the process of working with
5 the DoD?
6    A    No.
7    Q    Did you conduct any research prior to
8 calling Mr. Mansfield regarding the wiretap laws,
9 prior to the recording him?
10    A    No.
11    Q    Are you aware that in Pennsylvania that it
12 is a felony to record a conversation without the
13 consent of all parties to a phone call?
14         MR. SWEETBAUM: I'm going to stop this.
15 Are you asking her whether or not she's -- well, what
16 I would like to do is talk with my client, since you
17 apparently are now going into whether there was some
18 criminal activity that you believe that she
19 participated in.  And I believe she has a right to
20 understand what her rights are.
21         MR. PAPPALARDO: Sure.
22         MR. SWEETBAUM: Okay.  Thank you.
23         (Recess taken from 9:30 a.m. to 9:33 a.m.)
24    Q    (BY MR. PAPPALARDO)  Ms. Kirzhner, we just
25 took a break so you could talk to your lawyer while

AGREN BLANDO COURT REPORTING & VIDEO INC

Page 25

1   there was a pending question, correct?
2       A    I think so.
3       Q    All right. And so, Ms. Kirzhner, are you
4   aware that Pennsylvania's wiretap laws made it a
5   felony to record a conversation without the consent
6   of all parties of the phone call?
7       A    No, I'm not aware.
8       Q    Were you aware of that prior to making the
9   phone call?
10      A    No, I'm not aware. I was not aware of
11  that now, I was not aware of that then. I've never
12  been aware of that.
13      Q    Are you aware that Maryland's wiretap law
14  makes it a felony to record a conversation without
15  the consent of all parties to the call?
16      A    No, I am not aware.
17      Q    Do you believe that you violated any laws
18  in recording Mr. Mansfield's telephone conversation?
19      A    No.
20          (Exhibit 10 marked.)
21      Q    (BY MR. PAPPALARDO) I'm going to hand you
22  what has been marked as Exhibit No. 10. Can you
23  please read it to yourself. After you've had a
24  chance to review it, I'll ask you some questions
25  about it.

Page 26

1          MR. SWEETBAUM: The entire string, you
2   want her to read that?
3          MR. PAPPALARDO: Yes.
4          (Pause.)
5       Q    (BY MR. PAPPALARDO) Have you had a chance
6   to review Exhibit No. 10?
7       A    Yes.
8       Q    Exhibit No. 10 is an e-mail from David
9   Silverstein sent to you in October 10, 2008 and a
10  reply e-mail that you sent to Mr. Silverstein on
11  December 15th, 2008, correct?
12      A    It would appear to be the case.
13      Q    And sometime prior to receiving
14  Exhibit No. 10, you actually met David Silverstein in
15  Washington, correct?
16      A    I don't recall.
17      Q    All right. If you go -- if you look at
18  Exhibit No. 10, on that first page, can you read the
19  first line after it says, Ilona?
20      A    With much regret -- with much regret I
21  must share with you the continued dah, dah, dah --
22          THE REPORTER: I have to record what
23  you're saying.
24      A    I'm sorry. With much regret I must share
25  with you that business has continued to deteriorate

Page 27

1   since I last saw you in Washington.
2       Q    (BY MR. PAPPALARDO) Do you --
3       A    But I don't know when that last saw you in
4   Washington was.
5       Q    Yeah, that was my question. Do you recall
6   when that was?
7       A    No.
8       Q    Do you recall anything about meeting
9   Mr. Silverstein in Washington, where you talked
10  about --
11      A    During this time frame?
12      Q    Yes.
13      A    Maybe with the DoD conference downtown.
14      Q    Is it fair to say that in the December
15  2008 time frame, that David Silverstein, at least on
16  one occasion, was trying to tell you about how he
17  viewed the state of Evergreen's business?
18      A    Yes.
19      Q    And at least by December 2008, David
20  Silverstein was telling you that Evergreen had
21  clients who were canceling and postponing business?
22      A    Clearly.
23      Q    And he was telling you that Evergreen had
24  to lay off a significant number of its employees?
25      A    Um-hum.

Page 28

1          THE REPORTER: I'm sorry, your answer.
2       A    Yes.
3       Q    (BY MR. PAPPALARDO) So when we're taking
4   a deposition here, I should have explained this to
5   you before. The court reporter cannot understand an
6   uh-huh or huh-uh because on the transcript it sort of
7   blurs into one. I forget, myself, a lot. So if you
8   can try to recall to say yes or no.
9       A    Okay.
10      Q    Thank you.
11          THE DEPONENT: Sorry.
12      Q    (BY MR. PAPPALARDO) Now, in this December
13  2008 time frame, do you believe that David
14  Silverstein personally did anything to cause
15  Evergreen to have clients postpone or cancel events?
16      A    I don't know.
17      Q    Do you have any knowledge that would lead
18  you to believe that David Silverstein did anything to
19  cause Evergreen to lose clients or postpone events in
20  this December 2008 time frame?
21      A    I don't know.
22      Q    In Exhibit No. 10, David Silverstein is
23  also advising you that Evergreen's European
24  operations will be impacted, or he believes they'll
25  be impacted by this financial crisis, correct?

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 29

1  A   "Europe is going to feel this worse than
2  the U.S."
3  Q   Can you tell me what your understanding is
4  of what the United States was going through in this
5  December 2008 time frame?
6  A   Can you be more specific?
7  Q   The economy; what is your understanding of
8  the economic environment in December 2008?
9  A   "These are economic circumstances of
10  historic proportions."  A huge financial crises,
11  certainly stock market issues, a freeze on certain
12  liquidity transactions.
13  Q   And in Exhibit No. 10, David Silverstein
14  tells you you should not expect to be paid any time
15  soon, correct?
16  A   "As much as it pains me, I cannot continue
17  to pay you per our agreement....  While I do not look
18  forward to having a partner again, it looks like that
19  will be my only choice....  I will let you know when
20  things change, but I will not be able to send you any
21  money this month and would not want you counting on
22  that changing very fast."
23  Q   All right.  That's enough.
24  A   "I think we will have a better handle on
25  things after the new year."

Page 30

1  Q   So you would agree with me that in Exhibit
2  No. 10 David Silverstein is basically telling you
3  that you should not expect to be paid any time soon?
4  A   Soon is a relative term.  I mean, it says
5  we can talk early next year.
6  Q   In Exhibit No. 10, David Silverstein is
7  telling you that, quote, I will not be able to send
8  you any money this month and would not want you
9  counting on that changing very fast.
10  A   And supports that with, I think we will
11  have a better handle on things after the new year.
12  Q   And in Exhibit No. 10, Mr. Silverstein
13  advised you that he was prioritizing payments to his
14  lenders and keeping cash on hand rather than making
15  payments to you, correct?
16  A   I didn't see that in this particular
17  transaction, but --
18  Q   If you go to the second paragraph where it
19  says, my number one priority --
20  A   Okay.
21  Q   -- would you agree with me that
22  Mr. Silverstein advised you in Exhibit No. 10 that he
23  was prioritizing payments to his lenders and trying
24  to keep cash on hand rather than pay you?
25  A   Yes.

Page 31

1  Q   And in Exhibit -- in December of 2008
2  David Silverstein suggested that you take the stock
3  back that was securing your note, correct?
4  A   I don't know if he suggested it quite that
5  way.
6  Q   The last line of Exhibit No. 10 is saying,
7  I look forward to your default notice in the mail.
8  Do you see that?
9  A   Yes.
10  Q   And then if you look on the first
11  paragraph of that page, it says, quote, can you read
12  out loud that sentence, while I do not?
13  The last line of the first paragraph,
14  while I do not look forward to having a partner
15  again, can you read that out loud?
16  A   I'm not sure which --
17  Q   On the second page.
18  A   Oh, on the second page.
19  Q   The first paragraph.
20  A   Okay.  "While I do not look forward to
21  having a partner again, it looks like that is going
22  to be my only choice right now."
23  Q   And you would agree with me that you
24  understood that statement to mean that
25  Mr. Silverstein was suggesting that you were going to

Page 32

1  have to become a shareholder of Evergreen again,
2  correct?
3  A   That is not his choice.  So no, I don't
4  agree with what you just said.
5  Q   I wasn't trying to suggest that
6  Mr. Silverstein had the choice of whether you could
7  be a shareholder or not, but Mr. Silverstein is
8  basically indicating there that you may have to
9  become a shareholder again of Evergreen, correct?
10  A   That's not how I would say it, no.
11  Q   How would you say it?
12  A   He was suggesting that I may want to --
13  that he was in default.
14  Q   And what is the connection between
15  Mr. Silverstein being in default and you becoming a
16  shareholder again?
17  A   I would, upon my choosing, ask -- call
18  default.
19  Q   And you understood that if Mr. Silverstein
20  was in default from making payment to you, that your
21  only remedy would be to take your stock back,
22  correct?
23  MR. SWEETBAUM:  Objection to form.
24  A   Can you restate that question, Marc?
25  Q   (BY MR. PAPPALARDO)  Sure.  You understood

Pages 29 to 32

AGREN BLANDO COURT REPORTING & VIDEO INC

Page 33

1   that if Mr. Silverstein was in default for not paying
2   you, that your only remedy was to take your stock
3   back, correct?
4          MR. SWEETBAUM: Objection to form.
5       A   That wasn't my only remedy. I could work
6   with Mr. Silverstein, for instance, and, you know,
7   and figure out how we might get it back on track, and
8   work together as the agreement says, to figure
9   something else out.
10      Q   (BY MR. PAPPALARDO) Can you elaborate on
11  what you mean by that?
12      A   Dave was in default before this time and,
13  yet, I chose not to call default. So we clearly had
14  worked out other arrangements that allowed us to --
15  me to continue to get my buyout and him to continue
16  to have me not call default.
17      Q   In fact, if you look at the first page of
18  Exhibit No. 10, you basically advised Mr. Silverstein
19  that you viewed this as an investment, correct?
20      A   Yeah.
21      Q   And so you -- can you tell me how you
22  viewed your note as an investment?
23      A   Basically, as an investment, it was
24  something that would, you know, as owning stock in a
25  public company, ups and downs, and, you know,

Page 34

1   managing risk and reward, that's what I meant.
2       Q   And you knew that there was risk
3   associated with receiving full payment under the
4   note, correct?
5       A   I'm not sure what you mean by that
6   question, Marc. Maybe you can try it a different
7   way.
8       Q   Sure. You testified that you -- first of
9   all, you viewed this note as an investment, correct?
10      A   In the way I describe the investment, yes.
11      Q   And did you view it as a risky investment?
12      A   As with any stock type of transaction
13  there are risks and awards.
14      Q   But there are some investments that are
15  more riskier than others, would you agree with me?
16      A   Yes, I would agree with that.
17      Q   Did you view this as a risky or a non-
18  risky investment?
19         MR. SWEETBAUM: Objection. Form.
20      A   I viewed this as in any other investment
21  that I might make in the stock market.
22      Q   (BY MR. PAPPALARDO) You testified
23  previously that --
24      A   Previously today?
25      Q   Today.

Page 35

1       A   Um-hum.
2       Q   You testified previously today that
3   besides taking your stock back, you had another
4   option of waiting for the company to turn around,
5   correct?
6       A   Yeah.
7       Q   Did you have anything else besides that
8   available to you if there was default for payment?
9          MR. SWEETBAUM: Objection. Form.
10      A   I think there were other options, like the
11  one we're engaged in now.
12      Q   (BY MR. PAPPALARDO) Do you believe that
13  in the event that Dave Silverstein failed to make
14  payments under the note, that you had the right to
15  sue Dave Silverstein for money damages for breach of
16  contract?
17         MR. SWEETBAUM: Objection. Form.
18      A   Can you restate your question, please,
19  Marc?
20      Q   (BY MR. PAPPALARDO) Sure. In the event
21  that David Silverstein breached the stock purchase
22  agreement for failing to make any installment
23  payments to you, do you believe that you had the
24  right to sue David Silverstein for money damages?
25         MR. SWEETBAUM: Same objection.

Page 36

1       A   Well, that would depend on whether or not
2   he broke the other parts of the agreement, like
3   maintaining the value of the stock and operating in
4   good faith and all those types of things.
5       Q   (BY MR. PAPPALARDO) Do you believe that
6   in the event that David Silverstein breached the
7   stock purchase agreement for not acting in good
8   faith, do you believe that you had the right to sue
9   David Silverstein for money damages?
10         MR. SWEETBAUM: Objection. Form.
11      A   I always felt a contract is a contract and
12  you can go to court based on that contract. So I
13  guess I don't know what you're asking.
14      Q   (BY MR. PAPPALARDO) In your contract
15  there was a sole remedy clause, the stock purchase
16  agreement, there was a sole remedy clause, correct?
17      A   Um-hum. Yes.
18      Q   And in the sole remedy clause, you would
19  agree that there was limitations on your right to sue
20  David Silverstein for money damages, correct?
21         MR. SWEETBAUM: Objection. Form.
22      A   No. No, I don't agree with what you just
23  said.
24      Q   (BY MR. PAPPALARDO) So you believe that
25  you had the ability -- strike that.

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 37

1     Is it your testimony today that you have
2 the right to sue David Silverstein for money damages
3 if he breaches the good faith and fair dealing clause
4 contained in the stock purchase agreement?
5          MR. SWEETBAUM: Objection. Form.
6     A   Marc, I'm having trouble answering the
7 question because it's got a lot of parts.  So if you
8 want to try it again, maybe break it down to what
9 you're getting at, I can try to answer again.
10    Q   (BY MR. PAPPALARDO) Sure.  You entered
11 into a stock purchase agreement with David
12 Silverstein, correct?
13    A   Yes.
14    Q   And in your stock purchase agreement you
15 agreed to various things that are contained within
16 that written agreement, correct?
17    A   Yes, as did he.
18    Q   So I'm asking you, in your stock purchase
19 agreement, was there any prohibition against suing
20 David Silverstein for money damages if he failed to
21 make an installment payment to you?
22          MR. SWEETBAUM: Objection. Form.
23    A   I don't know.
24    Q   (BY MR. PAPPALARDO) Why don't you know?
25    A   Because I'm having trouble with the

Page 38

1 question as I have told you on no less than three
2 separate occasions.  So I guess I don't know the
3 answer.
4     Q   Are you aware of any prohibition in the
5 stock purchase agreement that prevents you from suing
6 David Silverstein for money damages if he fails to
7 make an installment payment to you?
8          MR. SWEETBAUM: Objection to form.
9     A   No.
10    Q   (BY MR. PAPPALARDO) Are you aware of any
11 prohibition in the stock purchase agreement that
12 prevents you from suing David Silverstein if he
13 breaches the good faith and fair dealing clause
14 contained in that agreement?
15          MR. SWEETBAUM: Objection to form.
16    A   I'm not aware, no.
17    Q   (BY MR. PAPPALARDO) Are you aware of any
18 prohibition in the stock purchase agreement that
19 prevents you from suing David Silverstein if there's
20 a violation of the valuation covenant contained in
21 that agreement?
22          MR. SWEETBAUM: Objection. Form.
23    A   Can you repeat that one more time?
24    Q   (BY MR. PAPPALARDO) Sure.  There's a
25 valuation covenant in the stock purchase agreement.

Page 39

1 Are you aware of that?
2     A   Um-hum.
3     Q   Is that a yes?
4     A   Yes. Sorry. Yes.
5     Q   Are you aware of any prohibition in the
6 stock purchase agreement that prevents you from suing
7 David Silverstein if that valuation covenant is not
8 met?
9          MR. SWEETBAUM: Objection. Form.
10    A   No, I'm not aware.
11    Q   (BY MR. PAPPALARDO) You knew that one of
12 the risks --
13    A   Do you think I could get a hot tea right
14 now?
15    Q   Do you want to take a break?
16    A   Yeah, is that okay?
17    Q   Sure.
18          (Recess taken from 9:56 a.m. to
19 10:03 a.m.)
20    Q   (BY MR. PAPPALARDO) You understood that
21 under the promissory note you would not receive any
22 interest during the time that the note was to be
23 repaid, correct?
24    A   Correct.
25    Q   And when you signed the promissory note,

Page 40

1 you knew that there was a risk that the note would
2 not be repaid, correct?
3     A   Like with any investment, quote-unquote,
4 certainly, you know, if the company went under, that
5 was a potential risk.
6     Q   When you say went under, you mean if it
7 went bankrupt, correct?
8     A   Bankrupt or closed its doors.
9     Q   And you understood that David Silverstein
10 was going to use the money from Evergreen to repay
11 the note, correct?
12    A   I have no knowledge of what money he was
13 or wasn't going to use, his own or others.
14    Q   In the stock purchase -- strike that.
15        Is it your testimony that when you signed
16 the agreement in 2004, you had no knowledge how David
17 Silverstein intended to repay the promissory note?
18    A   It was not something we discussed.
19    Q   In 2004, did you believe that Dave
20 Silverstein had the money to repay the note if he did
21 not work for Evergreen or own Evergreen?
22    A   I wasn't really aware of Dave's personal
23 financial situation to the tune of, you know, I don't
24 think he had $5 million hanging around, but he
25 certainly has access to money, as we're finding out.

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 41

1    Q    In 2000 -- is it your testimony, in 2004,
2  you were unaware of Dave Silverstein's financial
3  condition?
4    A    His personal financial condition?
5    Q    Personal financial condition.
6    A    I never looked at bank accounts.  I never
7  saw what investments he had.  I didn't know if he
8  carried bonds or not.  I didn't know if he was saving
9  for college.  I guess I don't understand what you're
10  getting at.
11    Q    My question is, in 2004, did you have any
12  understanding of Dave Silverstein's personal net
13  worth when you signed that promissory note?
14    A    Dave Silverstein's personal net worth?  I
15  really didn't have too much knowledge of Dave
16  Silverstein's personal net worth.
17    Q    You would agree with me that when you
18  signed the promissory note or when Dave Silverstein
19  signed the promissory note that you understood that
20  your personal net worth was greater than Dave
21  Silverstein's net worth?
22    A    Marc, I did not know David Silverstein's
23  personal net worth when I signed the agreement in
24  2004.
25    Q    Did you believe that Dave Silverstein

Page 42

1  would have the ability to repay the note through
2  moneys totally unrelated to Evergreen?
3    A    Can you repeat that question?
4    Q    Sure.  You understood that when Dave
5  Silverstein signed the note that he needed income and
6  shareholder distributions from Evergreen in order to
7  repay you?
8    A    We never talked about that.
9    Q    I'm asking what your understanding is.
10    A    I was not engaging in thought around how
11  David Silverstein would pay me back.
12    Q    You previously testified that if Evergreen
13  went bankrupt, you knew that your chances of getting
14  paid under the note would decrease, correct?
15    A    That's true.
16    Q    Why?
17    A    Because Dave would have to, you know,
18  close the company, I guess.
19    Q    Why would that impact your ability to get
20  repaid under the note if Evergreen closed?
21    A    Because I -- the stock -- restate your
22  question one more time, Marc, just to make sure I
23  understand what you're asking me.
24    Q    Why would, whether Evergreen goes bankrupt
25  or goes out of business, how would that impact your

Page 43

1  ability to be repaid under the note?
2    A    Well, he could earn money from Evergreen
3  or he could earn money from other sources.  And, you
4  know, he may not be able to repay me as quickly.
5    Q    Or at all?
6    A    I don't know if I really thought about or
7  at all.  I think I more thought about a long,
8  drawn-out time frame since, you know, the obligation
9  was by him.
10    Q    In approximately January of 2008, you and
11  David Silverstein were in negotiations regarding
12  David purchasing the entire face value of your note,
13  correct?
14    A    Yeah.
15    Q    And those negotiations involved agreeing
16  on some discounted purchase price for purchasing your
17  note, correct?
18    A    Purchasing your note is not language that
19  maybe I'm comfortable responding to.  Would you like
20  to restate that question?
21    Q    Sure.
22    A    You are in negotiations to change from a
23  then-approximately something a little bit under
24  $4 million buyout to a one-time $2 million buyout.
25       Is that what you're asking me?

Page 44

1    Q    That's exactly what I'm asking you.
2    A    Okay.
3    Q    So you and Mr. Silverstein were engaged in
4  negotiations where that promissory note would be
5  ripped up and you would receive a lump-sum payment at
6  one time, correct?
7    A    Yes.
8    Q    And when you and Mr. Silverstein were --
9  first of all, you and Mr. Silverstein were unable to
10  agree upon whatever that price is to that one-time
11  payment for your note, correct?
12    A    Or other ways to get there.
13    Q    Other ways, meaning possibly warrants,
14  correct?
15    A    And other ways.  Not just warrants.  You
16  know, 2 million plus some other amount over time, me
17  going to work for BMG to get the rest of it.  You
18  know, there were other options.
19    Q    And, of course, you understood that
20  whatever the -- that when you were negotiating, you
21  understood that the purchase price for your note was
22  going to be at some value less than what you were
23  owed under it, correct?
24    A    It was a negotiation point.  I mean,
25  what -- it could have been the same amount, just, you

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 45

1  know, again, in exchange for services or over an even
2  longer period of time.
3          In fact, I think you all offered ten years
4  at the current rate. You know, I mean, it was not
5  necessarily a decrease.
6      **Q    But you certainly didn't expect to receive**
7  **more money, correct?**
8      A    More than what was owed?
9      **Q    Under the note.**
10     A    No, I didn't.
11     **Q    Because this was a zero interest**
12  **promissory note, correct?**
13     A    Yes.
14     **Q    And in your negotiations with**
15  **Mr. Silverstein, Mr. Silverstein explained that one**
16  **of the risks is that the business may actually**
17  **deteriorate, correct?**
18     A    You have access to the communications. I
19  don't recall exactly which communication you're
20  referring to. I'm sure if you dig it out, we could
21  take a look at it. I don't recall exactly right now,
22  this minute, which one you're referring to.
23     **Q    I'm asking you about, do you ever recall**
24  **having any conversation or communications with David**
25  **Silverstein where David Silverstein explained that**

Page 46

1  **there was a risk in you being repaid under the note**
2  **that concerned Evergreen and its ability to stay in**
3  **business?**
4          MR. SWEETBAUM: Is your time frame before
5  or after the stock purchase agreement?
6          MR. PAPPALARDO: After the stock purchase
7  agreement.
8      A    He had made random comments, I think.
9      **Q    (BY MR. PAPPALARDO) And one of those**
10  **random comments is that he believed that there was --**
11  **strike that.**
12          **When you were negotiating with**
13  **Mr. Silverstein in the approximate January 2009 time**
14  **frame, Mr. Silverstein explained --**
15     A    I was not negotiating with Mr. Silverstein
16  in January 2009. 2008.
17     **Q    I'm sorry, 2008. I apologize.**
18     A    Yeah.
19     **Q    In the January 2008 time frame when you**
20  **were negotiating with Mr. Silverstein,**
21  **Mr. Silverstein was trying to get you to accept a**
22  **one-time payment that was less than the total**
23  **principal amount owed under the note, correct?**
24     A    Significantly less.
25     **Q    Significantly less. Approximately,**

Page 47

1  **Mr. Silverstein was trying to get you to agree to**
2  **approximately $2 million, correct?**
3      A    Instead of approximately 4.
4      **Q    Correct. And one of the justifications**
5  **that Mr. Silverstein gave you for accepting a**
6  **$2 million one-time payment is he believed that there**
7  **was a significant risk associated with Evergreen**
8  **staying in business, correct?**
9          MR. SWEETBAUM: I'm going to object to the
10  form.
11     A    I don't remember that particular dialogue
12  occurring in January 2008.
13     **Q    (BY MR. PAPPALARDO) At any time in 2008**
14  **do you recall David Silverstein discussing --**
15     A    No, I do not recall.
16     **Q    You had conversations with David Mansfield**
17  **in 2008 regarding purchasing your note, correct?**
18     A    Yes.
19     **Q    And --**
20     A    And I think it was more like late 2007 and
21  2008, yes, early 2008.
22     **Q    In the late 2007, early 2008 time frame,**
23  **you had some negotiations with David Mansfield,**
24  **correct?**
25     A    Yes. I wouldn't call them negotiations.

Page 48

1  I would call them discussions.
2      **Q    So you had discussions with David**
3  **Mansfield regarding the possibility of purchasing the**
4  **note for around $2 million, correct?**
5      A    Yes.
6      **Q    And David Mansfield, during those**
7  **conversations, one of the things he did was try to**
8  **justify that $2 million purchase price to you,**
9  **correct?**
10     A    There was some financial discounted cash
11  flow analysis that he provided.
12     **Q    And you would agree with me that one of**
13  **the things that David Mansfield tried to use to**
14  **justify only paying $2 million for the promissory**
15  **note, was that -- the belief that there might be a**
16  **risk associated with Evergreen staying in business,**
17  **correct?**
18     A    Not at that time, no, Marc. In fact, they
19  were quite excited about possibly selling Evergreen,
20  if I don't -- if I recall correctly.
21     **Q    In 2007, you're aware that Evergreen had**
22  **some issues with its lender and bank, Wells Fargo,**
23  **correct?**
24     A    I believe Dave Mansfield mentioned
25  something to that regard.

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

AGREN BLANDO COURT REPORTING & VIDEO INC

Page 49

1   MR. SWEETBAUM: Did you refer to an
2   Exhibit 11?
3   MR. PAPPALARDO: I'm going to. You don't
4   mind if I go out of order, do you? Okay.
5   (Exhibit 12 marked.)
6   **Q   (BY MR. PAPPALARDO) I'm going to show you**
7   **what is marked as Exhibit No. 12.**
8   A   Would you like me to read this, Marc?
9   **Q   If you would like to familiarize yourself**
10  **with it, you're more than welcome to, otherwise I'm**
11  **just going to ask you questions about various pieces**
12  **of it.**
13  A   Why don't I take the time to read it.
14  **Q   Thank you.**
15  (Pause.)
16  A   I'm ready, Marc.
17  **Q   Thank you. Exhibit 12 is an e-mail**
18  **that David Silverstein sent to you on January 17th,**
19  **2008, correct?**
20  A   Yes.
21  **Q   And in that e-mail David Silverstein**
22  **discussed possibly purchasing your note for**
23  **$2 million, correct?**
24  A   Yes.
25  **Q   And he also gave you other options,**

Page 50

1   correct?
2   A   Yes.
3   **Q   And one of the options he gave you was**
4   **taking your stock back, correct?**
5   A   Yes.
6   **Q   And the other option that he gave you was**
7   **basically assuming the risk of nonpayment, correct?**
8   A   No, there was an option of a ten-year
9   thing listed as number 2 on page 2 of the
10  communication, Mr. Pappalardo.
11  **Q   And you understood, though, that on the**
12  **first page, Mr. Silverstein discussed that there were**
13  **three significant discount rates that should be**
14  **applied, correct?**
15  A   In his view.
16  **Q   And one of the significant discount rates**
17  **that Mr. Silverstein felt should be applied dealt**
18  **with the risk of nonpayment, correct?**
19  A   The first risk is, come April, I may even
20  be telling the bank they're not getting paid right
21  now. The second risk is the time value of money.
22  The third risk is the capital gains. So I do not see
23  the risk you are referring to.
24  **Q   You understood that -- prior to**
25  **January 17th, 2008, you understood that Evergreen was**

Page 51

1   **in default with Wells Fargo, correct?**
2   A   No, not -- that was in 2009.
3   **Q   All right. You understood that in 2008**
4   **that Evergreen was having issues with Wells Fargo,**
5   **correct?**
6   A   Yes. It was the communication of David
7   Mansfield that suggested BMG was not in the new
8   loaning portfolio of Wells Fargo.
9   **Q   Did he explain what that meant?**
10  A   That Wells Fargo, the new, if I recall
11  correctly, the new lead of that branch was trying to,
12  you know, get out of certain types of commitments,
13  and BMG was one of those.
14  **Q   Let's go back to Exhibit No. 10, which is**
15  **the December 2008 e-mail. And would you agree with**
16  **me that nowhere in Exhibit No. 10 does David**
17  **Silverstein give you any assurance that you will ever**
18  **be paid in full under your note?**
19  A   Nor does he suggest that he won't.
20  **Q   My question to you is, would you agree**
21  **with me that nowhere in Exhibit No. 10 does David**
22  **Silverstein give you any assurance that you will ever**
23  **be paid in full for your note?**
24  MR. SWEETBAUM: Objection. Form.
25  A   Nor does he tell me that he won't.

Page 52

1   **Q   (BY MR. PAPPALARDO) My question is would**
2   **you agree with me that nowhere in Exhibit 10 does**
3   **David Silverstein give you any assurance that you**
4   **will ever be paid in full for your note?**
5   A   Marc, we have gone up and down this
6   document, and he does not suggest that he won't pay
7   me in full.
8   **Q   I'm asking you whether you see an**
9   **affirmative statement in there, in Exhibit No. 10,**
10  **where he affirmatively tells you that you will be**
11  **paid in full for your note?**
12  MR. SWEETBAUM: Objection. Form.
13  A   There are plenty of other documents that
14  suggest an interest to pay me in full. Just because
15  this one doesn't, doesn't mean that he wasn't
16  planning to pay me in full.
17  **Q   (BY MR. PAPPALARDO) I'm not arguing with**
18  **you. I'm just asking you, would you agree with me in**
19  **Exhibit No. 10 there is no affirmative representation**
20  **where he's giving you an assurance that you will be**
21  **paid in full under the note?**
22  A   I'm not going to count the number of words
23  in that question. Would you like to skinny it down
24  for me?
25  **Q   Sure. In Exhibit No. 10.**

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 53

1    A    Yes, Exhibit No. 10, right here.
2    Q    Would you agree with me that there is no
3  assurance in there that Mr. Silverstein gave you that
4  you're going to be paid in full for your note?
5    A    There is nothing in Exhibit 10, but there
6  are other exhibits where I do feel he represented
7  strong inclination to pay in full.
8    Q    And you understood that in December 2008
9  that, like any investment, there was a risk that you
10  would not be paid in full for your note?
11    A    No.  Because there were other
12  communications that supported an intention to pay in
13  full.
14    Q    When you signed the promissory note in
15  2004, you knew there was a chance that you would not
16  be paid in full for your promissory note, correct?
17    A    No, I didn't know there was a chance.
18    Q    So --
19    A    I assumed I would get paid in full, which
20  is why I took the buyout.
21    Q    And when you signed the promissory note in
22  2004, you believed with 100 percent certainty you
23  would receive $5 million in cash?
24        MR. SWEETBAUM:  Objection.  Form.
25    A    Yes.  In fact, your words in an e-mail, to

Page 54

1  trust Dave, that he will pay you, helped facilitate
2  my ability to believe that with 100 percent certainty
3  that Mr. Silverstein would pay.
4    Q    (BY MR. PAPPALARDO)  And you understood
5  that there were clauses in the stock purchase
6  agreement, for example, that if a certain amount of
7  money wasn't paid to you that you had the right to
8  take back all of your stock, correct?
9    A    Yes.
10    Q    And so you knew that there was at least
11  some chance that you would not be paid in full for
12  your purchase of your stock, correct?
13    A    Marc, I left because I was getting
14  $5 million, that's why I left the company.
15    Q    What I'm asking you is, when you signed
16  the stock purchase agreement, you understood that
17  there was a possibility that you would not receive $5
18  million in cash, but you would possibly have other
19  rights if you didn't receive the $5 million in cash.
20        (Mr. Silverstein entered the room.)
21    A    You have to restate your question.
22    Q    (BY MR. PAPPALARDO)  You understood that
23  when you signed the stock purchase agreement --
24    A    Yes.
25    Q    -- that there was a probability, however

Page 55

1  remote you might feel, that you would not receive
2  $5 million in cash from David Silverstein?
3    A    As I said, it was my understanding and my
4  belief based on the fact that both Mr. Silverstein
5  and Mr. Pappalardo asked me to trust them, that I
6  would be getting $5 million.
7        And that the provision to get stock back
8  was if I chose, if he chose to default or had to
9  default, and if I chose to take stock back, I would.
10    Q    You understood that after you signed the
11  promissory note that there was a chance that David
12  Silverstein would die the next day, correct?
13        MR. SWEETBAUM:  Objection.  Form.
14    A    I honestly never thought about that.
15    Q    (BY MR. PAPPALARDO)  But you would agree
16  with me that the day after Dave Silverstein signed
17  the promissory note, you would agree he could have
18  died on that day, correct?
19        MR. SWEETBAUM:  Objection.  Form.
20    A    Honestly, Marc, I didn't think about that.
21    Q    (BY MR. PAPPALARDO)  I'm not asking what
22  you thought about.
23    A    You're asking me to go back to 2004, okay,
24  and think about what I thought about back in 2004 and
25  that Dave may have been able to die the day after he

Page 56

1  signed the promissory note.  I mean --
2    Q    Your testimony today is that with 100
3  percent certainty, that there is nothing that could
4  have prevented Dave Silverstein from giving you
5  $5 million in cash, correct?
6    A    I mean, you know, Dave refers to in some
7  of his communication the nuclear bomb or whatever.  I
8  mean, that's like a crazy question.
9    Q    You knew that Dave Silverstein could die,
10  correct?
11        MR. SWEETBAUM:  Objection.  Form.
12    Q    (BY MR. PAPPALARDO)  You know it's
13  possible he can die, correct?
14    A    As you can.  As I can.
15    Q    You know it's possible that Dave
16  Silverstein could file bankruptcy, correct?
17    A    Yes.
18    Q    And you knew it's possible that a
19  bankruptcy court could say that Dave Silverstein
20  doesn't have to pay Ilona Kirzhner, correct?
21    A    Marc, if you're asking me, you knew back
22  in 2004, these were not the things I was thinking
23  about itemizing on a list at the talks of the buyout.
24    Q    I'm asking you today when you sit here --
25    A    You said you knew back then.

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 57

1    Q    We'll talk about today, right now.  You
2  know that there's a possibility Dave Silverstein
3  could die, correct?
4    A    Yeah.
5    Q    You know there's a possibility Dave
6  Silverstein doesn't have 3 point whatever million you
7  claim you're owed under the note?
8    A    Doesn't have, doesn't eliminate his
9  obligation.
10    Q    You understood there's a possibility --
11  you have your MBA, correct?
12    A    Yes.
13    Q    And you understand there's a possibility
14  that Dave Silverstein could file bankruptcy and a
15  bankruptcy court could say that he doesn't have to
16  pay you, correct?
17        MR. SWEETBAUM: Objection.  Form.  We've
18  gone over this quite a number of times.
19    Q    (BY MR. PAPPALARDO)  Your answer?
20    A    Can you restate the question one more
21  time, Marc?
22    Q    You understood there is a possibility that
23  Dave Silverstein would file bankruptcy and that a
24  bankruptcy judge might say that he doesn't have to
25  pay you?

Page 58

1    A    Do I understand that to believe the case
2  today?  Honestly, I don't know, Marc.  These are not
3  things that I, you know, think about or thought about
4  driving over here.
5    Q    You testified previously that you viewed
6  being repaid under the note as risky as an investment
7  as any other public stock, correct?
8    A    Yes.
9    Q    And so you understood you could lose your
10  investment when you invest in a stock, correct?
11    A    Or wait it out, and hope it comes back,
12  and, you know, as you do with investments.
13    Q    And so you also understood that there was
14  a possibility that you would not be repaid in full
15  for the note?
16        MR. SWEETBAUM: Objection.  Form.
17    A    As I stated in various communications, I
18  was planning to weather the storm.  And my thinking
19  was not, I'm not going to get paid, I'm not going to
20  get paid.
21        My thinking was, we'll get paid as the
22  ability of Mr. Silverstein to pay.
23    Q    (BY MR. PAPPALARDO)  And, again, you
24  understood that Mr. Silverstein's ability to pay you
25  was tied to the prospects of Evergreen.

Page 59

1        MR. SWEETBAUM: Objection.  Form.
2    A    Mr. Silverstein made a commitment to pay
3  me back.  And part of that commitment could have been
4  covered by means outside of Evergreen, and certainly
5  part of it could have been covered with means inside
6  of Evergreen.
7    Q    (BY MR. PAPPALARDO)  I agree with you on
8  that.  I'm not suggesting that legally speaking, that
9  if Evergreen did -- went bankrupt, that the
10  obligations under the note didn't exist.  That's not
11  my suggestion.  My question to you, though, is you
12  understood, though, that David Silverstein --
13    A    Understood then?  Now?
14    Q    Understood now that David Silverstein was
15  going to use the money that he made from Evergreen to
16  repay you under the note?
17    A    You had asked me this earlier, Marc, and
18  my answer was, that I did not have knowledge of
19  Mr. Silverstein's detailed road map of how he would
20  make those payments.  And that those could have come
21  from, you know, earnings he earned in Evergreen,
22  outside of Evergreen.  So I guess I don't know is the
23  answer.
24    Q    Evergreen was formed in 1999, correct?
25    A    I believe that's the case, yes.

Page 60

1    Q    July of 1999.  And prior to that David
2  Silverstein was working in Singapore, correct?
3    A    I believe that's the case, yes.
4    Q    For Seagate, correct?
5    A    I believe that's the case, yes.
6    Q    Do you know approximately how much David
7  Silverstein was making then?
8    A    I do not know how much David Silverstein
9  was making then.
10    Q    You knew that David Silverstein from 1999
11  to 2004 at times struggled financially with money,
12  correct?
13        MR. SWEETBAUM: Objection.  Form.
14    A    No.  How would I know that?  I don't -- I
15  testified earlier that I did not know the details of
16  Mr. Silverstein's financial situation.  His, you
17  know, wife sometimes worked part time, sometimes
18  didn't.  They had help at home.  They had decent
19  living accommodations.  They both drove decent cars.
20  What information would I have to suggest that
21  Mr. Silverstein was having financial trouble?  I had
22  none of that.
23    Q    (BY MR. PAPPALARDO)  What type of car in
24  2004 did David Silverstein drive?  A minivan?
25    A    I believe his wife drove the minivan.

Pages 57 to 60

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 61

1    Q    What did David Silverstein drive?
2    A    I think he drove an American-made sport
3    ute, if I'm not mistaken.
4    Q    Ford Explorer?
5    A    Red.  Are you suggesting because he drove
6    a Ford Explorer, he had financial trouble?
7    Q    How expensive of a house did he have?
8    Strike that.
9        You lived in approximately the same area
10    as David Silverstein, correct, in 2004?
11    A    Down the road a bit, yeah, okay.
12    Q    You knew that Dave Silverstein wasn't
13    living in a house that cost over a million dollars?
14    A    That's correct.
15    Q    You knew that his wife was a nurse,
16    correct?
17    A    I believe in 2004 she was not working.
18    Q    And you knew what David Silverstein's
19    salary was at Evergreen, correct, in 2004?
20    A    Our salaries and our dividends kind of
21    fluctuated.  So that varied up and down from 1999 to
22    2004 as we saw fit.
23    Q    From 1999 to 2004 David Silverstein took
24    the same exact salary as you, correct?
25    A    Yes.

Page 62

1    Q    And from --
2    A    As far as I know.
3    Q    And you have no reason to disbelieve (sic)
4    that David Silverstein took a greater salary than you
5    from the time that you worked at Evergreen until the
6    time you left, correct?
7    A    That's correct.
8    Q    And from the time that you worked at
9    Evergreen until the time that you left, David
10    Silverstein took the same exact distributions from
11    the company as you did, correct?
12    A    Correct.
13    Q    So you had an understanding of the amount
14    of income that David Silverstein was making in 2004,
15    correct?
16    A    That's correct.
17    Q    And you knew that David Silverstein was
18    not working outside of Evergreen in 2004, correct?
19    A    That's correct.
20    Q    And you certainly didn't expect David
21    Silverstein to get a second job after you left
22    Evergreen, correct?
23    A    Probably not, although I am aware that he
24    was involved in many -- I don't know about many, but
25    at least one real estate transaction that was, you

Page 63

1    know, obviously not a second job but provided for
2    significant additional income.
3    Q    How did you become aware that David
4    Silverstein was involved in a real estate
5    transaction?
6    A    Mr. Mansfield told me.
7    Q    When did Mr. Mansfield tell you that?
8    A    I don't know.
9    Q    In 2010?
10    A    No, before.
11    Q    2009?
12    A    Either 2008, 2009, I don't remember.
13    Q    So let's talk about your conversations
14    with David Mansfield, then, in 2009.  Did you talk to
15    David Mansfield in September, between September of
16    2009 and January 1st of 2010?
17    A    Can you restate those dates again?
18    Q    Sure.  In approximately September 2009
19    you're aware that --
20    A    September 2009.
21    Q    2009.  You were aware of an auction of
22    Evergreen's assets, correct?
23    A    Yes.
24    Q    After learning of that auction, did you
25    ever contact Mr. Mansfield?

Page 64

1    A    I'm not sure if I contacted him, but I
2    believe I did and we had casually arranged, as you
3    know, to meet at the October 2009 DoD conference.
4    Q    Can you tell me about any conversations
5    that you had with David Mansfield at the October 2009
6    DoD conference?
7    A    I think we supplied pretty detailed
8    discovery notes in that regard.
9    Q    Can you tell me what you recall from the
10    October 2009 DoD conference?
11    A    I recall Mr. Mansfield telling me that
12    Dave had -- was in violation of some loan covenants
13    and was trying to force either one or both lenders
14    into negotiation to try to either revise and/or
15    change the terms of his loans.
16        Mr. Mansfield also said that there was a
17    new entity set up that was a Delaware company and
18    that most, if not all, of the assets from Evergreen
19    had been moved, which made the stock that I had
20    rights to, in his words, worthless.
21    Q    Did you talk anything else about the
22    auction?
23    A    I don't recall, unfortunately.
24    Q    Do you recall anything else about your
25    conversation with Mr. Mansfield at the DoD

Pages 61 to 64

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 65

1    conference?
2        A    You know, Marc, we could check the notes
3    because I did submit some detailed notes.  It's been
4    a while, but that would be the highlights as I have
5    mentioned them.
6        Q    I understand that.  But besides your
7    notes, do you recall -- besides anything you may have
8    put in your notes, do you recall anything as you're
9    sitting here that is not in your notes or that you
10   haven't discussed with us today?
11           MR. SWEETBAUM:  I'm sorry, you're asking
12   her anything that is not in her notes.
13       Q    (BY MR. PAPPALARDO) Strike that off.
14           Do you recall anything, other than what
15   you've testified about today, what else do you recall
16   about the conversation?
17           MR. SWEETBAUM:  If you have the notes for
18   her, it might refresh her recollection.
19       Q    (BY MR. PAPPALARDO) Do you recall
20   anything else other than what you've discussed today
21   regarding what was talked about --
22       A    I'm sure we chatted about his weight loss.
23   I'm sure we chatted about his family.  I don't recall
24   anything else.
25       Q    When Mr. Mansfield told you that your

Page 66

1    stock was worthless, did you ask him any more
2    questions about that?
3        A    I don't remember.
4            MR. PAPPALARDO:  Why don't we just take a
5    break, a ten-minute break.
6            (Recess taken from 10:43 a.m. to
7    10:48 a.m.)
8        Q    (BY MR. PAPPALARDO) Ms. Kirzhner, you
9    said that you're currently an independent consultant?
10       A    I think I used the word contractor.
11       Q    Contractor, independent contractor.  How
12   many clients do you have?
13       A    It varies.  Right now, three, four, come
14   and go kind of thing.
15       Q    And you're aware that our country is
16   currently in a financial crisis, as described by
17   some, correct?
18       A    That is left up to interpretation,
19   Mr. Pappalardo.
20       Q    How would you describe our current
21   economic environment in the United States?
22       A    The stock market is back over 11,000.  The
23   unemployment rate has stopped growing.  I believe
24   some have called an end to the recession.
25       Q    And when did you begin being an

Page 67

1    independent contractor?
2        A    About a year, maybe, after I left BMG.
3        Q    And would you agree with me that since at
4    least December of 2008 the --
5        A    December 2008, yes.
6        Q    -- that it is more difficult for you to
7    find clients?
8        A    I have not had trouble, Marc.
9        Q    When you left Evergreen in 2004, your
10   average daily rate was $5,000, correct?
11           MR. SWEETBAUM:  I'm sorry, your average
12   daily rate?  I just didn't listen to the question, to
13   be honest with you.
14           MR. PAPPALARDO:  That's fine and you can
15   object to the form.
16           MR. SWEETBAUM:  I'm just hoping that so
17   that it helps me to object if I understand, when you
18   say average daily rate, is that some term in the
19   industry?
20           THE DEPONENT:  Yes.
21           MR. SWEETBAUM:  Okay.  That's fine.
22       A    It depended on the type of work I was
23   doing.
24       Q    (BY MR. PAPPALARDO) But you would agree
25   with me that your average daily rate in 2004 when you

Page 68

1    left Evergreen was $5,000?
2        A    Marc, I think we could look at the records
3    and we could run a calculation.  I think that would
4    be the high end.
5        Q    What is your understanding of what your
6    daily average rate was at Evergreen when you left?
7        A    I would say it would be in the
8    neighborhood of 3 to 5.
9        Q    Thousand dollars a day?
10       A    Yes.
11       Q    Today what is your average daily rate?
12           MR. SWEETBAUM:  Objection.  Form.
13       A    In the neighborhood of 2 to 4.
14           (BY MR. PAPPALARDO)  Thousand dollars?
15       A    Yes.
16       Q    And Don Wood contacted you, correct?
17       A    Yes, he did.
18       Q    And, in fact, Don Wood advised you of some
19   DoD work, correct?
20       A    That he was interested in, not that I was
21   interested in.
22       Q    And you're doing work for the DoD,
23   correct?
24       A    Yes.
25       Q    What is your rate at the DoD?

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 69

1    A    It's approaching $2,000 a day.
2    Q    When you say approaching, can you give me
3  an approximate?
4    A    It depends -- it's an hourly rate so it
5  depends on how many hours I work.
6    Q    What is your hourly rate for your work at
7  the DoD?
8    A    My hourly rate for my work at the DoD is
9  approximately $200 an hour.
10    Q    So approximately $1600 for eight hours,
11  correct?
12    A    I don't work eight hours a day.  I work
13  more.
14    Q    Now, when we referred -- when you were at
15  Evergreen, when you charged a daily rate, you would
16  charge that rate for the entire day regardless of how
17  many hours you worked, correct?
18    A    I believe that to be the case, yes.
19    Q    And do you have any clients currently that
20  you charge on a daily rate basis?
21    A    No.  It's pretty much all hourly.
22    Q    Can you tell me what your highest hourly
23  rate is that you're charging a client currently?
24    A    It would be in the neighborhood of $325 to
25  $375 an hour.

Page 70

1    Q    Comparing the rates that you charged in
2  2007 to the rates that you charge today, would you
3  agree with me that, on average, your rates that you
4  charge today is less than what you were able to
5  charge in 2007?
6    A    Marc, the nature of the work I do today is
7  different than the nature of the work I did at BMG in
8  2004.
9    Q    My question to you is, are you charging
10  roughly the same hourly rates today that you were
11  charging in 2007?
12    A    For the same work?
13    Q    Yes.
14    A    Yes.
15    Q    And so --
16    A    Maybe 25 percent less, maybe 10 percent.
17    Q    And that's really what I'm getting at.
18    A    Okay.
19    Q    You would agree with me that this
20  financial situation that is facing America has caused
21  you to charge less money?
22    A    No.  No.  That is not why the rates have
23  gone down.
24    Q    Okay.
25    A    The rates have gone down because we're in

Page 71

1  a commoditized market, not because the economy is in
2  what you would call distress or stress.
3    Q    You're aware of people who have lost their
4  jobs in the field that you're in, correct?
5    A    And other fields.
6    Q    And that there are more people -- well, is
7  it your understanding that there are more people
8  looking for work today in your field than there were
9  in 2007?
10    A    And every other field.
11    Q    And you would agree with me that the fact
12  that there are more people looking for work is
13  causing your rates in your field to become lower?
14    A    And a lot more providers, as, you know,
15  another maybe arguably even stronger driver of that.
16    Q    Okay.  But one of the drivers, you would
17  agree with me, is the fact that there are people who
18  are out of work and are willing to work for less
19  money today than there were in 2007?
20    A    I don't think that's impacting my rate,
21  no.
22    Q    I'm not asking you whether it impacts your
23  rates, but would you agree with me that it is
24  impacting rates that some other companies might be
25  charging?

Page 72

1    A    I think the supply of Lean Six Sigma
2  practitioners, both employed and unemployed, is
3  greater.  And as with any supply and demand type of
4  interaction, we're playing that interaction in our
5  industry, along with other industries.
6    Q    And in 2008 and 2009, David Silverstein
7  explained to you that Evergreen's business was being
8  impacted because it was being forced to charge lower
9  rates, correct?
10    A    Marc, you can check the communications on
11  that.  I don't have a recollection off the top of my
12  head.
13    Q    So you don't recall whether David
14  Silverstein ever explained that to you, either in
15  e-mail or in person?
16    A    I don't recall that sitting here right
17  now, no.  I mean, I could look at the documentation.
18    Q    Do you recall whether David Silverstein
19  ever told you that Evergreen's business was being
20  impacted by the fact that clients were taking longer
21  to pay?
22    A    He probably mentioned that in one of these
23  communications.
24    Q    Has that also been your personal
25  experience in 2008 and 2009, that clients were taking

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 73

1  longer to pay?
2  A  No.
3  Q  In 2008 and 2009, David Silverstein
4  explained to you that Evergreen was having difficulty
5  winning new clients and new business?
6  A  I don't really think he ever explained
7  that to me.
8  (Exhibit 13 marked.)
9  Q  (BY MR. PAPPALARDO) I'm going to show you
10  what is marked as Exhibit No. 13. Can you please
11  review it. And after you've had a chance to review
12  it, please tell me.
13  (Pause.)
14  A  Okay.
15  Q  Can you tell me about the type of
16  consulting work that you do right now?
17  A  Performance improvement.
18  Q  Can you be more specific?
19  A  Helping some DoD component with specific
20  projects, like Mr. Obama's --
21  Q  I don't want to know anything about any of
22  that, I'm sorry, because I don't want you to break
23  any confidentiality --
24  A  More specific?
25  Q  I mean, in general, can you give me what

Page 74

1  type of consulting work do you do for any clients
2  that you are trying to do work for?
3  A  For the International Society of Six Sigma
4  Professionals, I do something very different than I
5  do for my other clients. The nature of that
6  relationship is more rolling out an industry standard
7  certification for belts. The other work that I do,
8  as I said earlier, is general performance
9  improvement, process improvement, consulting,
10  mentoring, workshops.
11  Q  For what type of companies and entities?
12  A  I mean, do I have to disclose?
13  Q  No, I'm not asking for the names. Just in
14  general.
15  A  Well, some are manufacturing companies.
16  Some is the DoD. Some is, you know, healthcare. I
17  mean --
18  Q  Very large companies in some instances,
19  correct?
20  A  I don't think you can get much larger than
21  the Department of Defense, Marc.
22  Q  And you're aware that at least for --
23  A  And much smaller than ISSSP, by the way.
24  Q  You're aware that in a recession that one
25  of the things that large companies try to do is cut

Page 75

1  costs, correct?
2  A  Not just in a recession. All the time.
3  Q  And one of the ways that companies may try
4  to cut costs is to stop using outside consulting
5  companies, correct?
6  A  The other flip side of that is use them
7  more on very targeted opportunities.
8  Q  You are aware -- you go to -- can you tell
9  me what IQBC is?
10  A  It's an organization that runs various
11  conferences in different vertical segments.
12  Q  What type of segments?
13  A  I think they run the gamut. I honestly am
14  not intertwined and haven't been to an IQBC
15  conference since I think I went to one with BMG.
16  Q  Are you a member of any professional
17  organizations?
18  A  ISSSP.
19  Q  Can you tell me what ISSSP is for somebody
20  who doesn't know what it would be?
21  A  ISSSP is an organization that facilitates
22  and promotes practitioner and professional exchange
23  through conferences, through networking, through
24  webinars, through workshops that allow different
25  industry organizations to exchange best practices and

Page 76

1  benchmark and run surveys.
2  Q  In what field?
3  A  Performance improvement, process
4  improvement, Lean Six Sigma.
5  Q  And are you a member of any other
6  professional organizations?
7  A  Not at this time, that I recall.
8  Q  Besides the Department of Defense events,
9  have you attended any conferences in 2009 or 2010?
10  A  Yes, I went to the I Six Sigma conference
11  in Miami, where I think I saw Mr. Silverstein one
12  year.
13  Q  Any other conferences or events that you
14  can recall?
15  A  Or maybe the ISSSP conference.
16  Q  And you have a lot of friends and
17  acquaintances who are in the field of process
18  improvement, correct?
19  A  Yeah, um-hum.
20  Q  Is that a yes?
21  A  Yes. Yes.
22  Q  And some of those people work for private
23  consulting companies like Evergreen, correct?
24  A  Yes.
25  Q  And some work for larger companies like

**Court Reporting Videography Digital Reporting Transcription Scanning Copying**
**Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 77

1  **Accenture.  Do you know anybody who works for**
2  **Accenture?**
3  　　A　All the people I knew at Accenture are no
4  longer at Accenture, so I don't think I know anybody
5  who works at Accenture right now.
6  　　**Q　Boston Consulting, do you know anybody who**
7  **works for Boston Consulting?**
8  　　A　I don't know Boston Consulting.
9  　　**Q　Do you know of anybody who works for the**
10  **larger consulting companies?**
11  　　A　BMG.  I know a bunch of independents.
12  　　**Q　Do you know anybody that works for a**
13  **company that is larger than Evergreen or BMG in the**
14  **field of process improvement?**
15  　　A　Honestly, Marc, I don't know the revenues
16  or size of, say, AIT or SBTI, or all the plethora of
17  contracting, government contractors, that are not
18  what we would call traditional Lean Six Sigma
19  consultancies.  What is your question behind the
20  question?
21  　　**Q　Why don't you tell me, without giving the**
22  **names of people, tell me some of the companies where**
23  **you have friends or acquaintances who are in the**
24  **field of management or process improvement**
25  **consulting?**

Page 78

1  　　A　I think I disclosed that in your
2  discovery, Marc.  Mike Carnell, Gary Cohn.
3  　　**Q　I'm not asking for the names of people;**
4  **the names of the companies.**
5  　　A　GPS is Gary Kohn's company.  CSI
6  International is Mike Carnell's company.  Roxanne
7  O'Brasky currently works for AIT Group.  Steve
8  Zinkgraph, I don't know if he's still doing business
9  at SBTI.
10  　　There is, you know, dozens of government
11  contractors who are now considering themselves in the
12  Lean Six Sigma space.  I think there is one called
13  Caliper.  There is one called CPS.  There is one -- I
14  mean, I could go on and on.  I'm not sure what is
15  your point.
16  　　**Q　You're aware -- one of the companies you**
17  **talked about is AIT.  You're aware that AIT has been**
18  **significantly impacted by this financial crisis,**
19  **correct?**
20  　　A　I have not talked to AIT in detail about
21  any impact they may or may not have felt through the
22  financial crisis.
23  　　**Q　Are you aware that AIT laid off a large**
24  **number of employees between 2008 and 2009?**
25  　　A　No, I'm not.  In fact, they hired Roxanne,

Page 79

1  so I was aware that they were hiring, not letting go.
2  　　**Q　So as you sit here today, you're unaware**
3  **of any layoffs that occurred at AIT between 2008 and**
4  **2009?**
5  　　A　That's correct.
6  　　**Q　And let's talk about SBTI.**
7  　　A　You said unaware, right?
8  　　**Q　Yeah, you're unaware.**
9  　　A　Unaware.
10  　　**Q　And are you aware that SBTI has been**
11  **significantly impacted by the financial downturn?**
12  　　A　I am completely unaware.  I have had zero
13  communication with anyone from SBTI regarding their
14  woes about laying off people in this economic
15  downturn.
16  　　**Q　And so as far as you know, AIT was**
17  **completely unaffected by any financial downturn that**
18  **has faced this company -- this country?**
19  　　A　I didn't say that.  I just said I'm just
20  unaware of how they are impacted.
21  　　**Q　Are you aware of any impact AIT may have**
22  **felt because of the economic downturn this country**
23  **was facing?**
24  　　A　I'm unaware of any hardships or gains that
25  AIT, that SBTI may have felt from this economic

Page 80

1  downturn.  Some companies have grown in this economic
2  downturn, Marc.
3  　　**Q　So are you unaware?**
4  　　A　I am unaware in either direction.
5  　　**Q　For either AIT or SBTI?**
6  　　A　Correct.
7  　　**Q　And what about Six Sigma Academy, SSA, are**
8  **you aware of any --**
9  　　A　No, unaware.
10  　　**Q　What about SSQ?**
11  　　A　Six Sigma Qualified?
12  　　**Q　Yeah.**
13  　　A　I am unaware.  I have had no communication
14  with anyone from that company.
15  　　**Q　Are you aware of any company in the**
16  **process improvement field that was impacted by the**
17  **economic downturn?**
18  　　A　Other than Evergreen?
19  　　**Q　Yeah.**
20  　　A　I am not aware.
21  　　**Q　So as far as you sit here today, Evergreen**
22  **is the only company that you believe in the process**
23  **improvement field that was impacted by the financial**
24  **downturn?**
25  　　A　I didn't say that.  I said I'm not aware

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 81

1   of how other competitors to BMG have been feeling the
2   economic downturn, is what I said, Marc.
3       Q    Have you spoken to anybody who works in
4   the process improvement field who discussed any
5   impact that any other company besides Evergreen
6   that's involved in the process improvement field, how
7   they may have been impacted by the economic downturn?
8       A    I know of two companies that have grown in
9   the economic downturn.
10      Q    My question to you is, has anybody that
11  you've ever talked to in the process improvement
12  field, have you ever talked to any company other than
13  Evergreen that has been impacted in any way by the
14  economic downturn in a negative fashion?
15      A    Not specifically.  So there is talk at the
16  conferences around economic times are bad and
17  companies are cutting training budgets, but not, you
18  know, this company has laid off this many people
19  because of this.
20      Q    You're an acquaintance of Mike Cyger,
21  correct?
22      A    Yes.
23      Q    And Mike Cyger used to work for I Six
24  Sigma, correct?
25      A    He owned I Six Sigma.

Page 82

1       Q    Have you had any conversations with Mike
2   Cyger between September 2008 and today?
3       A    Probably, um-hum.
4       Q    Do you recall any conversations you've had
5   with Mike Cyger where you discussed or he discussed
6   how the current state of the economy might be
7   impacting companies that are in the field of process
8   improvement?
9       A    I don't recall.
10      Q    You're aware that, Dave Silverstein
11  explained to you, that the current economic situation
12  was impacting Evergreen, correct?
13      A    As you have identified in various exhibits
14  here, yes.
15      Q    Do you believe that David Silverstein did
16  anything to cause Evergreen's financial situation
17  prior to April of 2009?
18      A    Can you repeat your question?
19      Q    Sure.  Looking at Exhibit No. 13.
20      A    Yes, Exhibit 13.
21      Q    Exhibit 13 is an e-mail that David
22  Silverstein sent you on April 30th, 2009, correct?
23      A    It would appear to be the case.
24      Q    And in Exhibit No. 13, David Silverstein
25  described Whammy 1 on the left.  Can you read that?

Page 83

1       A    Whammy 1, less business, less people.  We
2   downsized from 100 to 70 in the U.S.  This is normal
3   in a downturn.
4       Q    Do you believe that David Silverstein
5   personally did anything to cause Evergreen to face
6   less business in April of 2009?
7       MR. SWEETBAUM:  Objection.  Form.
8       A    Can you repeat the question, Marc?
9       Q    (BY MR. PAPPALARDO)  Sure.
10      A    Do I believe --
11      Q    Do you believe -- if Evergreen had less
12  clients in April of 2009 than it did in 2008, do you
13  believe that David Silverstein did anything to cause
14  Evergreen to have less clients?
15      MR. SWEETBAUM:  Same objection.
16      A    That's like a crazy question.  You know,
17  there were times when I was at BMG that Dave was
18  thrown out of a couple of clients.  You know, maybe
19  that could have caused a small portion of this.
20      Do I believe that he would, you know, on
21  purpose cause clients to not come back to BMG, I
22  seriously doubt that.
23      Q    (BY MR. PAPPALARDO)  And in Whammy 2, Dave
24  Silverstein describes lower rates.  Do you see that?
25      A    Yes, I do.

Page 84

1       Q    Do you believe Dave Silverstein did
2   anything to cause Evergreen to have to charge clients
3   lower rates?
4       MR. SWEETBAUM:  Objection.  Form.
5       A    I believe that was a result of the
6   marketplace we're in.
7       Q    (BY MR. PAPPALARDO)  Can you describe
8   that, please?
9       A    That's what I mentioned earlier, Marc,
10  we're in a commoditized market where we have a lot of
11  providers peddling Lean and/or Six Sigma or Lean Six
12  Sigma, you know, that are not -- they're like the,
13  you know, the cheap Japanese imports and, you know,
14  are forcing real Lean Six Sigma providers like BMG,
15  you know, to have to compete.
16      Did I answer your question, Marc?
17      Q    You did.  Thank you.
18      A    Okay.
19      Q    You're aware that between December 2008
20  and December 2009 that there were less companies
21  looking for outside consultants to do process
22  improvement work, correct?
23      A    No, I'm not aware of that.
24      Q    Do you have any understanding of the
25  demand for process improvement work for outside

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 85

1  consultants to do process improvement work between
2  December 2008 and December 2009?
3     A   I know opportunities that have approached
4  me. I don't know what you're asking. Would you like
5  to try again?
6     Q   Yes. I'm asking you, between December
7  2008 and December 2009, do you have any understanding
8  of whether the demand for outside companies to
9  perform process improvement either increased or
10  decreased during that time frame?
11    A   I do not have knowledge.
12    Q   Between December 2008 and December 2009,
13  do you have any knowledge of whether the daily rates
14  for process improvement were increased or decreased,
15  during that time frame?
16    A   I have not done surveys from December 2008
17  to December 2009 regarding the daily rates of process
18  improvements, so I do not know.
19    Q   Again, you're an independent contractor
20  with approximately three to four clients, correct?
21    A   Yes.
22    Q   You would agree with me that David
23  Silverstein would be in a better position to discuss
24  about the change in rates between December 2008 and,
25  let's say, January of 2010, since he deals with more

Page 86

1  potential clients than you?
2     A   From his rice bowl he will, and I would be
3  from my rice bowl.
4     Q   Can you talk from your rice bowl and tell
5  me what you think?
6     A   In my opinion and the clients that have
7  approached me and the rates that I have been offered,
8  they have ranged in the neighborhood of 4 to $4,000.
9  I would say, you know, governmental, government
10  agencies are at the lower end of that range. And
11  private industries are at the higher end of that
12  range, from my rice bowl.
13    Q   You previously testified that your highest
14  daily rate is between 325 and 350 --
15    A   375.
16    Q   Your highest hourly rate is between 325
17  and 375 an hour, correct?
18    A   Something like that.
19    Q   You just testified you have been offered
20  up to $4,000 per day, correct?
21    A   If you take 375 times an 8-hour day, Marc,
22  you will get in the neighborhood of $4,000.
23    Q   I'm sorry, we may have a misunderstanding.
24  When we deal with the phrase daily rate, is it your
25  understanding that is usually based on an eight-hour

Page 87

1  day or is it your understanding that is based on
2  an-hour day?
3     A   That changes based on the contract with
4  the client.
5        MR. SWEETBAUM:  That's what I was trying
6  to find out. I didn't know what it meant.
7     A   I have clients that, you know, pay me
8  hourly for six-hour days.
9     Q   (BY MR. PAPPALARDO) From your, as you
10  said, rice bowl, can you please tell me between
11  December 2008 to today, can you please tell me what
12  you see as the demand for outside consulting
13  companies like Evergreen performing process
14  improvement work? Has it increased? Has it
15  decreased? Could you discuss it?
16    A   I know of two competitors to Evergreen
17  that are growing incredibly and have grown
18  incredibly. And, then, many of the old guys that
19  worked for Dave and I have gone to those places for
20  work.
21        You know, I would suspect that there are
22  others like Evergreen that, you know, could have felt
23  the swing the other way.
24    Q   And why do you believe that other
25  companies like Evergreen may have felt the swing the

Page 88

1  other way?
2     A   I don't know. I think that the answers
3  lie in management, in the industry, in the economy.
4  It's not a straight-up answer, Marc.
5     Q   Who are the two competitors you said have
6  grown over the time frame?
7     A   At least GPS and CS International have
8  grown. There are many government contractors that
9  are now in the Lean Six Sigma space, are growing
10  leaps and bounds.  GPS is certainly one that I know
11  of firsthand; IBM.
12    Q   Can you tell me about GPS, approximately
13  how many employees do they have today?
14    A   I don't know.  20, 30, 50, I don't know.
15    Q   What about CS International?
16    A   I think they're smaller.
17    Q   When you say smaller, approximately how
18  many?
19    A   I would guess 10 to 20.
20    Q   And you've testified that they've grown.
21  How do you know that they've grown?
22    A   I've talked to their owners.
23    Q   What have they told you?
24    A   You know, I would hate to give up
25  information that is really privileged to their

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 89

1  companies, considering their competitor to be BMG.
2    Q    I'm not asking for their client list or
3  anything like that. I'm just asking you to tell
4  about their growth?
5        MR. SWEETBAUM: Is that an issue that you
6  want to talk about? Is there a confidential --
7        THE DEPONENT: No, I just don't feel like
8  it's my place to talk about their business.
9    Q    (BY MR. PAPPALARDO) You're not bound by
10  any confidentiality agreement with GPS, are you?
11    A    No, but that doesn't mean I want to put
12  them in a compromising situation relative to their
13  position against BMG or BMGI corporation.
14    Q    You don't have any confidentiality
15  agreement with GPS International, do you?
16    A    Huh-uh.
17    Q    Is that a no?
18    A    No.
19    Q    Can you please tell me what you've heard
20  about GPS regarding their growth?
21    A    GPS contacts me every month to provide
22  them additional resources for delivering training.
23  So I assume that they are growing.
24    Q    So your statement that GPS has been
25  growing is based solely on the fact that they have

Page 90

1  contacted you for work, correct?
2    A    I think there was an e-mail where the
3  partner, one of the partners said, we're sitting on a
4  gold mine, something along those lines.
5    Q    What did he mean by sitting on a gold
6  mine?
7    A    I assume he meant that he's got more
8  business than he can handle and that they are doing
9  quite well.
10    Q    You testified that you believe CS
11  International has grown. Can you tell me why you say
12  that?
13    A    They have kind of really solidified a very
14  niche market for themselves and are really
15  capitalizing on that market.
16    Q    And what is their niche market?
17    A    Marc, I don't feel like I need to, you
18  know, provide BMGI Corporation information about its
19  competitors, and I don't feel that's relevant.
20    Q    Are you refusing to answer.
21        MR. SILVERSTEIN: I can step out.
22        THE DEPONENT: No, you're going to see the
23  transcript.
24        MR. SWEETBAUM: Is there some kind of
25  protective order that would resolve this.

Page 91

1    Q    (BY MR. PAPPALARDO) I'm not asking for
2  client lists, I'm not asking for --
3    A    You're asking for what kind of industry
4  they're in and you know I don't think that's relevant
5  to what we're doing here. I would prefer not to
6  answer the question, Marc. Can you move on?
7    Q    Are you refusing to answer the question?
8    A    They are in the mining industry, Marc.
9    Q    And do they provide Six Sigma and Lean Six
10  Sigma to mining industry clients?
11    A    And other stuff, I think.
12    Q    But the work they're doing is in Six Sigma
13  and in the Lean Six Sigma mining industry?
14        MR. SWEETBAUM: Before you answer, I am
15  not instructing her not to answer.
16        MR. PAPPALARDO: Why don't you confer.
17        MR. SWEETBAUM: That's what I was going to
18  ask you to do, Marc, if I could confer with my
19  client.
20        MR. PAPPALARDO: Yeah, yeah, definitely.
21        MR. SWEETBAUM: Thank you.
22        (Recess taken from 11:22 a.m. to
23  11:25 a.m.)
24    A    Yes.
25    Q    (BY MR. PAPPALARDO) Is it your testimony

Page 92

1  that CS International is growing as a result of the
2  Lean Six Sigma and Six Sigma work that it's doing?
3    A    That is my perception. I do not have
4  company information to support that.
5    Q    And so it's possible that CS International
6  is growing because it's doing work that Evergreen
7  doesn't do?
8        MR. SWEETBAUM: Objection. Form.
9    Q    (BY MR. PAPPALARDO) Or that Dave's
10  company doesn't do?
11        MR. SWEETBAUM: Objection. Form.
12    A    If I'm not mistaken, I think Dave does
13  have some inroads into this space in South Africa.
14    Q    (BY MR. PAPPALARDO) You testified you
15  don't know whether they're doing Lean -- you don't
16  know if they're doing something other than Lean or
17  Six Sigma that is causing their business to grow,
18  correct?
19    A    I would say it's mostly Lean Six Sigma.
20    Q    So in the April 2009 time frame it's fair
21  to say that Dave Silverstein is describing to you
22  that Evergreen's business is in a difficult
23  situation?
24    A    Whammy 1, whammy 2, whammy 3.
25    Q    Is that a yes?

Pages 89 to 92

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 93

1      A    I guess that's a yes.
2      Q    Okay.  And do you believe that Dave
3   Silverstein did anything intentionally to cause the
4   business to face economic troubles in April 2009?
5           MR. SWEETBAUM: Objection.  Form.
6      A    I think Dave, through his own admission,
7   has made -- taken on certain debts and made certain
8   investments that have contributed more to the
9   downturn, to the troubles he was having, than
10  possibly the economic woes of the nation.
11     Q    (BY MR. PAPPALARDO)  And so you believe
12  that Dave may have made some bad business decisions
13  in April of 2009 or prior?
14     A    Possibly, you know, ongoing at times.
15     Q    You obviously don't believe he did it with
16  bad intentions to cause you not to be paid, do you?
17          MR. SWEETBAUM: Objection.  Form.
18     A    Pre September 2009?
19     Q    (BY MR. PAPPALARDO)  Yes.
20     A    I think that would be accurate.
21     Q    So, let's say, from August 31st, 2009 to,
22  let's say --
23     A    Back.
24     Q    Backwards.  You don't believe Dave
25  Silverstein did anything maliciously trying to cause

Page 94

1   Evergreen's business to be negatively financially
2   impacted?
3           MR. SWEETBAUM: Objection.  Form.
4      A    No.
5      Q    (BY MR. PAPPALARDO)  You don't believe
6   that Dave Silverstein from April 31st (sic), 2009 to
7   2004 did anything in bad faith trying to cause
8   Evergreen to face economic problems?
9           MR. SWEETBAUM: Objection.  Form.
10     A    I honestly don't know the answer to that
11  question, Marc.
12     Q    (BY MR. PAPPALARDO)  Are you aware of
13  anything that Dave Silverstein may have done in bad
14  faith from April 31st, 2009 that may have caused
15  Evergreen to face economic problems?
16     A    I don't know the answer to that question,
17  Marc.
18          MR. SWEETBAUM: Can I close these blinds
19  back here?
20          MR. PAPPALARDO: Yes, please.
21          (Discussion off the record.)
22     Q    (BY MR. PAPPALARDO)  You're not aware of
23  anything that Dave Silverstein did to -- that caused
24  Evergreen not to win new business, are you?
25          MR. SWEETBAUM: Objection.  Form.

Page 95

1      A    I don't know.
2      Q    (BY MR. PAPPALARDO)  You're aware that
3   Dave Silverstein laid off a large number of
4   Evergreen's employees in order to reduce Evergreen's
5   costs, correct?
6           MR. SWEETBAUM: Objection.  Form.
7      A    A large number?  Here he says we downsized
8   from 100 to 70 in the U.S.
9      Q    (BY MR. PAPPALARDO)  Would you consider a
10  30 percent reduction in employees to be a large
11  number?
12     A    Yeah, I think it would.
13     Q    Did you ever speak to any former employees
14  of Evergreen that talked to you about Evergreen's
15  layoffs in 2008 and 2009?
16     A    Yes.
17     Q    And you would agree with me that Dave
18  Silverstein laid off employees in 2009 in an effort
19  to try to keep the company alive?
20          MR. SWEETBAUM: Objection.  Form.
21     A    I am not aware of his exact reasoning or
22  the details around the layoff, but I suspect he is
23  truthful when he says his costs exceed the revenue,
24  and so he was forced to make some hard choices.
25     Q    And you're aware of other companies during

Page 96

1   this time frame that also had to make hard choices
2   and lay off employees, correct?
3      A    I think you asked me that already, Marc.
4   And I said, no, I was not aware.  In fact, I was
5   aware of companies that did the exact opposite.
6      Q    And Dave Silverstein advised you that in
7   2009 he went without a salary for a period of time?
8      A    One or two months, I believe is what his
9   e-mail said.  Would you like me to find it?
10     Q    I'm just asking you what he told you.  He
11  told you that, correct?
12     A    He said on random occasions, they were
13  cutting back.
14     Q    And you have no reason to disbelieve Dave
15  Silverstein when he told you that he actually went
16  without his salary for a period of time?
17     A    No, I don't think he would be dishonest
18  about that, short period of time.
19     Q    To make it clear, in the stock purchase
20  agreement and the note, there was no limitations or
21  caps on the amount of salary that Dave Silverstein
22  could pay himself, correct?
23     A    Correct.
24          MR. SWEETBAUM: Objection.  Form.
25     A    I don't actually even recall, but I don't

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 97

1  believe that to be the case.
2      Is there another one coming here, Marc?
3      Q   (BY MR. PAPPALARDO)  There is.
4      A   All right.
5      (Exhibit 14 marked.)
6      Q   (BY MR. PAPPALARDO)  I show you what is
7  going to be marked as Exhibit No. 14.  After you've
8  had a chance to review it, please tell me.
9      (Pause.)
10     Q   (BY MR. PAPPALARDO)  Have you had a chance
11 to review it?
12     A   Yes.
13     Q   In the last sentence on the second page of
14 Exhibit No. 14, you ask Dave Silverstein, quote, are
15 you able to start paying me something now or
16 relatively soon?
17     Do you see that?
18     A   Yes.
19     Q   And this is an e-mail that you sent to
20 David Silverstein on October 25th, 2009, correct?
21     A   Correct.
22     Q   In October of 2009, had Dave paid you at
23 all in 2009 under the note?
24     A   No.
25     Q   Do you recall the last time,

Page 98

1  approximately, Dave Silverstein made any payments
2  under the note?
3      A   November 2008.
4      Q   And Dave Silverstein sent you a response
5  to the e-mail on October 26th, 2009, correct?
6      A   Yes, I guess that is correct.  It's right
7  here.
8      Q   And in that e-mail Dave Silverstein said,
9  quote, You should not expect any money from me or BMG
10 any time soon.
11     Do you see that?
12     A   Yes, I do.
13     Q   And just to clarify --
14     A   Just to clarify, let's go back for a
15 second.
16     Yes.  And if I'm not mistaken, there was
17 no Evergreen at that time.
18     Q   Well, you testified previously that BMG --
19 you understand Breakthrough Management Group, Inc.
20 was commonly referred to as BMG when you worked
21 there, correct?
22     A   Yes.
23     Q   You're not saying that BMG was a separate
24 company from Breakthrough Management Group, Inc. when
25 you worked there, correct?

Page 99

1      A   No.
2      Q   And you're aware that when Breakthrough
3  Management Group, Inc. changed its name to
4  Breakthrough Management Group International, Inc., it
5  also continued to refer to itself as either BMG or
6  BMGI.  Are you familiar with that?
7      A   I didn't know about the BMGI, but, yes.
8      Q   When I refer -- we talked about that at
9  the beginning of the deposition --
10     A   Yeah, Evergreen, yes.
11     Q   So when I say Evergreen, I'm also
12 referring to the same BMG that is referred to in this
13 e-mail.
14     A   Right.
15     Q   And just to be clear, when you -- when
16 Dave Silverstein on October 26, 2009 referred to BMG,
17 you believe that he was referring to Breakthrough
18 Management Group International, Inc. or what is
19 Evergreen, correct?
20     A   Yes.
21     Q   And you've received a number of payments
22 under your promissory note, correct?
23     A   Yes.
24     Q   And all of those payments were made by
25 either check or wire transfer made from Evergreen,

Page 100

1  correct?
2      A   I can check the records.  I didn't look at
3  exactly the name.  Usually it says what was deposited
4  and how much.
5      Q   Are you aware of any payments under the
6  note that were made by a check written on the account
7  of Dave Silverstein or a wire transfer from a
8  personal account of David Silverstein?
9      A   Again, I'm not aware of where the money
10 was always coming from.
11     Q   You had a conversation with Bob Bulow in
12 October of 2010, correct?
13     A   Yes.
14     Q   And one of the things that you discussed
15 with Mr. Bulow was the fact that your payments under
16 the note were being made from an Evergreen account,
17 correct?
18     A   I don't think we specified the exact
19 account, but it was understood that they were coming
20 from, you know, something that Dave triggered Bob to
21 make.  I suspect Dave wouldn't have Bob triggering
22 wires from his personal accounts.  So --
23     Q   And, in fact, when you had questions about
24 moneys that were to be paid under the note, you
25 would -- when Bob Bulow worked there, you would

Pages 97 to 100

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 101

1  contact Bob Bulow, correct?
2      A   Yeah, or Chris Taylor when Chris was
3  there, or Dave Mansfield at times.
4      Q   So you understood that Dave Silverstein
5  was using his Evergreen moneys to pay you under the
6  note, correct?
7      A   I wasn't familiar with where those moneys
8  came from, but I knew I had to call the BMG person to
9  initiate the wire.
10     Q   You didn't believe that Bob Bulow was Dave
11 Silverstein's personal accountant, did you?
12     A   No.
13     Q   You didn't believe that Chris Taylor was
14 Dave Silverstein's personal accountant, did you?
15     A   No, but Dave could have sent money to the
16 company from somewhere else to pay me.  I don't know.
17     Q   All right.  And in Exhibit No. 14, Dave
18 Silverstein also says, quote, right now I'm focusing
19 on my company and its lenders.
20         Do you see that?
21     A   Yes.
22     Q   Just to summarize, in October of 2009,
23 Dave Silverstein is telling you in an e-mail
24 basically two things:  You're not going to be paid
25 any time soon, and his main focus is taking care of

Page 102

1  the company and its lenders; is that correct?
2          MR. SWEETBAUM:  Objection.  Form.
3      A   Would you like to restate your question.
4      Q   (BY MR. PAPPALARDO)  I mean, would you
5  agree with me that in October of 2009, Dave
6  Silverstein is basically telling you two things:
7  You're not going to be paid any time soon, and his
8  main focus is the company and its lenders?
9          MR. SWEETBAUM:  Objection.  Form.
10     A   Why don't you break it out in two
11 questions.
12     Q   (BY MR. PAPPALARDO)  Are you unable to
13 answer the question, or is it confusing?
14     A   Well, here it says you should not expect
15 any money from me or BMG any time soon.
16         Now, this was after the auction.  So, I
17 mean, arguably, you know, maybe there were other
18 sources of income like BMGI Corporation, that he
19 could have paid me from.
20         So what is your question, Marc?
21     Q   I'm not trying to trip you up here.  I'm
22 trying to tell you what basically --
23     A   Take the and out of the question and ask
24 me two questions, and I'll see if I can answer the
25 questions.

Page 103

1      Q   I'll ask the question that I feel that I
2  warrant appropriate.  If you don't understand my
3  question or you have difficulty answering my question
4  because it's a confusing question, please tell me and
5  I'll repeat it.
6          So my question is, in October of 2009, you
7  would agree with me that Dave Silverstein is telling
8  you two things:  One, you're not going to be paid any
9  time soon; and, two, that his main priority is the
10 company and the lenders?
11     A   Marc, it's a compound question with an and
12 in it, okay?  Right here it says, you should not
13 expect any money from me or BMG any time soon.  That
14 is not the verbiage you used in your question, okay?
15         So at this point I believe, in October of
16 2009, that Dave was focusing on the company and the
17 lenders and that I was not to expect any money from
18 him or BMG anytime soon.
19     Q   All right.  And you testified previously
20 about Exhibit No. 10.  Would you take a look at
21 Exhibit No. 10, which is his December 2008 e-mail to
22 you.
23         Do you see Exhibit No. 10?
24     A   Yes, right here.
25     Q   So in December of 2008 Dave Silverstein

Page 104

1  again is telling you that you're not going to be paid
2  any time soon and his main focus is the company and
3  its lenders?
4      A   Well, in this particular e-mail, okay, if
5  I'm not mistaken, he says that -- I'm not sure if
6  it's this one or another one, that we can check in
7  early next year and see how things are going, okay.
8  So --
9      Q   I'm just asking you, my question to you
10 is, in Exhibit No. 10, you would agree with me that
11 Dave Silverstein is basically telling you that he is
12 not going to pay you any time soon, and that his main
13 focus is the company and its lenders?
14     A   That was Exhibit 14, Marc.
15     Q   I'm asking you to look under Exhibit
16 No. 10.
17     A   Exhibit No. 10 does not have that language
18 in it, Marc, that I recall.
19     Q   Let's look at Exhibit No. 10, go to the
20 second page.
21     A   My number one priority right now is to
22 ensure BMG is still around when it's all over.  That
23 means I have to prioritize cash and debt payments
24 over everything and anything.
25     Q   My question to you is when you saw the

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 105

1  word debt payments, you understood he was talking
2  about the lenders, correct?
3      A   Yes.
4      Q   So he is telling you in December of 2008
5  that his number one priority is the company and
6  taking care of the lenders, correct?
7      A   It would seem that would be the case.
8      Q   And that's the same thing that he's
9  telling you in October of 2009, correct?
10     A   And it's the same thing he told me when we
11  were running the company together, and trying to
12  drive our line of credit down and the cash flow was
13  always low.  So it's the same communication even from
14  before these rough times, and during the course of
15  when he was paying me.
16     Q   And going to Exhibit No. 14, nowhere in
17  Exhibit 14 does Dave Silverstein ever tell you that
18  you will never be paid under the note, does he?
19         MR. SWEETBAUM:  Objection.  Form.
20     A   Would you like to restate your question,
21  Marc?
22     Q   (BY MR. PAPPALARDO)  Sure.  In October of
23  2009, Dave sent you an e-mail, correct?
24     A   Yes.
25     Q   And nowhere in his October 2009 e-mail,

Page 106

1  Exhibit 14, does he say that you will never be paid
2  under the note?
3         MR. SWEETBAUM:  Objection.  Form.
4      A   No, he doesn't say that he is never going
5  to pay me under the note.  He says, you should not
6  expect any money from me or BMG any time soon.
7      Q   (BY MR. PAPPALARDO)  And going back to
8  Exhibit No. 10, which is his December 2008 e-mail,
9  again, he is basically telling you the same thing,
10  don't expect any money any time soon, correct; if you
11  look at third paragraph?
12     A   He talks about his number one priority.
13  Is that the paragraph you're referring to?
14     Q   No, the third paragraph, I will let you
15  know.
16     A   One, two, three, my number one priority.
17  So you're talking about the fourth paragraph, I will
18  let you know when things change.
19     Q   But I will not be able to send you any
20  money this month and would not want you counting on
21  that paying very fast?
22     A   Yes.  I think we will have a better handle
23  on things after the new year.
24     Q   So you would agree with me that Dave
25  Silverstein basically sent you the same message in

Page 107

1  October of 2009 that he sent you in December of 2008?
2      A   I have not sat down and read between the
3  lines here, Marc.  I assumed he was trying to work
4  through his economic -- his financial situation.  I
5  didn't micro analyze the details of the
6  communications.
7          I have other communications where he says,
8  my interest is very, very secure and other
9  communications that we'll get back on track, that
10  were kind of all in this time frame as well, Marc.
11     Q   My question to you is, do you agree that
12  Dave Silverstein is basically sending you the same
13  message in December of 2008 that he's sending you in
14  October of 2009?
15     A   Yes, and there are other communications,
16  numerous, that he sent messages that were kind of
17  different than these messages, that are not in your
18  exhibits currently on the table.
19     Q   You never -- after sending Exhibit 14, the
20  October 2009 e-mail, you never sent Dave any
21  additional e-mails, correct?
22     A   We've had communications recently, e-mail
23  exchanges that I believe I disclosed.  You know, I
24  mean, I can look through my records.  I don't know
25  exactly -- I didn't itemize all the e-mails.

Page 108

1      Q   Between October 2009 and to date, you and
2  Dave Silverstein never had any conversations
3  regarding whether he is going to pay you under the
4  note?
5      A   I don't recall, Marc.
6      Q   And you sued Dave Silverstein in November
7  of 2009, correct?
8          THE DEPONENT:  Alan, is that when we
9  filed?
10     Q   (BY MR. PAPPALARDO)  I'll represent to you
11  it was filed in December -- I'm sorry, November of
12  2009.
13         MR. SWEETBAUM:  That sounds about right.
14     A   That sounds right.
15     Q   (BY MR. PAPPALARDO)  And you did not send
16  Dave Silverstein any e-mails between Exhibit 14 and
17  filing a lawsuit, correct?
18     A   I don't believe I did.
19     Q   And you didn't have any conversations with
20  Dave Silverstein between October, the time that you
21  sent Exhibit 14 and the time that you filed your
22  complaint, correct?
23     A   Between when and when, Marc?
24     Q   Between the time that you sent Exhibit 14,
25  which is October 2009 and the time that you filed

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 109

1  your complaint in November of 2009?
2      A.  No.  I believe I had communications with
3  David Mansfield, but I don't believe there were any
4  communications between Mr. Silverstein and myself.
5      Q.  And the conversation you had with David
6  Mansfield in 2009, in October of 2009, was at the DoD
7  conference, correct?
8      A.  Yes.
9      Q.  And the DoD conference was prior to
10  October 25th, 2009, wasn't it?
11      A.  You know, I think it may have been.  I
12  think it was in the middle of October.
13      Q.  And so from October 25th, 2009 to the time
14  that you filed your complaint, you never had any
15  conversations with Dave Silverstein or anybody else
16  at Evergreen regarding whether you would be paid
17  under the note, correct?
18      A.  I don't know the answer to that.  I don't
19  think I spoke to Mr. Silverstein or Mr. Mansfield
20  after the DoD connection and after this
21  communication.
22      Q.  And so you don't recall any conversations
23  with anybody between October 25th, 2009 and the time
24  that you filed your complaint, regarding whether you
25  would be paid under the note, correct?

Page 110

1      A.  Marc, I think I just answered that.  I
2  said I don't know if I talked to other people, but I
3  don't believe I talked to Mr. Silverstein or
4  Mr. Mansfield.
5      Q.  Who else could you have spoken to between
6  October 25th, 2009 that worked at Evergreen --
7      A.  You didn't specify in your question that
8  you wanted me to limit it to Evergreen people.  I
9  mean, I talked to old employees regularly.  I talked
10  to clients that called me up.  I talked to my
11  husband.  I talked to my sister.  I talked to my
12  parents, you know.
13      Q.  Between October 25th, 2009 and the time
14  that you filed your complaint, did you have any
15  conversations with anybody who at the time was
16  working at Evergreen, concerning whether you would be
17  paid under the note?
18      A.  I don't think so, but I am not 100 percent
19  sure.
20      Q.  Now, prior to filing your lawsuit, you
21  never asked Dave Silverstein if the value of your
22  collateral that was securing the note was less than
23  the amount that was owed under the note, correct?
24      A.  From when to when, Marc?  Because I did
25  ask that information to David Mansfield.

Page 111

1      Q.  I'm asking you if you ever asked that of
2  David Silverstein?
3      A.  I assumed that that would be something
4  that might be included in financial statements that I
5  asked, in company communications and, you know,
6  communications to and from his lenders.  I thought
7  that that might be included in that communication.
8      Q.  So at no time prior to the time that you
9  filed your lawsuit did David Silverstein ever tell
10  you that the collateral that was securing your note
11  was less than the amount owed under the note,
12  correct?
13      A.  I don't think he ever said that.
14      Q.  And there was nothing in any financial
15  statements that David Silverstein gave you,
16  prior to the time that you filed your complaint, that
17  would lead you to believe that the value of the
18  collateral that was securing the note was less than
19  the amount owed under the note, correct?
20      A.  Marc, he didn't really give me too much
21  information after that one conference that we met in
22  Miami.  So, you know, he didn't give me any
23  information.
24      Q.  I'm asking you with respect to any
25  information that David Silverstein gave you prior to

Page 112

1  the time that you filed --
2      A.  Which was not a lot.
3      Q.  Can I finish my question?
4      A.  Yes.
5      Q.  At any time prior to the time that you
6  filed your complaint, did Dave Silverstein give you
7  any information that would lead you to believe that
8  your collateral that was securing your note was less
9  than the value of the amount that was owed under the
10  note?
11      A.  Did David Silverstein?
12      Q.  David Silverstein only.
13      A.  No.
14      Q.  You talked about you had a conversation
15  sometime in October of 2009 with David Mansfield,
16  correct?
17      A.  Yes.
18      Q.  And David Mansfield advised you that his
19  mother had died or was in the process of dying,
20  correct?
21      A.  I think he mentioned that she had passed.
22      Q.  And David Mansfield basically told you
23  that he was basically no longer the chief financial
24  officer of the company, correct?
25      A.  No, he told me that -- are you asking

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 113

1  about October 2009 or 2010?
2  **Q   I'm asking you about 2009.**
3  A   2009, he did not tell me he was no longer
4  chief financial officer.  In fact, he told me he was.
5  **Q   But in 2010, Dave Mansfield told you that**
6  **he had basically not been chief financial officer**
7  **since the summer of 2009, correct?**
8  A   No, that's not what he said.  He said that
9  when he resigned, in October 2010, that a couple
10  weeks after he announced his resignation was when
11  Mr. Silverstein designated a new chief financial
12  officer, not in 2009.
13  **Q   When did -- what did Dave Mansfield tell**
14  **you in either 2009 or 2010 regarding his involvement**
15  **in Evergreen's financials?**
16  A   I never asked him such a question, and my
17  assumption and his representation was that he was
18  continuing on as chief financial officer and was
19  stating facts and describing situations as such until
20  the very last conversation, or the second to the last
21  conversation, in early October of 2010.
22  **Q   Prior to suing David Silverstein, did you**
23  **ever conduct any valuation of Evergreen?**
24  A   I think I wrote a case study on Evergreen
25  for a final report in one of my MBA classes, where I

Page 114

1  think, I believe as part of that I had to run some
2  calculations on some valuation techniques for BMG.
3  **Q   And when was that?**
4  A   That had to be in 2006, something along
5  those lines.
6  **Q   And at the time you ran the valuation in**
7  **2006, your analysis of the valuation of Evergreen was**
8  **that it was worth more than the then-amount owed on**
9  **your note, correct?**
10  A   I have -- it's been four years and four
11  kids later, and I honestly do not remember what the
12  number was.  And I have not done that -- I don't
13  recall doing that analysis as such in my head.  And
14  if I did, I don't recall what it was.
15  **Q   So you don't know, as you sit here today.**
16  **Do you know whether or not your analysis of the**
17  **valuation of Evergreen in 2006 was more than**
18  **5 million or less than 5 million?**
19  A   I don't know.
20  **Q   Besides the analysis that you did in 2006**
21  **prior to suing David Silverstein, did you do anything**
22  **to conduct an evaluation of Evergreen and any**
23  **replacement collateral?**
24  A   I asked David Mansfield at the time
25  Mr. Silverstein offered me 2 million about -- it's in

Page 115

1  one of the e-mails I disclosed about, you know, ideas
2  regarding the valuation of Evergreen.
3  He provided me with some financial
4  statements, but no real answer for that question.  I
5  did, you know, back of the envelope calculations
6  based on revenues of when I was there versus current
7  throughout the buyout.
8  **Q   And in your back of the envelope**
9  **calculations, did you reach a conclusion that**
10  **Evergreen was worth more than 5 million or less than**
11  **5 million?**
12  A   More.  Until Mr. Mansfield told me it was
13  worthless.
14  **Q   Did you have any discussions -- so when**
15  **Mr. Mansfield told you -- so is it your testimony**
16  **that Mr. Mansfield told you that the value of**
17  **Evergreen and any replacement collateral was**
18  **worthless?**
19  A   He didn't use the words replacement
20  collateral.  He said, you know the stock -- something
21  along the lines of the stock you're entitled to is
22  now basically worthless because all the assets have
23  been transferred to a Delaware corporation.
24  **Q   Do you know whether or not David Mansfield**
25  **had ever reviewed the stock purchase agreement prior**

Page 116

1  to talking to you?
2  A   Yes, he mentioned that he had.
3  MR. SWEETBAUM:  It's noon.  Do you want to
4  take a break at some point?
5  MR. PAPPALARDO:  That's fine.  Yeah, we
6  can take a break now.
7  (Recess taken from 12:00 p.m. to
8  12:39 p.m.)
9  (Mr. Glasser not present following
10  recess.)
11  **Q   (BY MR. PAPPALARDO)  Ms. Kirzhner, you**
12  **testified previously about two separate conversations**
13  **you had with Dave Mansfield.  One was in October of**
14  **2009 at the DoD conference, and the other one was the**
15  **one that you recorded in October 2010.**
16  **My question is, did David Mansfield say**
17  **anything differently in the calls in October 2010**
18  **versus what he said in 2009 at the DoD conference?**
19  A   I'm not sure, Marc.  I'm not sure.  When
20  you say, said things differently, I don't know what
21  you mean.
22  **Q   Did Dave Mansfield in October of 2009 say**
23  **anything different than what he said in October 2010**
24  **in your phone calls?**
25  A   Those were two separate conversations

Pages 113 to 116

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 117

1 about two separate kind of subjects.  We didn't
2 rehash information from the October 2009 discussion.
3 So, again, I'm not sure what you're asking.
4    Q    When you spoke to Dave Mansfield in
5 October of 2010 in the phone call that you recorded,
6 did anything that he said in that October 2010 phone
7 call cause you to question what he had said in
8 October of 2009?
9    A    No.
10    Q    Now, in the phone call that was recorded
11 in October of 2010, Mr. Mansfield told you that he
12 was not involved in the actual asset sale, correct?
13    A    No, he did not say that.
14    Q    Did Mr. Mansfield tell you in that October
15 2010 conversation that he was aware of the details of
16 any deal that Dave or Dave Silverstein's companies
17 had made with First Capital Partners?
18    A    He provided little information other than
19 knowledge of a deal.
20    Q    And you would agree with me that in the
21 October of 2010 conversation you had with him, Dave
22 Mansfield kept on telling you that he was just
23 speculating as to what the exact arrangement Dave
24 Silverstein may have reached with First Capital
25 Partners, correct?

Page 118

1    A    You could listen to the audio again.  He
2 didn't provide too much detail, as I recall.
3    Q    Do you recall Dave Mansfield, in your
4 October 2010 conversation, telling you he would just
5 be speculating if he were to try to tell you exactly
6 what happened between Dave Silverstein and First
7 Capital Partners and the deal made or reached?
8    A    I don't remember him using the word
9 speculation, but it was clear that he didn't want to
10 share certain information.
11    Q    Would you agree with me that Dave
12 Mansfield told you in October of 2010 that he was not
13 actually part of negotiating any deal between First
14 Capital Partners and any company that Dave
15 Silverstein owned?
16    A    No, I don't recall that.
17    Q    Do you recall whether or not Dave
18 Mansfield told you in October 2010 that he just did
19 not have personal knowledge as to the details of the
20 arrangement between the First Capital Partners and
21 Dave Silverstein and any of his companies?
22    A    I don't believe he said he did not have
23 knowledge.  I believe he -- I didn't ask him such
24 direct questions as you are asking me.  The
25 conversation, you know, was a little bit more loose

Page 119

1 than that.  So I don't recall him saying exactly what
2 you said, no.
3    Q    Prior to calling Dave Mansfield in October
4 2010, you actually wrote out specific questions you
5 wanted to ask Dave Mansfield, correct?
6    A    I think I jotted a couple things down on a
7 piece of paper.
8    Q    Do you recall what you jotted down?
9    A    Do I recall what?
10    Q    Do you recall the notes that you jotted
11 down?
12    A    In a prior telephone exchange in early
13 October 2009 -- sorry, 2010, before Mr. Mansfield had
14 left, officially left BMG, he had referenced access
15 to private information on the finance drive that over
16 time he had less and less access to.
17    Q    And you understand, did Dave Mansfield
18 tell you in October 2010 that he was removed access
19 to the finance drive because he was not Evergreen's
20 chief financial officer?
21    A    No, that's not what he said.
22    Q    What did he say, if you recall?
23    A    He said that there were things that he
24 felt, you know, he should have been signing for and
25 having knowledge of and discussions he should have

Page 120

1 been involved in, that, you know, instead Ms. Gayle
2 Howard was now signing for, partaking in.
3    Q    Do you believe Dave Mansfield ever had
4 signatory authority on behalf of Evergreen?
5    A    I don't know.
6    Q    Did Dave Mansfield ever tell you that he
7 used to have signatory authority on behalf of
8 Evergreen?
9    A    He never told me he did or he didn't.
10    Q    So, in October 2009 you met Dave Mansfield
11 at a DoD conference, correct?
12    A    Yes.
13    Q    And you had a conversation with him that
14 you previously testified about today, correct?
15    A    Yes.
16    Q    And that conversation that you had with
17 him was actually a meeting in a bar, correct?
18    A    No.
19    Q    Where was it?
20    A    During conferences, there are little
21 networking tables set up in the lobby of the
22 conference facility.  It was in one such little lobby
23 area at a very private table, during a time when the
24 conference was in session.  So we were the only ones
25 in that room.

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 121

1    Q    Prior to filing your lawsuit, did you ever
2  ask for any financial information from David
3  Silverstein that David Silverstein refused to provide
4  you?
5    A    Yes.
6    Q    Can you tell me what and when?
7    A    Would you like me to get the paperwork
8  out?
9    Q    I'm just asking you if you can recall,
10  but, yes, I would like you to get the paperwork out.
11  But first, what can you recall?
12    MR. SWEETBAUM: I didn't bring it.
13    THE DEPONENT: Oh, you didn't bring it.
14    A    We disclosed all the information to you
15  all regarding times when, even, I think on this
16  communication, there was a request on my part.
17    Q    (BY MR. PAPPALARDO) Exhibit 10 you're
18  referring to
19    MR. SWEETBAUM: Exhibit 14.
20    Q    (BY MR. PAPPALARDO) Exhibit 14.
21    MR. SWEETBAUM: That's what she's looking
22  at.
23    A    Yeah, I thought there was some reference
24  to me asking for financial statements in one of
25  these. But there were several occasions, at least

Page 122

1  one, I think, arguably more than one, where I had
2  asked for -- thanks for the business update. I would
3  like those financials and last year's too. I know we
4  went through them in Miami, but I would like to take
5  another look at the finals.
6    And that's just one example, and I know I
7  asked for financials after this too.
8    Q    In that e-mail you're referring to you
9  said I know we went over them in Miami. So Dave
10  Silverstein actually went over financial statements
11  with you in Miami in 2008, correct?
12    A    Late 2008, yes.
13    Q    And after December 2008, Dave Silverstein
14  provided you with financial statements. Between
15  December 2008 and the time that you filed your
16  lawsuit, Dave Silverstein provided you with some
17  financial statements, correct?
18    A    Not after that Miami conference, no.
19    Q    Did you ever send any e-mails complaining
20  to Dave Silverstein that he had not provided you with
21  financial statements?
22    A    No, I just requested them again.
23    Q    And, in fact, in June of 2009, you advised
24  David Silverstein that you actually thanked him for
25  the transparency that he had provided you up until

Page 123

1  that point in time. Do you recall that?
2    A    I don't, but I tried to be courteous with
3  any information that he provided.
4    Q    From June of -- from December of 2008 to
5  June of 2009, do you believe that Dave Silverstein
6  was hiding information from you?
7    A    I wouldn't say he was hiding information
8  from me. I would maybe say I sensed a stronger
9  reluctance on his part to, you know, bother with
10  answering my requests.
11    Q    You would agree with me, in the stock
12  purchase agreement, there is no obligation for Dave
13  Silverstein to provide you with financial statements
14  requested?
15    A    In fact, I think there is, Marc. I think
16  you're mistaken.
17    Q    Can you look at Exhibit No. 11, please,
18  which is in front of you.
19    A    I'm not sure if it's in this agreement or
20  the --
21    Q    Well, we'll look through both.
22    A    I'm pretty sure I recall that there was a
23  term that said, would provide --
24    Q    Why don't you look at Exhibit No. 11.
25  First of all Exhibit No. 11 is the stock purchase and

Page 124

1  sale agreement that you signed in September of 2004,
2  correct?
3    A    I believe it is.
4    (Exhibit 11 marked.)
5    Q    (BY MR. PAPPALARDO) All right. Can you
6  please look through Exhibit No. 11 and tell me if you
7  see any obligation where Dave Silverstein is required
8  to provide you with any financial statements.
9    MR. PAPPALARDO: Mr. Sweetbaum, I see you
10  reading. I have no problem if you point her to that
11  particular section to speed up the process.
12    MR. SWEETBAUM: I appreciate you telling
13  me that. And I really haven't been looking, but I
14  will now.
15    A    Like I said, it might be in the other
16  agreement.
17    Q    (BY MR. PAPPALARDO) We'll go through here
18  and I'll show you the promissory note. You may want
19  to look at that in its entirety.
20    A    I haven't finished going through this,
21  Marc, but it certainly says that the parties both
22  warrant and covenant to conduct themselves at all
23  times from and after the date of this agreement,
24  personally and in their respective capacities, as
25  employees, officers, directors, shareholders and

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 125

1 former shareholders of the corporation in the utmost
2 of good faith and to deal with each other and the
3 corporation fairly and equitably in all requests --
4 or respects.
5     (Pause.)
6     Seller has had full access to all
7 financial and business information of the corporation
8 and seller acknowledges and agrees that no person has
9 made any representations or warrants with respect to
10 corporation's financial or business affairs or
11 prospects.
12     (Pause.)
13     **Q   (BY MR. PAPPALARDO)  Have you had a chance**
14 **to review the entire stock purchase agreement?**
15     A  I have.
16     **Q   And do you see any express requirement for**
17 **Dave Silverstein to provide you with any financial**
18 **statements of Evergreen?**
19     A  Not in this agreement, other than, you
20 know, the fair dealing clause I read earlier.
21     **Q   And for the purpose of this deposition,**
22 **we'll just refer to that as the good faith and fair**
23 **dealing clause, okay, in section 2 or 3 that you**
24 **previously read.**
25     **Now, I just want to make it clear, you're**

Page 126

1 **not suing Mr. Silverstein under -- for breaching the**
2 **good faith and fair dealing clause for failure to**
3 **provide you with financial statements, are you?**
4     MR. SWEETBAUM: Objection. Form.
5     A  Can you repeat the question?
6     **Q   (BY MR. PAPPALARDO)  Sure.**
7     MR. PAPPALARDO: For the remainder of this
8 deposition, Mr. Sweetbaum, I'm going to ask you to
9 preserve all your depositions (sic) or objections to
10 form. I have questions whether or not you're
11 coaching the witness.
12     MR. SWEETBAUM: You think I'm coaching the
13 witness?
14     MR. PAPPALARDO: I have questions because
15 every single time you say objection to form, she asks
16 to repeat the question. My question was clear. For
17 the purpose of this deposition, for the remainder I
18 will give you, every single question that I ask, your
19 objection to form is preserved.
20     MR. SWEETBAUM: I'm not willing to accept
21 that. I'm entitled to make objections to form.
22     MR. PAPPALARDO: You can make your
23 objection to form, which is your only objection. I
24 see no purpose, Mr. Sweetbaum, for you to refuse my
25 objection if, in fact, you're not -- if this isn't

Page 127

1 some signals going back and forth.
2     MR. SWEETBAUM: Mr. Pappalardo, you have
3 accused me of almost everything --
4     MR. PAPPALARDO: I'm not accusing you of
5 anything.
6     MR. SWEETBAUM: Okay. So you're not
7 accusing me of coaching the witness. You think I'm
8 making objections as to form and as a result I am
9 coaching the witness?
10     MR. PAPPALARDO: I have questions
11 regarding it. And so what I will say is I will let
12 you preserve your objections --
13     MR. SWEETBAUM: I am not willing to do
14 that.
15     MR. PAPPALARDO: Why are you not willing
16 to do that?
17     MR. SWEETBAUM: Because a form objection
18 is what is permitted. I think your questions are
19 unclear, especially when you get into what claims are
20 being asserted and legal issues, and you don't
21 specify time periods. They're extremely unclear to
22 me. I'm entitled to make a form objection in that
23 event, and I'm going to do that.
24     MR. PAPPALARDO: So you're refusing, even
25 though I'm saying from now through the remainder of

Page 128

1 the deposition, it will be as every single question
2 you have an objection as to form, you are saying you
3 will not accept that?
4     MR. SWEETBAUM: No, I'm not willing to
5 accept that.
6     MR. PAPPALARDO: Why is that?
7     MR. SWEETBAUM: I just told you why.
8     MR. PAPPALARDO: Why is it -- if I'm
9 preserving your objection, why is it you still feel
10 the need to object to form?
11     MR. SWEETBAUM: Because I think your
12 questions are poor.
13     MR. PAPPALARDO: That is fine, your
14 objection to form. Other than telling the witness
15 you have an objection, what is the purpose?
16     MR. SWEETBAUM: So you think I'm coaching
17 the witness because I'm objecting as to form?
18     MR. PAPPALARDO: I think that every
19 time --
20     MR. SWEETBAUM: Okay. Well, you're
21 entitled to think that, Mr. Pappalardo.
22     MR. PAPPALARDO: All right.
23     THE DEPONENT: There have been other
24 questions, Marc, I have asked you to repeat for me or
25 break out into two questions that Mr. Sweetbaum has

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 129

1  not objected to form on.
2      MR. PAPPALARDO:  Could you please reread
3  the last question?
4      (Audio record played back.)
5  A   Can you repeat the question, Marc?
6  Q   **(BY MR. PAPPALARDO)  Are you suing Dave**
7  **Silverstein in this case for breaching the good faith**
8  **and fair dealing clause, for failing to provide you**
9  **with financial statements?**
10     MR. SWEETBAUM: Objection. Form.
11 A   Marc, I ask you to review the legal
12 documents that we have submitted as our claims for
13 your answer.
14 Q   **(BY MR. PAPPALARDO) I'm asking you what**
15 **is your understanding?  Are you suing Dave**
16 **Silverstein for breaching the good faith and fair**
17 **dealing clause for failing to provide you with**
18 **financial statements?**
19     MR. SWEETBAUM: Objection. Form.
20 A   You're asking two questions there, Marc.
21 Either separate them and then I will be able to
22 answer them.  Don't commingle one thing, which is
23 breach of the good faith clause with lack of
24 providing financial statements.
25 Q   **(BY MR. PAPPALARDO)  What two questions do**

Page 130

1  **you think I asked you?**
2  A   I can't figure it out, which is why I have
3  not answered them.
4  Q   **Is your claim for breaching the good faith**
5  **and fair dealing clause based on your belief that**
6  **Dave Silverstein failed to provide you with financial**
7  **statements?**
8  A   No.  That would be evil.  You can strike
9  that if you want, or not.
10 Q   **Your claim for breaching the good faith**
11 **and fair dealing clause is based on your belief that**
12 **Dave Silverstein held an auction that caused your**
13 **collateral to be worthless or less than the value of**
14 **what is owed under the note, right?**
15     MR. SWEETBAUM: Objection. Form.
16 A   Marc, I refer you to the documents of the
17 claims that were submitted on my behalf.
18 Q   **(BY MR. PAPPALARDO) I'm asking you what**
19 **your understanding is of your breach of the good**
20 **faith and fair dealing clause.  Can you tell me what**
21 **it is?**
22 A   There are numerous pieces and parts to why
23 I think Dave violated the good faith and fair dealing
24 clause.
25 Q   **Please tell me what they are.**

Page 131

1  A   I don't know if I will capture all of them
2  that are represented in my claims against
3  Mr. Silverstein, but certainly transferring the
4  assets of the company that I had stock rights to,
5  without ever telling me about them, without ever
6  notifying me, is part of that.
7      I think figuring out how to raise a
8  significant amount of money to somehow, you know, be
9  the buyer and the seller and force lenders into
10 corners without ever notifying me of these
11 transactions that were going on, or the rationale for
12 these transactions.
13     You know, I'm sure if I really thought
14 about it, then I could continue.
15 Q   **Ms. Kirzhner, that's what I want to get**
16 **to. I'm not trying to trick you.  I just wanted to**
17 **make sure you're not suing him for good faith for not**
18 **giving financial statements.  Your claims are really**
19 **based on --**
20 A   I would like to see financial statements.
21 Q   **Correct.**
22 A   I think it's, you know, it's kind of funny
23 the financial statements you all provided ended in
24 August of 2009.
25 Q   **But, I mean, if there wouldn't have been**

Page 132

1  **this transfer of assets, you would agree with me that**
2  **you would not have any -- that you wouldn't have any**
3  **claim for breach of good faith and fair dealing?**
4  A   No, I would not agree with you there.
5  Q   **So can you tell me, if there would not**
6  **have been a transfer of assets, can you tell me how**
7  **Dave Silverstein breached the good faith and fair**
8  **dealing?**
9      MR. SWEETBAUM: Objection. Form.
10     By the way would you like me to explain
11 the form objections, I would be happy to.
12     MR. PAPPALARDO: No, you love to make
13 speaking objections.
14     MR. SWEETBAUM: Have I made a speaking
15 objection today?  Have I made any?  Point out one.
16 A   Marc, you have attempted to get me to say
17 that Dave had personal financial troubles through
18 various parts, both when I was at BMG and after I was
19 at BMG.
20     Somehow Dave managed to purchase a
21 multimillion dollar home.  Dave managed to come up
22 with cash to what I believe to be is a buyout of a
23 lender, one of the lenders.  Dave managed to pay
24 himself handsomely, and that's only the salary you
25 all disclosed because you refused to disclose the

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 133

1 capital gains contributions and sent us documents
2 that weren't even readable on a microscope, to try to
3 find that information on our own.
4         So, I think, you know, in the amounts of
5 draws in salaries that Dave took, he was not treating
6 me in good faith and fair dealing.
7         (Mr. Glasser entered the room.)
8     Q    (BY MR. PAPPALARDO)  I just want to make
9 it clear the stock purchase agreement doesn't have
10 any cap on the salary that Dave Silverstein can take,
11 right?
12    A    You made that clear earlier, Marc.
13    Q    Also there is no limitation in the stock
14 purchase agreement on the amount of draws that Dave
15 Silverstein can take, correct?
16    A    There is not.
17        MR. SWEETBAUM:  Objection to form.
18    Q    (BY MR. PAPPALARDO)  And you had the
19 ability to negotiate that if it was important to you,
20 correct?
21    A    I don't think I did have the ability to
22 negotiate that.  I think we discussed it in prime
23 form.  You all shut me down.
24    Q    So your testimony is that you didn't have
25 the ability to negotiate it because that Dave Silverstein

Page 134

1 told you prior to signing the agreement, that he
2 would never agree to a limit on the amount of his
3 distributions, correct?
4     A    I don't know if those were the exact
5 words, Marc.  I don't have a recollection on the
6 exact words but, you know, looking back, it just
7 seemed -- I don't remember.  I don't remember the
8 nature of those conversations.
9     Q    You agree Dave Silverstein told you it was
10 a non-negotiable point, putting a limit on the amount
11 of shareholder distributions he would take, correct?
12    A    I don't remember him saying that, Marc.
13    Q    Do you recall whether Dave Silverstein
14 agreed to put a limitation on his shareholder
15 distributions?
16    A    Well, clearly, it's not in the document,
17 Marc.
18    Q    Why didn't -- in December 2008 when you
19 received --
20    A    December 2008.
21    Q    In December 2008 when you received Exhibit
22 No. 10, why didn't you sue Dave Silverstein when he
23 told you that he didn't give you -- when Dave
24 Silverstein didn't give you any assurance that you
25 would be paid in very fast order or whatever words he

Page 135

1 said?
2        MR. SWEETBAUM:  Objection.  Form.
3     A    Would you -- I think I heard your
4 question, but since you're all distracting me by
5 passing your notes around, I would ask you to repeat
6 the question so I can make sure.
7     Q    (BY MR. PAPPALARDO)  Why didn't you sue
8 Dave Silverstein in December of 2008 when he told you
9 that you would not be paid any time soon under the
10 note?
11    A    Okay.  As I mentioned earlier in my
12 testimony, Marc, Dave was in default long before
13 then, okay?  We had always had fairly productive
14 exchange on what he could and couldn't do and how we
15 could work together to meet his needs and mine.  And
16 so I continued to anticipate that, although he was
17 going through rough financial times, that he and I
18 would work through it as we had in the past.
19    Q    Why did you sue in October of 2009?
20        MR. SWEETBAUM:  Objection.  Form.
21    Q    (BY MR. PAPPALARDO)  When Dave Silverstein
22 again sent you the same message that you wouldn't be
23 paid any time soon?
24    A    At that point I had spoken to
25 Mr. Mansfield, and he had informed me that my stock

Page 136

1 was basically worthless because of this, you know,
2 transfer of assets.  So I felt at that point I had no
3 other recourse.
4     Q    I would like you to look at Exhibit 11,
5 which is the stock purchase agreement and,
6 specifically, go to page 4.
7         Section 3.01 reads, in the event that
8 buyer is in breach of this agreement for failing to
9 pay any installment purchase price, it basically
10 states that your sole remedy shall be return of your
11 own stock.
12        Do you see that?
13    A    Then seller's sole and exclusive remedy
14 for the default or breach of the agreement shall be
15 for seller (and seller's heirs, successors and
16 assignors, except that in no event shall seller
17 assign all or any of seller's rights under the note
18 or this agreement to any person or entity that is in
19 the business or industry, or is a competitor of the
20 corporation, nor shall any portion of the stock be
21 transferred to any person, dah, dah, dah, dah.
22    Q    So you agree with me, in section 3.01, you
23 agree that if Dave fails to make any installment of
24 the purchase price that your sole remedy shall be to
25 seek the return of your stock?

Pages 133 to 136

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 137

1      MR. SWEETBAUM: Objection. Form.
2      A    We had covered this earlier in the
3    deposition.  Why do we need to go back to this?
4      Q    (BY MR. PAPPALARDO)  Ms. Kirzhner, I am
5    here the one asking you questions, unfortunately.  My
6    question is in section 3.01 would you agree with me
7    that it states if Mr. Silverstein fails to make any
8    installment payment when due, that your sole remedy
9    shall be return of your stock; do you agree with
10   that?
11     MR. SWEETBAUM: Objection. Form.
12     A    As long as the other portions of this
13   agreement are not breached or violated, that my
14   remedy is to take the stock back, yes.
15     Q    And in section 3.01, when it refers to the
16   sole remedy, there is not a carve-out saying that
17   section 3.01 does not apply if there is a breach of,
18   let's say, the covenant of fair dealings, is there?
19     MR. SWEETBAUM: Objection. Form.
20     A    This is an entire agreement.  And, you
21   know, I believe that what you're saying is not
22   correct.
23     Q    (BY MR. PAPPALARDO)  So can you tell me
24   where in section 3.01 it states that if there's a
25   breach of the covenant of good faith and fair dealing

Page 138

1    that the sole remedy clause does not apply?
2      MR. SWEETBAUM: Objection. Form.
3      A    Clearly those words aren't in here, Marc,
4    but I think it is our view and the view of the Court
5    that, you know, this is an entire agreement and, just
6    because Dave is in breach, meaning in default of
7    making payments, that you can't really separate out
8    that from fair dealing and/or asset transfers and
9    maintaining the value of the stock.
10     And so, you know, it would create a
11   thousand-page agreement if you had to wordsmith
12   things like you're suggesting, Mr. Pappalardo.
13     Q    (BY MR. PAPPALARDO)  Ms. Kirzhner, I'll
14   represent to you that the Court dismissed your
15   express breach of contract claim for violating the
16   covenant of good faith and fair dealing against
17   Mr. Silverstein because it said that section 3.01
18   bars any such claims.
19     A    Right, and it was maintained against BMG.
20     Q    So what I'm asking is, with respect to
21   Mr. Silverstein who I represent, I'm asking you,
22   would you agree with me any claims against David
23   Silverstein for violating the express covenant of
24   good faith and fair dealing are barred by section
25   3.01, sole remedy clause?

Page 139

1      MR. SWEETBAUM: Objection. Form.
2      A    Mr. Pappalardo, you are throwing a lot of
3    legal jargon at me and I will not answer that
4    question unless you would like to clean it up.
5      Q    (BY MR. PAPPALARDO)  So are you telling me
6    you are refusing to answer the question?
7      A    I'm telling you I do not understand the
8    question.  So put it into baby terms for me, sir.
9      Q    Section 3.01 of the stock purchase
10   agreement states that your sole remedy shall be to
11   accept the return of your stock, if Dave Silverstein
12   is in breach of the covenant of good faith and fair
13   dealing.  Do you agree with that?
14     MR. SWEETBAUM: Objection. Form.
15     A    I don't read what you said as being
16   written here, Marc.  No, I don't agree with that
17   statement.
18     Q    (BY MR. PAPPALARDO)  In 2004 when you
19   negotiated this, Dave Silverstein told you he would
20   not sign an agreement if you could sue him for money
21   damages, correct?
22     A    No, not correct.
23     Q    And so you testified also previously that
24   you understand that the Court ruled against you
25   that -- and the Court said that the agreement bars

Page 140

1    you from suing Dave Silverstein for money damages,
2    for breach of the express covenant good faith and
3    fair dealing, you're aware of that, correct?
4      MR. SWEETBAUM: Objection. Form.
5      A    Marc, there were eight claims, under my
6    understanding, six of which survived.  I had read the
7    Court's ruling, it is not top of mind right now.  So
8    to -- for me to remember exactly the terminology that
9    was used and try to relate it to this term is not
10   something I think I can do right now.
11     Q    (BY MR. PAPPALARDO)  So, do you believe
12   that under this agreement, the stock purchase
13   agreement, that you're allowed to sue Dave
14   Silverstein for money damages for breaching the
15   covenant of good faith and fair dealing as contained
16   in this agreement?  Yes or no?
17     MR. SWEETBAUM: Objection. Form.
18     A    Marc, I don't know the answer to your
19   question.
20     Q    (BY MR. PAPPALARDO)  Under your stock
21   purchase and sale agreement, do you know whether you
22   agreed to limit your remedy to money damages if Dave
23   breaches the valuation covenant?
24     MR. SWEETBAUM: Objection to form.
25     A    This is another question you're asking me

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 141

1  now?
2   **Q   (BY MR. PAPPALARDO)  I'm going to ask you**
3  **a number of questions throughout this, Ms. Kirzhner.**
4   A   That's fine.
5   **Q   Okay.**
6   A   Again, you know, make them real simple for
7  me if you can because you're mixing apples with
8  oranges in my mind, and making it a little tricky for
9  me to follow you.
10   **Q   Do you have any mental imparities that are**
11  **preventing you from answering?**
12   A   No.
13   MR. SWEETBAUM: Objection. Form.
14   **Q   (BY MR. PAPPALARDO)  Are you on any**
15  **medication today?**
16   A   No, I'm not.
17   **Q   Or do you have dyslexia?**
18   MR. SWEETBAUM: Objection. Form.
19   A   No, I do not.
20   **Q   (BY MR. PAPPALARDO)  Do you have attention**
21  **deficit disorder?**
22   MR. SWEETBAUM: Objection. Form.
23   A   No, I do not.
24   **Q   (BY MR. PAPPALARDO)  Have you been**
25  **diagnosed with any mental condition that would**

Page 142

1  **prevent you from being able to understand the terms**
2  **of an agreement?**
3   MR. SWEETBAUM: Objection to form.
4   A   Mental, no.
5   **Q   (BY MR. PAPPALARDO)  Psychological?**
6   A   No.
7   **Q   Okay. So I'm just asking you what you**
8  **agreed to in 2004, Ms. Kirzhner. I'm asking you, did**
9  **you agree that you would not sue --**
10   A   Marc, just --
11   **Q   I'm asking a question. Did you agree in**
12  **2004 that you would not sue Dave Silverstein --**
13   A   No.
14   **Q   -- for money damages --**
15   A   No.
16   **Q   -- if he breached the express covenant of**
17  **good faith and fair dealing?**
18   A   No.
19   **Q   And so, do you believe that Exhibit 11,**
20  **the stock purchase agreement, is an ambiguous**
21  **agreement?**
22   MR. SWEETBAUM: Objection. Form.
23   A   No, I think it's pretty straightforward,
24  that if Mr. Silverstein maintains the value of the
25  stock, that, you know, he should pay me what he

Page 143

1  committed to paying me as he and his business can
2  facilitate. And should I not want those payments,
3  and should I not want to work in good faith with
4  Mr. Silverstein to create a payment plan that works
5  for me and for him, that I could choose to take some
6  valuable stock back, if it exists.
7   **Q   (BY MR. PAPPALARDO)  And you always**
8  **thought you could sue Dave Silverstein for money**
9  **damages if the company's value didn't reach the level**
10  **agreed to in this agreement?**
11   A   Marc, I did not have those thoughts
12  because both you and Mr. Silverstein, okay, asked me
13  to trust you in good faith that you would, in fact,
14  pay me.
15   **Q   So when you entered into the agreement in**
16  **2004, you had no thoughts or understanding as to**
17  **whether Dave -- whether you could sue Dave**
18  **Silverstein for violating the valuation covenant**
19  **contained in the agreement?**
20   A   I assumed that Dave would pay per his
21  commitment and per your request for me to trust him.
22   **Q   My question is. In 2004 did you have any**
23  **thoughts or understandings whether you could sue Dave**
24  **Silverstein for money damages if he violated the**
25  **valuation covenant?**

Page 144

1   A   I don't recall having those thoughts,
2  Marc, because I assumed that he would pay, if not
3  exactly per the obligation he and you defined on your
4  own terms, that on some other terms, that would meet
5  my needs and his needs.
6   **Q   Did you have any understanding of whether**
7  **you could sue Dave Silverstein -- in 2004, did you**
8  **have any understanding whether you could sue Dave**
9  **Silverstein for money damages if he breached the**
10  **violation of the valuation covenant?**
11   A   I think I answered that already, Marc, by
12  saying that I assumed that Dave would pay me. And
13  you all had asked me to trust him since he paid
14  Roxanne, that he was going to pay me. And so I
15  honestly was not thinking about litigation at that
16  time.
17   **Q   I'm asking you what your understanding was**
18  **in 2004. Do you have an understanding -- do you**
19  **have -- strike that.**
20   **In 2004, what was your understanding --**
21   A   You should take a two-minute break.
22   **Q   Well, I'm asking a question. In 2004,**
23  **what was your understanding --**
24   A   You just said strike that.
25   **Q   In 2004, what was your understanding of**

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 145

1  whether you could sue Dave Silverstein for money
2  damages if he breached the valuation covenant?
3      A    I think I mentioned to you several times
4  already that my thoughts were not around engaging in
5  litigation with Mr. Silverstein.  And so my thoughts
6  were around the fact that $5 million over a certain
7  number of years was enough for me to go and be a mom
8  and do consulting work on the side.  And so I was not
9  engaging in thoughts about litigation.
10     Q    I'm not asking about your thoughts.  Yes
11 or no --
12     A    You just said thoughts.
13     Q    I'm asking your understanding, yes or --
14 agree with me.  Do you agree with me or disagree with
15 me, it was your understanding in 2004, when you
16 entered into the stock purchase agreement, that you
17 could not sue Dave Silverstein for money damages if
18 he breached the valuation covenant?
19     A    I did not have thoughts.  I always
20 believed that we would work through it together to
21 find a way where I could get the money that was owed
22 to me, and he would have the flexibility, which he so
23 desired, in the agreement.
24          I was not thinking about litigation, Marc.
25     Q    So as you sit here today, you cannot tell

Page 146

1  me what your understanding was whether or not you
2  agreed to refrain from --
3      A    You finished your question.  Do you think
4  I could take a break now?
5      Q    Well, I just started.  I didn't know until
6  I started this one.  As you sit here today, you do
7  not have an understanding of whether or not you
8  agreed to refrain from suing Dave Silverstein for
9  money damages if he violated --
10     A    No, Marc, I never agreed to not sue Dave,
11 never, ever, ever, ever, ever in any written or oral
12 conversation.
13     Q    Do you want to take a break now?
14     A    Sure.  Thank you.
15          (Recess taken from 1:29 p.m. to 1:39 p.m.)
16     Q    (BY MR. PAPPALARDO) Ms. Kirzhner, before
17 we took a break, I was trying to determine your
18 understanding of the stock purchase agreement.  My
19 question to you is, did you read the stock purchase
20 agreement from beginning to end prior to signing it
21 in 2004?
22     A    Yes.
23     Q    And did you understand the stock purchase
24 agreement when you signed it in 2004?
25     A    For the most part, I believe I did.

Page 147

1      Q    Is there any portion that you can recall
2  that you didn't understand --
3          MR. SWEETBAUM: Objection --
4      Q    (BY MR. PAPPALARDO) -- when you signed it
5  in 2004?
6          MR. SWEETBAUM: Objection.  Form.
7      A    Marc, that was over six years ago.  I have
8  had three children in four short years.  It would be
9  hard for me to recall exactly the nature of every
10 single item on that agreement, and whether I
11 understood every single item on that agreement.  I
12 believe I was -- you know, I believe I did, as I
13 mentioned earlier.
14     Q    (BY MR. PAPPALARDO) That you did
15 understand it when you signed it?
16     A    Yes.
17     Q    And as you sit here today, can you recall
18 anything that you did not understand in 2004 that is
19 contained in the agreement?
20          MR. SWEETBAUM: Objection.  Form.
21     A    I do not recall.
22          (Exhibit 15 marked.)
23     Q    (BY MR. PAPPALARDO) Let me show you what
24 is marked as Exhibit 15.
25     A    I was wondering when Exhibit 15 was going

Page 148

1  to be marked.
2      Q    Ms. Kirzhner, why were you wondering when
3  Exhibit 15 was going to be marked?
4      A    Mr. Pappalardo, I'm just trying to lighten
5  the atmosphere to get through the afternoon.  I
6  apologize if I offended you with that comment.  I'll
7  try to refrain from such comments for rest of the
8  afternoon.
9      Q    You didn't offend me.
10     A    Okay.
11     Q    Can you please turn to page 6, your fourth
12 claim for relief.  Could you just read your fourth
13 claim for relief to yourself.  And after you've had a
14 chance to review it, can you please tell me.
15     A    I'm done.
16     Q    You understand that the Court ruled that
17 your fourth claim for relief is a fraudulent
18 conveyance claim.  Are you aware of that?
19          MR. SWEETBAUM: Objection.  Form.
20     A    I don't exactly recall the words the Court
21 used.  Thank you for that, Mr. Pappalardo.  After
22 giving some thought --
23     Q    (BY MR. PAPPALARDO) I don't have any
24 pending question.  You'll have a chance to clarify
25 any testimony you want when your counsel asks you

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 149

1  questions.
2  A  All right.
3  (Exhibit 16 marked.)
4  Q  (BY MR. PAPPALARDO)  So, Ms. Kirzhner, I'm
5  going to show you what is going to be marked Exhibit
6  No. 16.
7  A  Is there a page you would like me to go
8  to?
9  Q  Yes.  Specifically, Exhibit 16 is the
10  court order which granted in part, denied in part the
11  motions to dismiss in this case.
12  Have you ever read this before?
13  MR. SWEETBAUM:  Just for the record, this
14  is not a complete copy.
15  MR. PAPPALARDO:  I would agree.
16  A  I do not believe I read all 30 pages.  My
17  attorneys provided me a synopsis.
18  Q  (BY MR. PAPPALARDO)  And specifically, if
19  you go down to the second page, which is numbered
20  number 14 --
21  A  Um-hum.
22  Q  -- and it says:  Upon the court's review
23  the plaintiff's fourth claim for relief appears to be
24  akin to a fraudulent conveyance.  If you see the
25  remaining pages it talks about a fraudulent

Page 150

1  conveyance claim.
2  A  Are you asking me if I see the words on
3  the page?
4  Q  Yes.
5  A  I see the words on the page.
6  (Mr. Silverstein left the room.)
7  Q  (BY MR. PAPPALARDO)  Would you agree with
8  me that your fourth claim for relief is that the
9  defendants transferred the assets of Evergreen in
10  2009 in order to defraud people?
11  A  Marc, I am not going to argue or respond
12  to questions regarding legal jargon that is not my
13  area of professional expertise.
14  Q  Are you refusing to answer that question?
15  A  I'm telling you I don't think you're
16  asking me a question that I understand.  And there is
17  enough legal jargon in that question, and in the
18  documents you have put in front of me, which is why I
19  have paid for counsel to represent me in this kind of
20  conversation.
21  Q  As you sit here today, can you tell me
22  what your fourth claim for relief, your fraud claim,
23  is, what you're alleging happened?
24  A  Well if we go back to Exhibit 15 I can
25  reread to you Exhibit 15 if you would like, for the

Page 151

1  fourth claim.  Would you like me to reread that to
2  you?
3  Q  I'm just asking you what your
4  understanding is.  If you want to read it to help
5  you -- first of all, your complaint is a verified
6  complaint, correct?
7  A  Yes.
8  Q  All right.
9  A  I guess.
10  Q  And I'm asking you what your understanding
11  of your claims are.
12  Do you have any understanding of what your
13  fraud claim is?
14  A  Are you asking me about the fourth claim?
15  Q  Yeah, your fourth claim.  I'm not asking
16  you to read.  I'm asking you what, without reading
17  it, can you tell me what your fourth claim for relief
18  is?
19  A  I believe that there was a fake, sham,
20  pretend auction, where, although it was said that
21  certain BMG assets were allowed to be bid on, that
22  that was, in fact, a misrepresentation and not the
23  truth.
24  Q  And you believe that you were damaged
25  because you basically don't have any collateral now,

Page 152

1  right?
2  MR. SWEETBAUM:  Objection.  Form.
3  A  That I was damaged, I don't -- can you
4  repeat your question.  That I was damaged?
5  Q  (BY MR. PAPPALARDO)  You believe you were
6  damaged by that sale because you don't have
7  collateral now?
8  A  That's one of the reasons, yes.
9  Q  Can you tell me another reason?
10  A  Mr. Silverstein has basically no incentive
11  to continue to pay me.
12  Q  Why is that?
13  A  Because the stock of BMG is now,
14  quote-unquote, in the words of Mr. Mansfield,
15  worthless.
16  Q  And you would agree with me that if there
17  would not have been a transfer of the assets of
18  Evergreen, that you would not have a fraudulent
19  conveyance claim?
20  A  I don't know, Marc.
21  Q  Why don't you know?
22  MR. SWEETBAUM:  Objection.  Form.
23  A  Maybe there were other things.
24  Mr. Mansfield referred to other transactions that,
25  you know, happened.  You know, I don't know.

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 153

1    Q    (BY MR. PAPPALARDO) So as you sit here
2    today, you're not aware of anything else?
3    A    No, not yet.
4    Q    And really, based on all the knowledge
5    that you have today, you would agree with me that
6    really all of your claims really focus in on this
7    transfer of assets that occurred in 2009?
8         MR. SWEETBAUM: Objection. Form.
9    A    No, I think it goes beyond that.
10    Q    (BY MR. PAPPALARDO) I mean, your first
11    claim is the violation of the valuation covenant,
12    correct?
13    A    I don't know the claim order.
14    Q    You can look at your complaint, if you
15    would like.
16    A    Do I need to validate everything you're
17    saying? Can you just ask me the question that you
18    really want me to answer?
19    Q    You know, Ms. Kirzhner, I'm going to ask
20    you a number of questions here. I know you might
21    have problems with some of them. If you don't
22    understand my questions, it's certainly fair for you
23    to ask me to repeat it.
24    A    I have been.
25    Q    But in terms of commentary and being angry

Page 154

1    at my questions, I'm sorry.
2    A    I'm not angry at your questions. I'm
3    trying to create a two-way dialogue that works for
4    both of us.
5    Q    So going to page 4 of your complaint,
6    which is Exhibit 14 (sic), I believe.
7    A    Yes, page 4. First claim for relief.
8    Q    If you go down to paragraph 41.
9    A    Yes.
10    Q    It says: Upon information and belief,
11    BGMI has not maintained --
12         THE REPORTER: I'm sorry.
13    Q    (BY MR. PAPPALARDO) Do you see paragraph
14    41 where it states: Upon information and belief,
15    BMGI has not maintained the value of BMGI and any
16    replacement collateral at a value at least equal to
17    the unpaid purchase price of the stock?
18    A    Yes.
19    Q    So your first claim for relief is the
20    violation of the valuation covenant, would you agree
21    with me?
22         MR. SWEETBAUM: Objection. Form.
23    A    There's several things on here. That's
24    one of several.
25    Q    (BY MR. PAPPALARDO) One of your several

Page 155

1    complaints, correct?
2    A    Um-hum.
3    Q    Is that a yes?
4    A    Yes.
5    Q    Okay. And you would agree with me that
6    your claim for the violation of the valuation
7    covenant is based on this transfer of assets that
8    occurred in 2009, correct?
9    A    Yes.
10    Q    Okay. And in 2009 when this -- prior to
11    the transfer of those assets, you are aware that
12    there was a proposed sale, correct?
13    A    No, I'm not sure. No.
14    Q    And you were notified sometime around
15    September 17th, September 19th of 2009 that there was
16    a planned sale of Evergreen's assets, correct?
17    A    No, I was not notified. I was asked to
18    comment on that sale and then I had to go try to
19    figure it out.
20    Q    Somebody made you aware that there was a
21    proposed sale of the assets to occur on
22    September 24th, 2009, correct?
23    A    Yes.
24    Q    And you had your attorney, Tim Schafer,
25    attend the asset sale, correct?

Page 156

1    A    Yes.
2    Q    And going back to claim four, your fraud
3    claim, is also premised on this transfer of assets
4    that occurred sometime in 2009, correct?
5    A    In part, yes.
6    Q    When you say in part, what is the other
7    part? I'm just trying to understand the scope of
8    your claims.
9    A    Well, Marc, we are still in the discovery
10    process of figuring out everything that went on,
11    okay?
12         There were all kinds of other legal suits
13    going on that we're just now starting to learn about.
14    So, when I say in part, I mean, you know, there is
15    other stuff out there. It's one of, you know, the
16    fourth claim has one, two, three, four, five, six,
17    seven parts to it. So in part, that's what I mean
18    by, in part.
19    Q    When you say there are other legal suits
20    you're just starting to learn about, what else are
21    you just starting to learn about?
22    A    The lawsuit with First Capital Partners,
23    the lawsuit or proposed lawsuit with the landlord,
24    the whole bankruptcy threat with the landlord, you
25    know.

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 157

1   Q    So, just to make this clear, your first
2   claim for relief, the violation of the valuation
3   covenant, has nothing to do with whether Dave sued or
4   didn't sue First Capital Partners, correct?
5   A    I don't know that to be the case.
6   Q    So your first claim for relief is the
7   violation of the valuation covenant.  Can you please
8   tell me how the fact that there may have been a
9   lawsuit against First Capital Partners may have
10  caused Dave to be in breach of the valuation
11  covenant?
12  A    Maybe he transferred stock to them.
13  Maybe, you know, I mean, there's all sorts of things.
14  I don't know the answer.
15  Q    As you sit here today -- I understand,
16  Ms. Kirzhner, that we're still at the very beginning
17  of discovery, okay?  And so I just want to make it
18  clear I'm not trying to trip you up.  I'm just trying
19  to figure out, as of today at this early stage of
20  discovery, what your understanding of your claims
21  are, okay?
22  A    Okay.
23  Q    And I understand, Ms. Kirzhner, as
24  discovery progresses, you might learn additional
25  things that may cause you to either have new claims

Page 158

1   or which may satisfy the claims that you have
2   asserted in this complaint, okay?
3   A    Okay.
4   Q    And so, just so it's on the record here so
5   no one is trying to trip you up, I'm just trying to
6   make sure what your understanding is today, but I'm
7   not trying to limit you from necessarily not adding
8   additional claims in the future, okay?
9   A    Okay.
10  Q    So --
11       MR. SWEETBAUM:  Are those questions?
12       MR. PAPPALARDO:  Well, I just feel like
13  she feels like I'm trying to trip her.
14  Q    (BY MR. PAPPALARDO)  And I just really
15  want to know what your understanding of your claims
16  are.
17       So, Ms. Kirzhner, in your second -- so
18  your second claim for relief is a violation of the
19  express covenant of good faith and fair dealing?
20       (Mr. Silverstein entered the room.)
21  Q    (BY MR. PAPPALARDO)  Do you see that?
22  A    I see it here.
23  Q    And you would agree with me that based on
24  the information that you have today that your claim
25  for violation of the express covenant of good faith

Page 159

1   and fair dealing is based on the fact that you
2   believe that Dave -- or, I'm sorry, that the
3   defendant transferred the assets of Evergreen, or in
4   fact did transfer the assets of Evergreen?
5   A    Marc, you asked me that question earlier.
6   And I believe I added to that by saying I think there
7   are other things that also include the amounts of
8   both draws and salary that, in my opinion, were not
9   necessarily in good faith and fair dealing.
10       And in particular, the way Mr. Silverstein
11  bullied me in the transaction to pay back our tax
12  liabilities, that was not in good faith and fair
13  dealings.
14       As Mr. Bob Bulow also mentioned.
15  Q    So when you refer to you were
16  quote-unquote bullied regarding the tax liabilities,
17  that refers to a 2003 shareholder loan, correct?
18  A    Yes.
19  Q    And you understood that both you and Dave
20  Silverstein had equal shareholder loans in 2003,
21  right?
22  A    Yes.
23  Q    And you understand that in 2005 you were
24  asked to repay that loan, correct?
25  A    Yes.

Page 160

1   Q    And you understand that Dave Silverstein
2   repaid the loan through a shareholder distribution,
3   correct?
4   A    I believe that to be the case.
5   Q    And --
6   A    Through a 2005 shareholder distribution.
7   Q    And you understood that in 2005 you could
8   not receive a shareholder distribution in 2005,
9   because you were not a shareholder of Evergreen,
10  correct?
11  A    That's not what I'm suggesting would be
12  good faith and fair dealing.  What I am suggesting is
13  that we requested from Mr. Silverstein that that
14  money come off the tail end of his $2.64 million
15  payment.  But Mr. Silverstein instead elected to
16  completely cut off all of my payment and threatened
17  my family.
18  Q    When you say that, that the payment should
19  have come out of your $2.64 million payment, can you
20  explain that for me?
21  A    Yes.
22  Q    What $2.64 million payment are you
23  referring to?
24  A    Mr. Pappalardo, if you go back to the
25  stock purchase agreement, Exhibit 11, okay, item G,

Pages 157 to 160

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 161

1  the remaining unpaid balance of $2,640,000 will be
2  paid on June 31st (sic), 2010.
3      Q    So you felt that it would have -- that if
4  Mr. Silverstein would have acted in good faith that
5  he would have agreed to allow you to repay that in
6  2010?
7      A    Or taken it off the tail end of the money
8  he owes me instead of basically cutting off my
9  family.  By the way, that was suggested.
10     Q    But you understood when you took a loan in
11 2003, that there was no obligation on Mr. Silverstein
12 to accept repayment in 2010, correct?
13     A    Nor was there any information in September
14 2009 that we had not worked through that.  And, in
15 fact, I had no knowledge of that until tax time in
16 2005, long after the buyout agreements were
17 negotiated.  So one could say Mr. Silverstein, you
18 know, hid that from me during the September 2009
19 negotiations.
20     Q    You mean 2004 negotiations?
21     A    Sorry, 2004 negotiations.
22     Q    So is it your belief that Dave Silverstein
23 hid the fact that you had a shareholder loan in 2004
24 from you?
25     A    I honestly believe, we were in the middle

Page 162

1  of a lot of stuff and it was just something that had
2  slipped his mind.
3      Q    And so you don't believe it was
4  intentional that Dave didn't talk to you about the
5  shareholder loan --
6      A    No, what was intentional was his complete
7  cutting off of all my payments immediately, without
8  giving me any notice that it was coming, even after
9  communication that he said we could forgive the debt,
10 which was another option, Mr. Pappalardo, that he
11 mentioned to me.
12     Q    And he talked to you, one of the things
13 that Mr. Silverstein talked to you about was
14 forgiving the 2003 shareholder note, correct?
15     A    The tax loan, forgiving the tax loan.
16     Q    Yes.
17     A    Yes.
18     Q    And you did not want that, did you?
19     A    Of course I wanted that.
20     Q    But you knew that that would be income to
21 you, correct?
22     A    Yeah, and I would have to pay taxes on it.
23     Q    Now, you understood that when -- your
24 testimony is, in 2005 that you stopped receiving
25 payments under the note, close period, correct?

Page 163

1      A    Because of this -- yeah, he basically said
2  to Bob, you will not send another payment.
3      Q    What was your remedy --
4      A    Until this is, quote unquote, paid back.
5      Q    What was your remedy under the stock
6  purchase agreement when Dave Silverstein stopped
7  making payments under the promissory note?
8      A    Obviously, I could pay the money he had
9  already paid, take my stock back, you know, I could
10 call default.  I could --
11     Q    And if you called default, what would your
12 remedy be?
13     A    To take the stock back.
14     Q    So you had -- in 2003 Anton Collins and
15 Mitchell prepared your tax returns, your personal tax
16 returns, correct?
17     A    I think so, the same company we had used.
18     Q    So you had just as much knowledge in 2003
19 that there was a shareholder loan as Mr. Silverstein,
20 correct?
21     A    I honestly recall maybe a five-second
22 conversation around, you know, that this is a
23 typical --
24          Mr. Pappalardo, if you would like to
25 continue this deposition, it's very distracting to

Page 164

1  me.
2      Q    Okay.
3      A    So if you need to take a break, let's take
4  a break.
5      Q    I don't need to take a break.  I have a
6  pending question to you.
7      A    Yes, you did.
8      Q    My question to you is, in 2003 you had as
9  much knowledge as Mr. Silverstein did regarding the
10 fact that the shareholder loan existed, correct?
11     A    No, I think he had more knowledge because
12 he was working the financial.  He owned the
13 financials of our company.  He gave direction to the
14 CFO.  He ran -- I ran the operations.  He ran the
15 sales and marketing and the financials.
16          So, no, I wasn't asked about how much of a
17 loan should we take.  I wasn't asked about, you know,
18 how this was going to appear on our taxes.  I wasn't
19 asked about potential future payback.  You know, we
20 didn't have any of those conversations.  He just said
21 we're doing this because it's a common thing to do
22 and it will all come out in the wash.
23          Does that answer your question, sir?
24     Q    It does.
25     A    Okay.

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 165

1    Q    Who is Josh Newfeld?
2    A    An MBA cohort of mine from the College of
3    William & Mary.
4    Q    And in 2007, you were attempting to find a
5    third party besides Mr. Silverstein who might be
6    interested in purchasing your note, correct?
7    A    No.  Mr. Silverstein had somehow informed
8    me that he was trying to get additional moneys for
9    Raptor and debt refinancing and other things.
10    And I knew Mr. Newfeld was a
11    representative of a company not unlike First Capital
12    Partners, that could be an option to provide
13    Mr. Silverstein with some cash.
14    Q    Did you ever talk to anyone prior to
15    October of 2009 about potentially purchasing your
16    note, besides Mr. Silverstein?
17    A    No, not that I recall.
18    Q    Now, you testified that, in 2008, you,
19    Dave Silverstein and Dave Mansfield were negotiating
20    regarding Mr. Silverstein purchasing your note in one
21    lump-sum payment, correct?
22    A    Um-hum.
23    Q    Is that a yes?
24    A    Yes.  I apologize.  Yes.
25    Q    And you were unable to reach a deal with

Page 166

1    Mr. Silverstein, correct?
2    A    Correct.
3    Q    Do you think that Mr. Silverstein was
4    angry with you when you were unable to reach a deal
5    in 2008 regarding purchasing your note?
6    A    I don't know.
7    Q    Do you have any reason to believe that
8    Mr. Silverstein was angry with you in 2008 when he
9    couldn't reach a deal with you regarding purchasing
10    your note?
11    A    I don't know.
12    Q    In September of 2004 you told David
13    Silverstein that Tim Schafer had sent you a letter
14    advising you of the risk of entering into the stock
15    purchase agreement, based on the 3.01 sole remedy
16    clause.
17          Do you recall that conversation?
18    A    I don't recall the specific conversation.
19    Certainly Tim --
20          MR. SWEETBAUM:  Well, wait.  Are we
21    talking about a conversation between --
22          MR. PAPPALARDO:  Yeah, between those two.
23          MR. SWEETBAUM:  Not with Mr. Schafer.
24    A    Oh, no.  I thought you said Tim Schafer.
25    Q    (BY MR. PAPPALARDO)  Let me rephrase that.

Page 167

1    In September 2004 you had a conversation with David
2    Silverstein, where you told Mr. Silverstein that Tim
3    Schafer had sent you a letter advising you of the
4    risk of entering the stock purchase agreement based
5    on the sole remedy clause.
6          Do you recall that conversation?
7    A    I don't.
8    Q    Now, going -- I would like you to look
9    back at the stock purchase agreement, please, which
10    is Exhibit 11, I believe.  Specifically, go to page
11    5.  And there's a subsection (a), it says nonpayment
12    of any required installments.  Could you just read
13    that sub (a) to yourself.
14          And there's a cross reference to, in
15    subparagraph (a), to section 2.05 and section 15.
16    Could you also look at both of those.
17    A    Okay.
18    Q    So, you understood that in order for you
19    to call a payment default, you first had to give the
20    grace period in section 2.05, and then you had to
21    give Mr. Silverstein seven days to cure the default
22    for a payment of default?
23    A    Should I want to call default.
24    Q    Should you want to call default, correct.
25    A    It would appear that to be the case.

Page 168

1    Q    And to this day, you have actually never
2    called a payment default?
3    A    That's correct.
4    Q    And so, as we sit here today, while you
5    may believe that Dave Silverstein is in default for
6    other reasons, it's not your position that Dave
7    Silverstein is currently in default for a payment
8    default, correct?
9    A    He is in default, but that doesn't mean
10    I have -- this says, you know, I don't necessarily
11    have to call default even if he is in default.  So
12    what is your question, Mr. Pappalardo?
13    Q    My question is, is it your position that
14    today, Dave Silverstein is in default for failing to
15    make a payment under your note?
16    A    He is.
17    Q    And so you have called --
18    A    No, I have not called a default.
19    Q    Now, section 3.01, if you look at page 5
20    says that there will be a payment default only if
21    there is a failure to make a required payment.  You
22    then have to wait the grace period and then he has
23    seven days to cure.
24          Do you agree with that or disagree with
25    that?  Page 5, section 3.01(a).

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 169

1   A   Page 5 is not section 3.01 -- oh, (a).
2   Nonpayment of any required installment when due
3   including any grace periods, upon notice to buyer
4   pursuant to paragraph 2.05 and 15 and failure to cure
5   such default within seven days of receiving notice in
6   writing to do so.
7   Q   If you look at -- first of all, let's go
8   right above that.  For purposes of this agreement,
9   the buyer shall be deemed in breach and/or default
10  upon the occurrence of any of the following.
11      Do you see that?
12  A   Yes.
13  Q   And then (a) is payment.  Do you see the
14  part dealing with payment?
15  A   Yes.
16  Q   So would you agree with me that buyer is
17  David Silverstein under this agreement?
18  A   Yes.
19  Q   Okay.  And that you would agree with me
20  that David Silverstein is only in default for failing
21  to make a payment if you give him the required grace
22  period under Section 2.05 and then send him written
23  notice with an opportunity to cure?
24  A   Right.
25  Q   Okay.  And you have not provided David

Page 170

1   Silverstein with any written notice that he is in
2   default for failing to make a payment, correct?
3   A   That's correct.
4   Q   And you have not given David Silverstein
5   any period to cure any payment default as of today,
6   correct?
7   A   No, other than various communications that
8   we've worked through together on, you know, I know
9   I'm in default.  I need to cap you at a certain
10  amount.  And those were prior conversations that, you
11  know, he was still in default, but I didn't call
12  default.
13  Q   So my question is, is Dave Silverstein in
14  default of the stock purchase agreement currently
15  today for failing to make an installment payment
16  under the note?
17      MR. SWEETBAUM:  Objection.  Form.
18  A   He's in default, but I have not chosen to
19  produce any written notification of that.
20  Q   (BY MR. PAPPALARDO)  Just so I understand
21  your interpretation of this agreement, the beginning
22  part says, 3.01(a), it says:  For purposes of this
23  agreement, the buyer shall be deemed to be in breach
24  and/or default only, you know, if the occurrence of
25  (a), (b), or (c) occur.

Page 171

1   (a) deals with payment default and
2   requires you to send written notice and for you to
3   give him an opportunity to cure, correct?
4       MR. SWEETBAUM:  Objection.  Form.
5   A   Yes.
6   Q   (BY MR. PAPPALARDO)  And so my question
7   is, do you believe that even though you have not
8   provided Mr. Silverstein with notice of
9   default for failing to make a payment that he is in
10  default for failing to make a payment?
11  A   Marc, I don't understand that question.
12  Q   Have you provided --
13  A   Here is the deal --
14  Q   I'll rephrase it.  So you have not sent
15  David Silverstein a notice of default for failing to
16  make a payment, correct?
17  A   No, I haven't.
18  Q   And you would agree with me that section
19  3.01 requires that you send a written notice if
20  Mr. Silverstein fails to make a payment, if you want
21  to call a breach of default for that nonpayment
22  issue, correct?
23  A   Yes.
24  Q   And so my question to you is do you
25  believe that Dave Silverstein is in default for

Page 172

1   failing to make a payment today?
2       MR. SWEETBAUM:  Objection.  Form.
3   A   This is the third or fourth time you've
4   asked me that question.  And this will be the third
5   or fourth time I have said yes, I feel he is in
6   default of not making a payment, but I have not
7   chosen to create -- to call it.
8   Q   (BY MR. PAPPALARDO)  Why?
9   A   First, in the past, we have been able to
10  work through terms that are satisfactory to me and
11  him in continuing to -- with the buyout.
12      And, second, I don't want the stock.  I
13  want the money.
14  Q   And you didn't want the stock in December
15  of 2008, did you?
16  A   No.
17  Q   And you didn't want it in June of 2009
18  when he told you that there might be a bankruptcy?
19  A   No.
20  Q   And you don't want it today, do you?
21  A   No.
22  Q   And can you imagine any situation in which
23  you would want the stock of Evergreen back?
24  A   Well, I can imagine some situations, not
25  the stock of Evergreen, no.

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 173

1    Q    Okay.
2    A    Because it's clearly worthless today,
3  unless he transfers assets back or, you know, makes
4  it worth something. Maybe I would have some
5  interest, and if it was worth more than he owed me,
6  maybe I would have some interest.
7    Q    So if the stock was worth what he owed
8  you, would you want the stock back?
9         MR. SWEETBAUM: Objection. Form.
10   A    No.
11   Q    (BY MR. PAPPALARDO) Now, in looking at
12 the stock purchase agreement, you understand that
13 Dave Silverstein purchased your stock and not
14 Evergreen, correct?
15   A    Yes.
16   Q    And you understand that Dave Silverstein
17 is the only party who has an obligation to pay you
18 for your stock, correct?
19   A    No.
20   Q    Can you tell me who has an obligation to
21 pay you for your stock under the stock purchase
22 agreement?
23   A    You know, Marc, Dave has done a good job
24 of creating documented conflicts of interest as buyer
25 and seller and owner of one and the other of these

Page 174

1  entities. So, you know, David Silverstein is a
2  pseudo name for not just the person David Silverstein
3  is, but, you know, in my opinion, he is who these
4  other entities are as well.
5         So it's, you know, a little bit fuzzy to
6  me.
7    Q    So I would like you to look at -- I would
8  like you to look at section 2 on page 1 of Exhibit 11
9  of the stock purchase agreement.
10   A    Um-hum.
11   Q    It says -- can you read the first line to
12 yourself, beginning with in consideration of the
13 sale? Do you see it in Section 2?
14   A    What page are you on? Page 1? I thought
15 you said page 2.
16   Q    Oh, I'm sorry.
17   A    The item that says sale of stock?
18   Q    Yes.
19   A    Okay.
20   Q    First of all, the promissory note was
21 signed when you sold your stock, correct?
22   A    I believe that's the case, yes.
23   Q    And Evergreen did not provide you with a
24 note to you. Dave Silverstein did, correct?
25   A    I'm trusting you on this, Marc. It has

Page 175

1  been a long time since I looked at the promissory
2  note. But I'll certainly trust that you are making a
3  correct assertion.
4    Q    And I'll just show you the promissory
5  note.
6         (Exhibit 17 marked.)
7    Q    (BY MR. PAPPALARDO) I'll show you what is
8  going to be marked as Exhibit 17.
9    A    Okay.
10   Q    Do you recognize Exhibit 17?
11   A    Yes.
12   Q    Exhibit 17 is a promissory note that David
13 Silverstein delivered to you, correct?
14   A    I believe it is.
15   Q    And the maker on this says David
16 Silverstein, an adult individual, if you look in the
17 first paragraph?
18   A    Yes.
19   Q    And you do not recall ever receiving a
20 promissory note from Evergreen, do you?
21   A    No.
22   Q    And going back to Exhibit 11, the stock
23 purchase agreement, section 2 states that buyer,
24 David Silverstein, agrees to pay you $5 million,
25 correct?

Page 176

1    A    I believe that's the case, yes.
2    Q    And so you would agree with me that
3  Evergreen never agreed to pay you any money under the
4  stock purchase agreement as part of the purchasing of
5  your stock?
6    A    No, but the payments all came from
7  Evergreen, as you so readily asked me to admit to
8  some time ago.
9    Q    Well, let's go back to that because you
10 said you didn't know. I was asking you the question.
11 Is it your testimony now that all of the payments
12 under the stock purchase agreement and note were paid
13 by Evergreen?
14   A    My testimony was that my contacts for the
15 payments were the individuals in the accounting
16 department at BMG.
17   Q    But you have no knowledge whether or not
18 the money came from Dave Silverstein or Evergreen?
19   A    As I commented earlier, I didn't expect
20 that Dave would let Bob Bulow and Chris Taylor manage
21 his personal accounts.
22   Q    And Bob Bulow told you that the payments
23 that may have come from Evergreen came as shareholder
24 distributions, correct?
25   A    He didn't -- I don't recall him saying

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 177

1   that.
2       Q    I just want to make it clear, though, that
3   under the stock purchase agreement, Evergreen never
4   agreed to pay any money, correct?
5       A    No, it was -- under the stock purchase
6   agreement?
7       Q    Yes.
8       A    The stock purchase agreement was signed
9   both by David Silverstein as the corporation and both
10  by David Silverstein as the buyer.
11      Q    But in section 2, it states that buyer
12  agrees to pay you $5 million, correct?
13      A    Yes, it does.
14      Q    And nowhere in Exhibit 11, the stock
15  purchase agreement, is there any statement that
16  Evergreen will ever pay you any money, correct?
17      A    I guess not.  I don't recall.
18      Q    In Exhibit 17, the promissory note, the
19  note states that the obligation to pay you $5 million
20  is a personal obligation of David Silverstein,
21  correct?
22      A    I don't know if it says personal
23  obligation, but it was my understanding that Dave
24  would be buying out the shares.
25      Q    And not Evergreen, correct?

Page 178

1       A    As I mentioned earlier, Marc, it's hard to
2   discern one from the other, but, yes, in general
3   principle, that is my understanding.
4       THE DEPONENT:  Would this be a good time
5   for a 15-minute potty break?
6       MR. PAPPALARDO:  Yeah, that would be fine.
7       (Recess taken from 2:23 p.m. to 2:35 p.m.)
8       (Exhibit 18 marked.)
9       Q    (BY MR. PAPPALARDO)  Handing you what is
10  marked as Exhibit 18.  You can review it if you would
11  like.  After you've had a chance to review it, please
12  tell me.
13      A    Okay.
14      Q    In 2007, in July of 2007 you were
15  contacted regarding the UCC warrant that had been
16  filed against Evergreen, correct?
17      A    Now, re-looking at this, I recall that
18  vaguely, yes.
19      Q    And you were requested to have BMG removed
20  as the debtor since the debt is personal to
21  Mr. Silverstein, correct?
22      A    Yes.
23      Q    And you had no issue with that, correct?
24      A    No.
25      Q    When did you first learn that Evergreen

Page 179

1   was planning on holding an auction of its assets?
2       A    I believe the date was the 16th or 17th of
3   September, per the disclosed e-mail that I forwarded.
4       Q    How did you first learn of it?
5       A    I received an inquiry from Larry Goldman,
6   or Goldstein -- Goldman at More Steam.
7       Q    Did you ever call Mr. Goldman after
8   receiving an e-mail from him?
9       A    He requested a call, and I believe we had
10  a call.
11      Q    Do you know why Mr. Goldman requested you
12  call him regarding the sale of Evergreen's assets?
13      A    I think More Steam felt there was
14  something sneaky and suspicious, and, you know,
15  unethical about what was going on and they wanted to
16  get my take on it.
17      Q    And why do you think More Steam or
18  Mr. Goldman would care about the sale and what
19  Mr. Silverstein was doing, whether it was ethical or
20  unethical?
21      A    I think they had a legitimate interest in
22  some of the assets since they specifically inquired
23  about the BMG learning stuff and wanted to know if it
24  was even worth the, you know, contact or whether it
25  was truly just a sham auction.

Page 180

1       Q    What did you tell Mr. Goldman?
2       A    I said, wow, thanks for letting me know.
3   I had no idea.  And I'll see what I can figure out.
4       Q    And you subsequently learned that after
5   your conversation with Mr. Goldman, did you learn
6   that the sale had actually been advertised in the
7   some national newspapers?
8       A    I don't know if I actually saw the
9   advertisements, but, I mean, I think that was
10  communicated to me by David Mansfield in October, a
11  few weeks after that.
12      Q    Did you ever suggest that Mr. Goldman
13  contact Evergreen regarding the sale?
14      A    I don't remember.
15      Q    Did you -- did you express any opinion to
16  Mr. Goldman whether you believe the auction was a
17  sham or real at that time?
18      A    I believe I said, I have no idea.  Thanks
19  for bringing it to my attention and I'll see what I
20  can figure out.
21      Q    I am just going to look down here.  I
22  don't mean to be rude?
23      A    You're running out of stickies there.
24      Q    I'm going to hand you what will be marked
25  as Exhibit 19.

Pages 177 to 180

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 181

1           (Exhibit 19 marked.)
2      Q     (BY MR. PAPPALARDO)  Do you recognize
3  Exhibit 19?
4      A     Um-hum.
5      Q     And what is Exhibit 19?
6      A     For some reason the top got cut off
7  because I was not privy to this until, I would say,
8  the last two weeks.
9      Q     Okay.
10     A     So it's not like I was copied in this
11 chain back in September 2009.  And it appears to be a
12 conversation between Bill Hathaway, the owner of More
13 Steam, and Larry Goldman.
14     Q     And in the first part of Exhibit 19 it
15 says, I have heard indirectly from a BMG MBB -- now,
16 MBB refers to master black belt?
17     A     Yes.
18     Q     And BMG is also Evergreen, correct?
19     A     Yes.
20     Q     Now, do you have any idea who the BMG
21 master black belt is that Mr. Hathaway allegedly
22 indirectly heard that this was a legal maneuver?
23     A     No.
24     Q     Did you ever talk to Mr. Hathaway about
25 how he learned about the sale?

Page 182

1      A     No.
2      Q     Did you ever talk to Mr. Goldman about how
3  he learned about the sale?
4      A     Yeah, I mentioned that I chatted with
5  Larry.  And, you know, I think they either found
6  the -- I don't know how they found the website or
7  whatever.  I don't recall asking him specifically how
8  he learned of the auction.
9      Q     Did Mr. Goldman ever tell you who advised
10 him at Evergreen about the sale?
11     A     No.
12     Q     Did --
13     A     We never discussed that.
14     Q     Now, you also had a conversation with Jim
15 Kelly?
16     A     Yes.
17     Q     And when is the last time you spoke to
18 Mr. Kelly?
19     A     I don't know, last 30 days, maybe, 21
20 days.
21     Q     And approximately the last 30 days when
22 you spoke to Mr. Kelly, did you speak to him about
23 the claims in your lawsuit?
24     A     No, I don't think that we discussed the
25 claims in my lawsuit.  I was inquiring about if they

Page 183

1  ever followed through on contacting BMG about the
2  e-learning products that they may be interested in.
3      Q     What did Mr. Kelly say?
4      A     He said they did not.
5      Q     Did he tell you why?
6      A     They felt that this was not something that
7  was truly a legitimate auction, that they could
8  really bid for product on.
9      Q     Did he tell you why he felt that?
10     A     No.
11     Q     And did Mr. Kelly ever advise you who the
12 employee of Evergreen was who told him that this may
13 be a legal maneuver?
14     A     You asked me that earlier, and I said no.
15     Q     I asked you that with respect to
16 Mr. Goldman.  Mr. Hathaway, I'm asking you about --
17     A     You said BMG MBB.
18     Q     I'm asking you did anybody at More Steam
19 tell you who that person was that was referred to in
20 Exhibit 19?
21     A     No, I never asked.
22     Q     Do you have any idea who that person might
23 be, as you sit here today?
24     A     No.
25     Q     Now, again, you claim you were -- you

Page 184

1  claim you were first made aware at least a few days
2  before the September 24th auction, correct?
3      A     Yes.
4      Q     Why didn't you -- why didn't you try to
5  obtain an injunction to stop the sale?
6           MR. SWEETBAUM:  Objection.  Form.
7      A     I sent a letter, which I'm sure you have,
8  because you provided it in your discovery.  And I
9  think I provided it in my discovery around, you know,
10 asking for what the heck's going on, and to stop.
11     Q     (BY MR. PAPPALARDO)  In, let's say,
12 October 1st, 2009, did you still believe that you
13 might be paid under the note?
14     A     Yeah.
15     Q     And when was the first time you didn't
16 believe that you were going to be paid under the
17 note?
18     A     When Mr. Mansfield told me my stock was
19 worthless.
20     Q     Again, though, Mr. Silverstein's
21 obligation to pay you is not based on the value of
22 the stock.  Would you agree with me?
23     A     Yes.
24     Q     So tell me why you didn't believe that you
25 were going to be paid under the note in October --

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 185

1     A   As I mentioned earlier today, there would
2 be no incentive for Mr. Silverstein to pay it.
3     Q   If that's the case, then in October 2009
4 when you sent Mr. Silverstein an e-mail, he never
5 told you at that time that he would never pay you,
6 did he?
7     A   No, and I'm still hoping he does.
8     Q   But you've now brought a lawsuit, correct?
9     A   Yes.
10     Q   And you never called him before your
11 lawsuit to say, hey, Dave, are you going to pay me?
12     A   That is so not true. There were several
13 calls I placed to Dave before the auction asking him
14 what the heck is going on. I called Gayle as well.
15 Gayle said, call Dave, call Dave, he can explain
16 everything.
17         I sent the e-mail, which I believe you
18 provided as one of the exhibits, that said, you know,
19 what is your plan to get back on track? And got, you
20 know, not great responses.
21     Q   So we'll talk about those conversations.
22 But at no time prior to the time that you filed your
23 lawsuit, did Dave ever tell you that he would never
24 pay you under the note, correct?
25     A   You, Mr. Pappalardo, asked me to agree

Page 186

1 that he wasn't going to pay me, earlier today, based
2 on all these e-mail exhibits that you provided. So
3 I'm not sure what you're asking me to confirm or
4 deny.
5     Q   I'm asking you, did you ever have a
6 conversation with David Silverstein where David
7 Silverstein told you that he would never pay you
8 under the note?
9     A   No, I didn't.
10     Q   And you said that you had conversations
11 with David Silverstein after you learned of the
12 auction, correct?
13     A   No. He never returned my calls.
14     Q   Did you call David Silverstein after you
15 learned of the auction?
16     A   Yes.
17     Q   How many times?
18     A   At least twice.
19     Q   And did he respond to you in any way?
20     A   You saw the one e-mail, you produced it.
21 And other than that, there was no response.
22     Q   So David Silverstein's only response was an
23 e-mail in which he said that he would not pay you
24 soon, correct?
25     A   That would be my recollection.

Page 187

1     Q   All right. After you learned of the sale,
2 you could have requested your stock back and tried to
3 stop the sale, correct?
4     A   As I mentioned earlier, Marc, it is not --
5 it was not ever my intention to take my stock back.
6     Q   And you believe that the September 24th,
7 2009 auction damaged you, correct?
8     MR. SWEETBAUM: I'm sorry. I didn't hear
9 the question.
10     Q   (BY MR. PAPPALARDO) You believe that the
11 September 24th, 2009 auction damaged you, correct?
12     MR. SWEETBAUM: Objection. Form.
13     A   Yes.
14     Q   (BY MR. PAPPALARDO) And can you tell me
15 what you did prior to the sale of Evergreen's assets
16 to attempt to limit your damages that you have
17 suffered?
18     A   Can you restate the question, please?
19     Q   Sure. Can you tell me what you did after
20 you learned of the potential sale to try to limit
21 your damages that you claim to have suffered?
22     A   I sent the e-mail to stop, cease and
23 desist on the auction. I tried to reach out to Dave
24 to understand what was going on. I reached out to
25 Gayle to try and understand what is going on. I

Page 188

1 reached out to David Mansfield to try to understand
2 what is going on. You know, I tried to get as much
3 information as I could.
4     Q   Did you reach out to David Mansfield in
5 September of 2009?
6     A   I don't recall. I don't recall.
7     Q   Why did you wait until October to sue?
8 Why didn't you sue in September?
9     A   I think I remember reaching out to him and
10 he said he was going to be at the DoD conference and
11 we could talk then or something along those lines.
12     Q   When you say he, are you referring to
13 David Silverstein?
14     A   No, David Mansfield.
15     Q   And in June of 2009, David Silverstein
16 actually delivered the shares of stock to you,
17 correct?
18     A   What was the date on that?
19     Q   June of 2009?
20     A   Yes, I believe that's the case.
21     Q   And Dave Silverstein advised you in June
22 of 2009 that Evergreen was considering filing
23 bankruptcy, correct?
24     A   Yes, he did.
25     Q   And in June of 2009 in a letter, Dave

**Court Reporting Videography Digital Reporting Transcription Scanning Copying**
**Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 189

1 Silverstein advised you that Evergreen was in breach
2 of covenants with First Capital Partners?
3    A    Something along those lines, yes.
4        (Exhibits 20 and 21 marked.)
5    Q    (BY MR. PAPPALARDO) I'm going to hand you
6 what has been marked as Exhibits 20 and 21. You may
7 want to read Exhibit 21 first just to help you with
8 these.
9        MR. SWEETBAUM: I'm don't have 21 --
10       MR. PAPPALARDO: Sorry, did I get my
11 numbers wrong?
12       (Tendered documents.)
13       MR. SWEETBAUM: Do you want her to read
14 both of these?
15       MR. PAPPALARDO: Yeah.
16       By the way, Alan, I'm not going to be a
17 lot longer.
18       MR. SWEETBAUM: Okay. That's helpful. I
19 appreciate knowing that. What do you mean when you
20 say not a lot?
21       MR. PAPPALARDO: Object to form.
22       MR. SWEETBAUM: It's 5 of 3. Are you
23 thinking by 4?
24       MR. PAPPALARDO: Yeah, by 4.
25       MR. SWEETBAUM: That's fine. Thank you.

Page 190

1    Q    (BY MR. PAPPALARDO) So Exhibit 20 is a
2 letter that you received from David Silverstein on or
3 about June 17th, 2009, correct?
4    A    Yes. I think they had the wrong date on
5 it.
6    Q    And you sent a response, which is
7 Exhibit 21, on or about June 19th, 2009, correct?
8    A    Yes.
9    Q    And on the first page of Exhibit 20, on
10 the last paragraph at the bottom there,
11 Mr. Silverstein advises you that Evergreen was in
12 default with First National Bank of Colorado.
13       Do you see that?
14   A    Yes.
15   Q    For certain financial covenants, correct?
16   A    Yes.
17   Q    And Mr. Silverstein also advised you that
18 Evergreen was in default with First Capital Partners,
19 correct?
20   A    Yes. I read it, Marc.
21   Q    And Mr. Silverstein advised you in June of
22 2009 the amount of -- the principal amount that was
23 owed to First Capital Partners, didn't he?
24   A    Approximately 4.5 million. Is that what
25 you're referring to?

Page 191

1    Q    Yes.
2    A    Okay, yeah.
3    Q    And Mr. Silverstein also advised you in
4 June of 2009 that Evergreen was the subject of a
5 lawsuit from its landlord, correct?
6    A    Eviction notice. I don't think he used
7 the word lawsuit here, but I suspected there was
8 something legal going on.
9    Q    And Mr. Silverstein advised you -- I'm
10 sorry, on or about June 17th, 2009, Mr. Silverstein
11 attempted to tender your shares in Evergreen stock to
12 you, correct?
13   A    Yes.
14   Q    And you refused to accept those shares,
15 correct?
16   A    Yes.
17   Q    And Mr. Silverstein flew down in June of
18 2009 in an attempt to hold a shareholder meeting with
19 you, correct?
20   A    I think he was there on business anyway at
21 the Federal Reserve or something. I don't think he
22 flew in just to meet with me because he had attempted
23 to do it via conference call.
24   Q    But Mr. Silverstein did meet with you in
25 person in June of 2009, correct?

Page 192

1    A    Yes.
2    Q    And Mr. Silverstein wanted you to accept
3 your shares and to vote whether Evergreen should file
4 bankruptcy, correct?
5    A    That is what he wanted, yes.
6    Q    And you refused to accept your shares
7 then, correct?
8    A    I think I sent a letter ahead of that
9 meeting. I don't recall the exact date of the
10 meeting, but I definitely made it clear that I was
11 not interested in taking my stock back.
12   Q    And in Exhibit 21, which is your
13 responsive letter on June 19th, 2009, that was sent
14 after you had met with Mr. Silverstein, correct?
15   A    That's what I just said, Marc, I'm not
16 sure.
17   Q    Okay. And in Exhibit 21 you thanked
18 Mr. Silverstein for providing you with transparency
19 relative to this, correct?
20   A    Yes.
21   Q    And at any time prior to June 19th, 2009,
22 are you aware of any misrepresentations that
23 Mr. Silverstein made to you regarding Evergreen?
24   A    No. I don't think he was necessarily
25 forthcoming in, you know, either providing financials

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 193

1  or answering calls, especially through the auction,
2  but I don't think he misrepresented.
3      Q    Why didn't you want to be part of the
4  decision-making process in June of 2009 whether
5  Evergreen should file bankruptcy?
6      A    As I mentioned to Mr. Silverstein then,
7  you know, being a 34 percent stockholder doesn't give
8  any rights when the majority is held by someone else.
9          And as I mentioned to you earlier,
10  Mr. Pappalardo, I was not interested in being a
11  stockholder.  I was interested in getting the money
12  paid.
13      Q    You testified that when you learned that
14  Evergreen shares might be worthless, you felt that
15  Mr. Silverstein did not have any incentive to repay
16  you, correct?
17      A    He had less incentive, yes.
18      Q    Less incentive.  If Evergreen would have
19  filed bankruptcy protection where it was liquidated,
20  that same decreased incentive to repay you would
21  exist, correct?
22          MR. SWEETBAUM:  Objection.  Form.
23      A    As I mentioned to you earlier, I didn't
24  really do an analysis on the bankruptcy situation.
25  You know, certainly, there were risks there.

Page 194

1      Q    (BY MR. PAPPALARDO) Did you seek any
2  advice in June of 2009 when you learned that
3  Evergreen was contemplating bankruptcy?
4      A    I think I kicked the idea around with some
5  attorneys.
6      Q    Did you speak to -- do you have a
7  brother-in-law named Lev, correct?
8      A    Yes, I do.
9      Q    Did you speak with Lev in June of 2009
10  regarding Evergreen's potential bankruptcy?
11      A    I don't think so.  I don't think so.
12      Q    Have you ever had any conversations in
13  2009 regarding Evergreen's financial condition with
14  Lev?
15      A    On random occasions he asked me how things
16  are going, you know.  I would say we talk about it
17  randomly here and there.
18      Q    Did Lev give you any advice whether to
19  accept your shares or not in 2009?
20      A    I think he said, you probably don't want
21  them and, you know, sent me to my attorney.
22      Q    When you say your attorney, who are you
23  referring to?
24      A    When Dave offered me 2 million, I had
25  seeked -- sought, seeked --

Page 195

1          MR. SWEETBAUM:  Sought.
2      A    Sought, thank you, Russian-born, you know.
3  I had sought the counsel of an attorney in the D.C.
4  area.
5      Q    (BY MR. PAPPALARDO) I'm not going to ask
6  you about that.
7      A    Okay.  And it was the same attorney.  My
8  point was, it was the same attorney I called on this
9  matter.
10      Q    Okay.  Now, you understand that Tim
11  Schafer went to Evergreen's offices on
12  September 24th, 2009, correct?
13      A    Yes.
14      Q    And after Mr. Schafer went to Evergreen's
15  offices, did he call you up and tell you what he
16  either heard or seen?
17      A    I don't think he called me up.  I believe
18  he sent an e-mail with a detailed summary.
19      Q    Has Mr. Schafer ever had any discussions
20  with you, either over the phone or in person, where
21  he told you what was said between Mr. Silverstein and
22  Mr. Schafer?
23          MR. SWEETBAUM:  Hold on.  I understand,
24  Marc, you believe that what is not privileged is,
25  obviously, Tim Schafer's appearance at the auction,

Page 196

1  and his discussions with Ilona about that.
2          So, based upon that, we've agreed that we
3  will allow questions to be answered regarding that
4  limited area, but I think your question is broader
5  than that.
6          MR. PAPPALARDO:  Let me make sure I don't
7  go beyond that.
8          MR. SWEETBAUM:  Okay.  Thank you.
9          MR. PAPPALARDO:  I do want to respect
10  that.
11      Q    (BY MR. PAPPALARDO) All I'm asking about
12  is any conversations you've had with Mr. Schafer
13  where Mr. Schafer told you either what
14  Mr. Silverstein said on September 24th, 2009 to
15  Mr. Schafer or what Mr. Schafer told Mr. Silverstein
16  on that same date. I'm not asking about legal advice
17  or legal opinions.
18      A    I have not had conversations that I recall
19  with Mr. Schafer on that subject.  I reviewed his
20  e-mail documenting the instance and proceeded with
21  dialogue with my attorney.
22      Q    So just to clarify, it's your testimony
23  that you've never had any conversations with
24  Mr. Schafer where Mr. Schafer told you what
25  Mr. Silverstein said after the September 24th, 2009

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 197

1  auction?
2      A    Not without the presence of my attorneys.
3      Q    That's fine, if your attorneys were
4  present. I'm asking you did you ever have a
5  conversation with Mr. Schafer where Mr. Schafer told
6  you what Mr. Silverstein said?
7      A    I do not believe I have. And if I did, it
8  would be -- he would have reiterated exactly the
9  document that he produced when he left the auction.
10     Q    So, is it your testimony that you don't
11 recall any conversation that you've had with
12 Mr. Schafer, where Mr. Schafer told you what was said
13 by either he or Mr. Silverstein in September of 2009,
14 regardless of whether the meeting was attended by
15 your attorneys?
16     A    Again, Marc, Tim has been on various
17 conference calls as we felt the need to pull him in.
18 I do not recall. Some of those had to do with what
19 happened when he attended the auction. Some of the
20 discussion did not have anything to do with what
21 happened at the auction.
22         So I don't recall if, how much of that
23 conversation were what was said, but I remember an
24 e-mail documenting what had happened that I
25 considered to be the source document of the

Page 198

1  communications on that day.
2      Q    And is Mr. Schafer representing you in
3  this litigation?
4      A    In this litigation, no. He's outside
5  counsel as well.
6      Q    Is Mr. Schafer outside counsel for you in
7  connection with this litigation?
8      A    I would consider him a resource that is,
9  you know, on retainer at will.
10     Q    And you testified previously that after
11 you learned of the auction in 2009, that you spoke
12 with Dave Mansfield at a DoD conference, correct?
13     A    Yes.
14     Q    And you spoke with Dave Mansfield again,
15 at this DoD conference again in October 2010,
16 correct?
17     A    Yes.
18     Q    Also at the conference was Dave
19 Silverstein, correct?
20     A    I think he and I may have come on
21 different days. I don't believe I saw David
22 Silverstein at that conference.
23     Q    Did you make any effort to try to set up a
24 meeting with Mr. Silverstein at that DoD conference?
25     A    I believe I mentioned to Mr. Mansfield on

Page 199

1  several occasions, both at the DoD conference and in
2  Miami last year, as well as, most recently, when I
3  approached Mr. Silverstein about discussing potential
4  ways to meet his needs and mine.
5      Q    When you refer to Miami, what are you
6  referring to?
7      A    There is an annual I Six Sigma conference
8  in Miami that I am usually at and Mr. Silverstein is
9  usually at.
10     Q    That was in January of 2010?
11     A    Most recent one, I think it was February,
12 actually.
13     Q    February, I'm sorry. So it was in
14 February of 2010, correct?
15     A    Yes.
16     Q    And then --
17     A    And I approached Mr. Mansfield and let him
18 know, to let Mr. Silverstein know that I was always
19 happy to sit down and have a productive dialogue.
20     Q    So you approached Mr. Mansfield at some
21 point in time regarding possibly meeting with David
22 Silverstein in February of 2010 at the Miami
23 conference, correct?
24     A    Or any time. I said I was always open to
25 a conversation with Dave; I mean any time. And still

Page 200

1  am, Mr. Pappalardo. I like saying Mr. Pappalardo.
2      Q    I still like Marc better.
3      A    Okay. That's fine.
4          (Discussion off the record.)
5          (Exhibit 22 marked.)
6      Q    (BY MR. PAPPALARDO) I show you what has
7  been marked as Exhibit 22. If you could, read the
8  bottom part of Exhibit 22, which is an e-mail from
9  Marc Pappalardo to Tim Schafer dated September 3rd,
10 2004.
11     A    Did you want me to read the second page,
12 Marc?
13     Q    You can, if you would like. You can just
14 read the first page. The first page is fine,
15 actually.
16     A    Okay.
17     Q    You're aware that on September 3rd, 2004
18 that you were advised that Evergreen was going to be
19 replaced as the buyer on the stock purchase agreement
20 and Dave Silverstein was going to be the buyer,
21 correct?
22     A    In reviewing it now, I guess so.
23     Q    And you are aware that prior to
24 September 3rd, 2004 that Mr. Silverstein told you
25 that in no event would he allow Evergreen to be sued

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 201

1  for money damages?
2     A   No, I do not recall any conversation along
3  those regard -- along those lines, Marc.
4     (Exhibit 23 marked.)
5     Q   (BY MR. PAPPALARDO)  I'm handing you what
6  has been marked as Exhibit 23.  I would like you to
7  read bullet number 4 on the first page of Exhibit
8  No. 23, just to yourself.
9     A   Okay.
10    Q   Exhibit 23 is an e-mail dated August 30th,
11 2004 from David Silverstein to you, correct?
12    A   Yes.
13    Q   And Exhibit 23, David Silverstein
14 basically tells you that he is not going to negotiate
15 the sole remedy clause, correct?
16    A   I just read a section in there that you
17 asked me to read and it does not discuss the sole
18 remedy clause.
19    Q   You read paragraph number 4, is that what
20 you read, number 4?
21    A   Yes.  Owner is an atypical.  There are
22 multiple material changes to the document that were
23 made and, even if your attorney believes they are or
24 should be customary clauses, they are unacceptable to
25 me.  If you want to go through with the sale that

Page 202

1  needs to be better understood by your attorney before
2  we meet.  I did in fact review the changes made to my
3  documents and they are unacceptable across the board.
4  I am willing to discuss matters of clarity, vagueness
5  or intent.  However I will not entertain discussions
6  regarding the material terms of the agreement
7  including security projects, subordination,
8  acceleration of a note, late fees --
9     Q   Stop right there.
10    A   -- versus your only remedy being the
11 return of your unpurchased stock.
12    Q   So, Ms. Kirzhner, my question to you is on
13 August 30th, 2004, David Silverstein basically told
14 you that he would not allow you to basically -- he
15 would not negotiate the fact that you wanted to
16 accelerate the promissory note and receive full
17 payment if there was a breach, correct?
18    A   I don't -- what you said and what I read
19 here is not -- I don't agree with what you said.
20    Q   In August 30th -- on August 30th, 2004,
21 Mr. Silverstein sent you an e-mail basically telling
22 you he would not negotiate, that your only remedy
23 would be the return of your unpurchased stock,
24 correct?
25    A   Yes.

Page 203

1     Q   And prior to August 30th, do you recall
2  that you were attempting to negotiate an agreement
3  where you could accelerate the promissory note and
4  receive payment of moneys if there was a breach or
5  default?
6     A   I do not recall that, Marc.
7     Q   And you do recall, though, that
8  Mr. Silverstein told you that he would not negotiate
9  the fact that he wanted your only remedy to take back
10 the stock, correct?
11    A   I don't recall those conversations, but I
12 do recall that it was a sticking point for him.
13    Q   And besides in the August 30th, 2004
14 e-mail, which is Exhibit 23, you had conversations
15 with David Silverstein where you were negotiating the
16 purchase of your stock, correct?
17    A   I am sure we did.  I do not recall the
18 content of those conversations.
19    Q   Do you recall any conversations where
20 Mr. Silverstein discussed that he wanted your only
21 remedy to be the return of your unpurchased stock?
22    A   I just said I don't recall those
23 conversations, Marc.
24    Q   And on August 30th, 2004, when Exhibit 23
25 was sent, Evergreen was the intended purchaser of the

Page 204

1  stock, correct?
2     A   I don't remember.  I don't remember what
3  version we were on in the edit, Marc.
4     Q   We'll go back to Exhibit, I believe 22,
5  where it says we're going to replace buyer.  What's
6  the date of that e-mail?
7     A   September 3rd, but that doesn't mean, you
8  know, that it wasn't talked about before.
9     Q   You have no recollection of any
10 discussions, do you, prior to September 3rd, 2004 of
11 David Silverstein being the buyer of the stock?
12    A   I don't recall any recollection of BMG
13 being the buyer of the stock either.
14    Q   Because you just don't have any memory,
15 correct?
16    A   Very limited memory, in terms of what we
17 talked about.  I was 8.9 months pregnant.
18    Q   When was your first son born?
19    A   September 8th.
20    Q   And the stock purchase agreement was
21 signed sometime after your son was born, correct?
22    A   Yes.  I believe the date on it is the
23 15th.
24    Q   And going back to the stock purchase
25 agreement, which is Exhibit 11 --

Pages 201 to 204

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 205

1    A   Um-hum.

2    Q   -- if you look at the first two pages of

3  Exhibit 11, there is some handwritten numbers written

4  in there.

5    A   Yep.

6    Q   Is that a yes?

7    A   Yes.

8    Q   All right.  And also on page 2 there's

9  some handwritten numbers written in?

10    A   Yes.

11    Q   And it's your recollection that this stock

12  purchase agreement was signed with some rush,

13  correct?

14    A   No.

15    Q   Were you planning on moving back -- first

16  of all, in September of 2004, where were you living

17  at the time?

18    A   Longmont, Colorado.

19    Q   And when did you move to Virginia, was it?

20    A   When my son was, I think four or five

21  weeks old.  So that would be -- oh, it was -- mid

22  October, mid October or late October, early November.

23    Q   So you don't -- you believe you actually

24  stayed in Colorado for a few weeks after this stock

25  purchase agreement?

Page 206

1    A   Oh, absolutely.  I wasn't going to -- I

2  mean, my son was, you know -- I wasn't going to take

3  a one-week-old on the airplane and all that kind of

4  stuff.

5    Q   Okay.

6    MR. PAPPALARDO:  Just give me one minute

7  off the record.  I think I'm almost done.

8    MR. SWEETBAUM:  Okay.

9    MR. PAPPALARDO:  Let's take a quick break.

10  Two-minute break.

11    (Recess taken from 3:22 p.m. to 3:26 p.m.)

12    Q   (BY MR. PAPPALARDO)  So, Ms. Kirzhner, I

13  would like to talk to you about the damages you claim

14  you suffered in this case.  Besides potential

15  attorney's fees, are you seeking money in excess of

16  what is owed under the note?

17    A   I think those are all things that could be

18  talked about.

19    Q   I'm saying in this lawsuit, are you

20  seeking more?  I want to know what your damages are.

21    A   I think the State of Colorado has an

22  8 percent kind of rate of interest, that sort of

23  thing, in addition to attorney's fees.

24    Q   So besides any prejudgment, post-judgment

25  interest and attorney's fees, are you seeking

Page 207

1  anything more than what you are owed under the note

2  or you claim you are owed under the note?

3    A   I don't think so.

4    Q   And if the auction did not decrease the

5  value of your collateral, can you tell me how you

6  have been damaged in this case?

7    MR. SWEETBAUM:  Objection to form.

8    A   Can you restate the question?  If the

9  auction did not --

10    Q   (BY MR. PAPPALARDO)  Decrease the value of

11  your collateral, can you tell me how you have been

12  damaged in this case?

13    A   Yeah.  I've had to, you know, watch

14  Mr. Silverstein take out significant money from the

15  business, and, you know, treat his buyout payments

16  way down the list, if even on the list of priorities,

17  to meet his obligation.

18    I've had to go out and take on a lot more

19  work than I would have wanted to, considering I have

20  three kids under the age of six.

21    Q   Again, neither the stock purchase

22  agreement or the note stated that Dave Silverstein

23  had to limit his salary or his draws, correct?

24    A   So?  It had a statement of good faith and

25  fair dealing.  And, you know, that may not be so fair

Page 208

1  to me.

2    Q   But you testified previously that Dave

3  Silverstein would never have accepted a limit on his

4  draws or salary when you entered into the agreement,

5  correct?

6    A   I don't remember.  I think I testified

7  that I don't remember if we had those conversations.

8  You know, and you all asked me to trust him to pay

9  for the commitment he defined.  So, you know, I

10  didn't embark on conversation -- I don't recall

11  embarking on conversations to limit his payments or

12  draws because you guys asked me to trust him, and I

13  did.

14    Q   David Silverstein did not approach you

15  about buying your stock.  You approached him,

16  correct?

17    A   Honestly, Marc, I do not recall.

18    Q   You wanted to retire in 2004, didn't you?

19    A   I think it was clear that Dave's inner

20  circle continued to exclude me even though I was half

21  owner of the company.  And he was making subtle

22  indications that, you know, he didn't want me to be

23  on a board of directors.  He didn't want me to, you

24  know, be privy to certain conversations.  So it's

25  like being in a bad marriage.  Why do you want to

**AGREN BLANDO COURT REPORTING & VIDEO INC**

Page 209

1 stay, if you feel like it's not quite the way it
2 should be.
3    Q    In 2003 and 2004, Evergreen attempted to
4 receive a woman-owned business certification, didn't
5 it?
6    A    Yes.
7    Q    And, in fact, Evergreen was unable to
8 receive its woman-owned business certification
9 because you did not know enough about the company
10 that they didn't believe you were an owner, correct?
11    A    No, not correct.
12    Q    Can you tell me what happened in your
13 interview?
14    A    Yes.  Mr. Silverstein asked, or Ms. Howard
15 asked Mr. Silverstein to transfer 4 percent of
16 Mr. Silverstein's ownership to Mrs. Silverstein to
17 make it look like we were a majority owned, instead
18 of 50-50.  It would be, you know, 54 with Kathy
19 owning 4 percent, me owning 50, Dave owning 46.
20    And the interviewer asked me if
21 Mrs. Silverstein had daily responsibilities at the
22 company, how often she came into the office, what her
23 role was.  And she really saw through the facade that
24 Mr. Silverstein and Ms. Howard concocted to try to
25 represent us as a woman-owned business, a majority

Page 210

1 woman-owned business.
2    Q    In September of 2004, do you believe that
3 Dave wanted you to sell -- was somehow forcing you to
4 sell his stock to you?
5    A    No.
6    Q    And so it was your decision to want to
7 sell your stock to him, correct?
8    A    Yes.
9    Q    But you realized in 2004 that Dave would
10 not buy your stock if you tried to limit the amount
11 of salary he would take, correct?
12    A    You asked me this question before, Marc,
13 and I do not recall engaging in conversations with
14 Dave about limits on what he can pay himself and the
15 dividends and distributions that he could take.
16    You all asked me to trust that Dave would
17 pay per the commitment he designed on his own, and I
18 did.
19    MR. PAPPALARDO:  I don't have any further
20 questions.
21    MR. SWEETBAUM:  I have no questions.
22    MR. PAPPALARDO:  All right.  Thank you.
23    (Proceedings concluded at 3:33 p.m.)
24
25       * * * * * * *

Page 211

1       I, ILONA KIRZHNER, do hereby certify that I
2 have read the foregoing transcript and that the same
3 and accompanying amendment sheets, if any, constitute
4 a true and complete record of my testimony.
5
6
7
                _____
8              Signature of Deponent
               ( ) No Amendments
9              ( ) Amendments Attached
10 Subscribed and sworn to before me this
11 _____ day of _____, 2010.
12
13    Notary Public: _____
14    Address: _____
15             _____
16 My commission expires _____
17 Seal:
18
19
20 KAM
21
22
23
24
25

Page 212

1 STATE OF COLORADO )
2                    )  ss.   REPORTER'S CERTIFICATE
3 COUNTY OF DENVER )
4    I, Kelly A. Mackereth, do hereby certify
5 that I am a Registered Professional Reporter and
6 Notary Public within the State of Colorado; that
7 previous to the commencement of the examination, the
8 deponent was duly sworn to testify to the truth.
9    I further certify that this deposition was
10 taken in shorthand by me at the time and place herein
11 set forth, that it was thereafter reduced to
12 typewritten form, and that the foregoing constitutes
13 a true and correct transcript.
14    I further certify that I am not related to,
15 employed by, nor of counsel for any of the parties or
16 attorneys herein, nor otherwise interested in the
17 result of the within action.
18    In witness whereof, I have affixed my
19 signature and seal this 23rd day of November, 2010.
20    My commission expires April 7, 2011.
21
22                _____
              Kelly A. Mackereth, CRR, RPR, CLT
23              216 - 16th Street, Suite 650
              Denver, Colorado  80202
24
25

Pages 209 to 212

**AGREN BLANDO COURT REPORTING & VIDEO INC**

## Page 213

1  AGREN BLANDO COURT REPORTING & VIDEO, INC.
    216 - 16th Street, Suite 650
2  Denver, Colorado  80202
    4450 Arapahoe Avenue, Suite 100
3  Boulder, Colorado  80303
4  November 23, 2010
5  Alan D. Sweetbaum, Esq.
    SWEETBAUM, LEVIN & SANDS, PC
6  1125 Seventeenth Street
    Suite 2100
7  Denver, CO 80202
8  Re:  Deposition of ILONA KIRZHNER
    Kirzhner vs. Silverstein, et al.
9    Case No. 1:09-CV-2858-CMA-BNB
10  The aforementioned deposition is ready for reading
    and signing.  Please attend to this matter by
11  following BOTH of the items indicated below:
12  _____ Call 303-296-0017 and arrange with us to read
    and sign the deposition in our office.
13
14  _XXX_ Have the deponent read your copy and sign
    the signature page and amendment sheets, if
15    applicable; the signature page is attached.
16  _____ Read the enclosed copy of the deposition and
    sign the signature page and amendment
17    sheets, if applicable; the signature page is
    attached.
18  _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
19    By _____ due to a trial date of _____
20  Please be sure the original signature page and
    amendment sheets, if any, are SIGNED BEFORE A NOTARY
21  PUBLIC and returned to Agren Blando for filing with
    the original deposition.  A copy of these changes
22  should also be forwarded to counsel of record.
    Thank you.
23
    AGREN BLANDO COURT REPORTING & VIDEO, INC.
24
25  cc:  All Counsel

1          - AMENDMENT SHEET -
2
3       Deposition of ILONA KIRZHNER
         November 15, 2010
4      Kirzhner vs. Silverstein, et al.
      Case No. 1:09-CV-2858-CMA-BNB
5
    The deponent wishes to make the following changes in
6  the testimony as originally given:
    Page  Line    Should Read    Reason
7  _____ _____ _____ _____
8  _____ _____ _____ _____
9  _____ _____ _____ _____
10  _____ _____ _____ _____
11  _____ _____ _____ _____
12  _____ _____ _____ _____
13  _____ _____ _____ _____
14  _____ _____ _____ _____
15  _____ _____ _____ _____
16  _____ _____ _____ _____
17  _____ _____ _____ _____
18  _____ _____ _____ _____
19  _____ _____ _____ _____
20  Signature of Deponent: _____
21
    Subscribed and sworn to before me this _____ day of
22  _____, 2010.
        Notary's signature _____
23  (seal)      Notary's address _____
24          _____
25        My commission expires _____.

## Page 214

1  AGREN BLANDO COURT REPORTING & VIDEO, INC.
    216 - 16th Street, Suite 650
2  Denver, Colorado  80202
    4450 Arapahoe Avenue, Suite 100
3  Boulder, Colorado  80303
4
5
6    ILONA KIRZHNER
    November 15, 2010
7    Kirzhner vs. Silverstein, et al.
    Case No. 1:09-CV-2858-CMA-BNB
8
9
10  The original deposition was filed with
11  Daniel Glasser, Esq., on approximately the
    23rd day of November, 2010.
12
13  _____ Signature waived.
14  _____ Unsigned; signed signature page and
    amendment sheets, if any, to be filed at
15    trial.
16  _____ Reading and signing not requested pursuant
    to C.R.C.P. Rule 30(e).
17  _XXX_ Unsigned; amendment sheets and/or signature
    pages should be forwarded to Agren Blando to
18    be filed in the envelope attached to the
    sealed original.
19
20
21  Thank you.
22  AGREN BLANDO COURT REPORTING & VIDEO, INC.
23  cc:  All Counsel
24
25

**Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying**
**Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306**