**Page 37**

```
08:56:19   1    Q  Do you believe --
08:56:20   2    A  I don't -- it's different than the
08:56:22   3  company's independent auditor, which is what the
08:56:25   4  stock purchase agreement states.
08:56:32   5    Q  Have you ever requested a valuation of
08:56:35   6  the company's independent auditors?
08:56:39   7    A  No.
08:56:40   8    Q  Have you ever requested a quotation for a
08:56:43   9  valuation from the company's independent auditors?
08:56:46  10    A  Marc, who -- I don't believe I had the
08:56:50  11  name of the company's independent auditors.
08:56:54  12    Q  Do you believe that the name of the
08:56:57  13  company's independent auditors is different today
08:57:00  14  than it was in 2004?
08:57:04  15    A  The way the stock purchase agreement is
08:57:07  16  written doesn't specify who the company is, was, or
08:57:13  17  could be.
08:57:16  18    Q  In April of 2011, David Silverstein
08:57:20  19  offered to split the cost of having the company's
08:57:24  20  independent auditors conduct a valuation; correct?
08:57:28  21       MR. DE VINE:  Form.
08:57:28  22    A  No, he offered to have ACM conduct an
08:57:35  23  audit of the company's valuation; the April 15th, to
08:57:49  24  be exact.
08:57:56  25    Q  (BY MR. PAPPALARDO)  And do you have any
```

**Page 38**

```
08:57:57   1  reason to believe that the company's -- that ACM is
08:58:01   2  not the company's independent auditors?
08:58:04   3    A  Marc, ACM has been Dave's personal tax
08:58:14   4  company, Dave's business tax company, who Dave calls
08:58:23   5  for advice on this foreclosure/auction transaction
08:58:33   6  and all kinds of other things.
08:58:36   7       For you to think that I would think ACM
08:58:38   8  was the company's independent auditors I think is
08:58:46   9  very presumptuous.
08:58:48  10    Q  They also performed -- prepared your tax
08:58:51  11  returns, too; correct?
08:58:52  12    A  They did.
08:58:53  13    Q  Nowhere in Section 2.03 does it state
08:58:57  14  that David Silverstein has to pay for the company's
08:58:59  15  independent auditors to perform a valuation;
08:59:01  16  correct?
08:59:03  17    A  I don't specifically recall, but I will
08:59:05  18  assume that you are correct.
08:59:07  19    Q  And again, David Silverstein offered to
08:59:09  20  pay for half of the fees for the company's
08:59:11  21  independent auditors to perform a valuation;
08:59:14  22  correct?
08:59:14  23       MR. DE VINE:  Form.
08:59:14  24    A  No.  I just answered that.  He agreed to
08:59:17  25  pay for ACM to perform an audit.
```

**Page 39**

```
08:59:20   1    Q  (BY MR. PAPPALARDO)  So is it your
08:59:22   2  testimony that ACM cannot be an independent auditor
08:59:26   3  of the company if it also prepares his personal tax
08:59:30   4  returns?
08:59:31   5    A  Not just his personal tax returns; okay?
08:59:37   6  He has been a client of that company for nearly a
08:59:39   7  decade.
08:59:41   8       I think it would be, you know, not fair,
08:59:48   9  not independent that they would conduct an audit.
08:59:53  10    Q  And you understand that, when you signed
08:59:55  11  the stock purchase agreement, that they -- that ACM
08:59:58  12  had been preparing Dave's personal tax returns;
09:00:01  13  correct?
09:00:02  14    A  Yes.
09:00:03  15    Q  And you understood, did you not, that
09:00:07  16  when you signed the stock purchase agreement, that
09:00:10  17  you trusted ACM; correct?
09:00:12  18       MR. DE VINE:  Form.
09:00:16  19    A  Marc, I was not thinking about ACM at all
09:00:21  20  when I signed the stock purchase agreement.  If
09:00:26  21  Mr. Silverstein had wanted to specify ACM there,
09:00:29  22  maybe I would recall making that connection.
09:00:32  23       There was no connection between the words
09:00:34  24  "company's independent auditors" and "ACM" at the
09:00:39  25  time I signed the stock purchase agreement.
```

**Page 40**

```
09:00:41   1    Q  (BY MR. PAPPALARDO)  In what year did ACM
09:00:43   2  not become independent, in your view?
09:00:47   3    A  When they -- when BMG became their
09:00:53   4  client.
09:00:53   5    Q  And "BMG," you are referring to BMGI,
09:00:56   6  Inc.?
09:00:58   7    A  Yeah.
09:00:59   8    Q  So if ACM was BMGI, Inc.'s client at the
09:01:04   9  time that you signed the stock purchase agreement --
09:01:06  10    A  Sorry, when BMGI became their client, not
09:01:11  11  the -- I think you --
09:01:11  12    Q  So in 2004, when you signed the stock
09:01:14  13  purchase agreement?
09:01:15  14    A  Yes, Marc.
09:01:16  15    Q  -- ACM was BMGI, Inc.'s independent
09:01:19  16  auditors?
09:01:21  17    A  You have asked me that question no less
09:01:23  18  than three to five times, and I have said that is
09:01:26  19  not my belief.
09:01:27  20    Q  And you had no idea who ACM's independent
09:01:31  21  auditors were when you signed the stock purchase
09:01:33  22  agreement; correct?
09:01:34  23       MR. DE VINE:  Form.
09:01:34  24    A  Would you like to restate that question?
09:01:37  25  I don't understand what you are asking.
```

Pages 37 to 40

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

AGREN BLANDO COURT REPORTING & VIDEO INC

Page 41

```
09:01:38   1    Q   (BY MR. PAPPALARDO) When you signed the
09:01:39   2    stock purchase agreement -- again, let me make this
09:01:39   3    clear -- you had no idea who BMGI, Inc.'s
09:01:42   4    independent auditors were?
09:01:44   5    A   My understanding was that, should we need
09:01:50   6    a valuation of the company, Dave and I would sit
09:01:56   7    down and figure out the right organization to
09:02:03   8    conduct it.
09:02:04   9    Q   If ACM had never prepared any tax returns
09:02:07  10    for either Dave Silverstein or any of his companies
09:02:11  11    other than BMGI, Inc., would you consider them to be
09:02:13  12    independent?
09:02:13  13        MR. DE VINE: Form.
09:02:16  14    A   I don't know, Marc, because they may have
09:02:19  15    been serving as consultants or experts in other ways
09:02:24  16    than just tax preparers. I don't know.
09:02:31  17    You know, if BMGI was never a client to
09:02:33  18    ACM and they had no knowledge of each other, maybe I
09:02:37  19    might consider ACM independent.
09:02:39  20    Q   (BY MR. PAPPALARDO) Here's what I don't
09:02:41  21    understand, because Section 2.03 says "the company's
09:02:43  22    independent auditors"; correct?
09:02:45  23    A   Yes.
09:02:45  24    Q   Okay. And you have your MBA, again;
09:02:50  25    correct?
```

Page 42

```
09:02:52   1    A   Marc, we established that over and over
09:02:54   2    again. Are you being smart with me?
09:02:56   3    Q   No. Do you understand what an audit is?
09:02:58   4    A   Yes, I do understand.
09:02:59   5    Q   Can you tell me what your understanding
09:03:01   6    of an audit is?
09:03:02   7    A   It's when an organization comes in to
09:03:06   8    look through your transactions, to look through your
09:03:09   9    financials, to kind of understand your business and
09:03:13  10    the way things run and move financially and validate
09:03:18  11    that everything is copacetic.
09:03:21  12    Q   So ACM would have to be -- BMGI would
09:03:25  13    have to be a client of ACM in order for ACM to be
09:03:29  14    its auditors; correct?
09:03:30  15    A   I think any company that has the right
09:03:33  16    skill set can come in and audit another company.
09:03:35  17    Q   In order for ACM to audit the company's
09:03:39  18    books, BMG would have to be its client; correct?
09:03:45  19    A   Yes, but that is not to say that they
09:03:50  20    would have to provide a valuation. Other companies
09:03:55  21    can provide valuations that can also audit.
09:03:59  22    Q   But Section 2.03 says the only company
09:04:02  23    that can perform a valuation is the independent
09:04:04  24    auditors?
09:04:05  25    A   No, it doesn't. It says "the company's
```

Page 43

```
09:04:07   1    independent auditors." It does not specify ACM.
09:04:11   2    Q   Correct, but your testimony is, the fact
09:04:14   3    that the independent auditors of the company -- the
09:04:20   4    fact that one of its clients was the company made it
09:04:23   5    not independent?
09:04:23   6    Am I missing something or --
09:04:25   7    A   For many years, and personal client, as
09:04:30   8    well, and serve as consultants and experts who they
09:04:35   9    call upon regularly.
09:04:38  10    Q   Are you interpreting the word
09:04:43  11    "independent auditor" in Section 2.03 to be
09:04:45  12    something other than somebody who performs an audit
09:04:49  13    of financial statements?
09:04:55  14    A   Can you restate that question, please?
09:04:56  15    Q   Are you interpreting the phrase
09:04:59  16    "independent auditor" in Section 2.03 to be
09:05:01  17    something other than a company that audits financial
09:05:06  18    statements of a company?
09:05:09  19    A   I don't know. There were a lot of other
09:05:17  20    than's in there. You can read it one more time if
09:05:20  21    you would like.
09:05:22  22    Are you interpreting --
09:05:24  23    Q   Are you interpreting that phrase,
09:05:27  24    "independent auditor," in Section 2.03 to be
09:05:29  25    something other than the company that performs
```

Page 44

```
09:05:32   1    audits of the company's financial statements?
09:05:38   2    A   I am interpreting it as some company, not
09:05:44   3    necessarily the company that provides audits
09:05:49   4    annually, provides tax return services annually,
09:05:53   5    provides consulting services on need, provides
09:05:55   6    experts on need, provides financial support, as
09:06:00   7    independent, yes. Other than that, yes.
09:06:06   8    I don't know if I answered your question,
09:06:09   9    but --
09:06:11  10    Q   You have indicated in your amended
09:06:22  11    complaint that no defendant has ever offered you a
09:06:26  12    security interest in BMGI Corp.?
09:06:30  13    A   Until really that April 15th memo, that
09:06:34  14    is correct.
09:06:34  15    Q   And you are aware, though, that
09:06:36  16    Mr. Silverstein has offered you a security interest
09:06:40  17    in BMGI Corp.; correct?
09:06:42  18    A   Yes.
09:06:43  19    Q   And you are aware also that, when he
09:06:45  20    testified in November of 2010, he testified that you
09:06:48  21    had a security interest in BMGI Corp.; correct?
09:06:51  22    A   He did.
09:06:53  23    Q   Is there anything that Mr. Silverstein
09:06:55  24    could do to assure you that you have a security
09:07:00  25    interest in BMGI Corp.'s stock?
```

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

## Page 45

```
09:07:05   1     A    Start paying me.
09:07:07   2     Q    Well, you understand that collateral is
09:07:09   3   different than payment; correct?
09:07:10   4     A    Yes, but you asked me a question, I gave
09:07:12   5   you an answer.
09:07:13   6     Q    Well, if he were to pay you, that would
09:07:16   7   not provide you any evidence that you have a
09:07:18   8   security interest in the stock that he owns in BMGI
09:07:22   9   Corp.; correct?
09:07:23  10     A    It might provide me some reassurance that
09:07:26  11   he plans to meet his obligation.
09:07:29  12     Q    But again, your complaint is not that
09:07:32  13   Mr. Silverstein has failed to pay you under the
09:07:36  14   note, your complaint is that your collateral is
09:07:38  15   worthless; correct?
09:07:40  16          MR. DE VINE:  Form.
09:07:41  17     A    Before November 29, 2010, or before his
09:07:47  18   deposition, yes.
09:07:49  19     Q    (BY MR. PAPPALARDO)  Because to this
09:07:50  20   date, you have not brought a claim for failing to
09:07:52  21   pay any monies under the promissory note; correct?
09:07:55  22          MR. DE VINE:  Form.
09:07:55  23     A    Correct.
09:07:56  24     Q    (BY MR. PAPPALARDO)  And to this date,
09:07:57  25   you have not sued him for not -- for not paying any
```

## Page 46

```
09:08:02   1   monies on the stock purchase agreement, either;
09:08:04   2   correct?
09:08:06   3          MR. DE VINE:  Form.
09:08:06   4     A    Marc, I can pull out the claims if you
09:08:09   5   would like me to pull them out.  My damages have
09:08:12   6   been stated several times in several different
09:08:15   7   forms.
09:08:16   8          I feel Mr. Silverstein has done something
09:08:21   9   not just unethical but arguably illegal, and that's
09:08:31  10   where I am at.
09:08:32  11     Q    (BY MR. PAPPALARDO)  But your claims are
09:08:33  12   based on the value of your collateral under the
09:08:36  13   stock purchase agreement?
09:08:37  14     A    Some of them, yes.
09:08:38  15     Q    And Mr. Silverstein has told you that you
09:08:41  16   have a collateral interest in the stock of BMGI
09:08:45  17   Corp.; correct?
09:08:47  18     A    As of the date of his deposition, that is
09:08:51  19   correct.
09:08:52  20     Q    And you have no reason to believe that
09:08:54  21   the collateral in BMGI Corp. is worth less than the
09:08:58  22   unpaid purchase price for your stock; correct?
09:09:00  23     A    Correct.
09:09:12  24     Q    And, in fact, your expert, Stephen Hazel,
09:09:15  25   believes that BMGI Corp. may be worth as much as $20
```

## Page 47

```
09:09:20   1   million as of 12/31/2010; correct?
09:09:22   2          MR. DE VINE:  Form.
09:09:24   3     A    I have read a lot of reports in that
09:09:29   4   regard, and I don't remember exactly the numbers
09:09:31   5   that Mr. Hazel used.
09:09:33   6     Q    (BY MR. PAPPALARDO)  Has anyone done a
09:09:35   7   valuation on your behalf of BMGI, Inc. as of today's
09:09:39   8   date?
09:09:43   9     A    Yes.
09:09:44  10     Q    Who?
09:09:46  11     A    Our experts.
09:09:49  12     Q    To your understanding -- well, your
09:09:52  13   understanding is your expert has produced an expert
09:09:55  14   report, correct, in this case?
09:09:56  15     A    Yes.
09:09:56  16     Q    Mr. Hazel?
09:09:57  17     A    Right.
09:09:57  18     Q    And it's your understanding that
09:09:59  19   Mr. Hazel only has an opinion as to the value of
09:10:01  20   BMGI, Inc. as of 2009; correct?
09:10:06  21     A    At some point in there, yes.
09:10:08  22     Q    And it's also your understanding that
09:10:10  23   Mr. Hazel does not have an opinion as to the value
09:10:13  24   of BMGI, Inc. after the statutory merger documents
09:10:18  25   were filed; correct?
```

## Page 48

```
09:10:21   1     A    He would probably -- I can't answer on
09:10:24   2   his behalf, but he would probably say after the
09:10:28   3   merger, the value of BMGI, Inc. is that of BMGI
09:10:32   4   Corp.
09:10:33   5     Q    So it's your understanding as you sit
09:10:35   6   here today that BMGI, Inc. is worth at least the
09:10:39   7   unpaid purchase price of your stock; correct?
09:10:44   8     A    Post November 2010, yes.
09:10:52   9     Q    And you understand that, as we sit here
09:10:54  10   today, that BMGI, Inc. is the same company as BMGI
09:10:57  11   Corp.; correct?
09:11:00  12     A    Yes.
09:11:07  13          MR. PAPPALARDO:  We have been going for
09:11:09  14   over an hour.  Do you want to take a break now?
09:11:09  15          MR. DE VINE:  Yes.
09:11:12  16          MR. PAPPALARDO:  How long do you need?
09:11:14  17          THE VIDEOGRAPHER:  We are off the record
09:11:15  18   at 9:10.
09:11:16  19          (Recess taken from 9:10 a.m. to
09:18:46  20   9:18 a.m.)
09:18:46  21          THE VIDEOGRAPHER:  We are back on the
09:19:22  22   record at 9:18.
09:19:23  23     Q    (BY MR. PAPPALARDO)  Ms. Kirzhner, if you
09:19:27  24   are able to prevail on any claim against Evergreen,
09:19:30  25   do you believe that you should be able to collect on
```

Pages 45 to 48

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

Page 49

```
09:19:32   1   that judgment against BMGI Corp.?
09:19:34   2        MR. DE VINE: Form.
09:19:38   3   A   I believe I should be able to collect any
09:19:45   4   way I can, whether it's from Dave or the merged
09:19:52   5   entity or whatever.
09:19:56   6   Q   (BY MR. PAPPALARDO) Do you believe it's
09:19:58   7   wrong that DSI lent money to BMGI, Inc.?
09:20:02   8        MR. DE VINE: Form.
09:20:05   9   A   No.
09:20:06  10   Q   (BY MR. PAPPALARDO) Do you think there
09:20:07  11   is a conflict of interest when an officer of a
09:20:10  12   company enters into a loan agreement with the
09:20:13  13   company he works for?
09:20:15  14   A   No.
09:20:18  15   Q   And, in fact, you are aware that, when
09:20:22  16   you were with BMGI, Inc., you actually lent money to
09:20:24  17   BMGI, Inc.; correct?
09:20:28  18   A   I recall for tax purposes we did do some
09:20:33  19   kind of loan back and forth, but I believe it was in
09:20:41  20   the other direction, where the company loaned us
09:20:44  21   money, not we loaned the company money.
09:20:47  22        But even if there were times, Marc, when
09:20:50  23   we loaned the company money, I would not find that
09:20:53  24   unreasonable.
09:20:57  25   Q   And, in fact, you are aware that in 2003
```

Page 50

```
09:21:11   1   the company lent you $130,000; correct?
09:21:18   2   A   Yes. That whole thing was quite
09:21:26   3   frustrating, from start to finish.
09:21:30   4        We had run through some -- for lack of
09:21:38   5   better words, I would call financial gymnastics at
09:21:42   6   the end of 2003 to reduce our tax burden, and to my
09:21:52   7   understanding -- actually, I recall a conversation
09:22:00   8   where Dave said, "This is done all the time. It's
09:22:05   9   no big deal. We will take care of it. You don't
09:22:07  10   need to worry about it; you know, we will figure it
09:22:12  11   out next year."
09:22:14  12        So I actually don't remember signing any
09:22:21  13   kind of loan document that said I would have to
09:22:25  14   repay BMG, but I kind of trusted Dave to take care
09:22:33  15   of that because he really took care of the financial
09:22:36  16   end of things for the most part.
09:22:38  17   Q   And you are aware -- first of all, in
09:22:41  18   December of 2003, your tax preparer, your personal
09:22:46  19   tax preparer, was ACM; correct?
09:22:48  20   A   Yes.
09:22:49  21   Q   You are aware, are you not, that ACM told
09:22:51  22   the company that it had made too many distributions,
09:22:56  23   excessive distributions to the shareholders,
09:22:58  24   correct, in 2003?
09:22:59  25   A   No, I do not recall that whatsoever.
```

Page 51

```
09:23:03   1   I am not saying it didn't happen. I just
09:23:05   2   do not recall that.
09:23:06   3   Q   Do you -- I am going to show you what we
09:23:09   4   are going to mark as Exhibit 130.
09:23:11   5        (Exhibit 130 marked.)
09:23:37   6   Q   (BY MR. PAPPALARDO) Exhibit 130 are
09:23:46   7   action by unanimous consent, written consent of the
09:23:49   8   stockholders of Breakthrough Management Group, Inc.
09:23:52   9   Do you see that?
09:23:53  10   A   I do.
09:23:53  11   Q   And the effective date is December 15,
09:23:58  12   2003. Do you see that?
09:24:00  13   A   I do.
09:24:00  14   Q   And, in fact, when you were with the
09:24:02  15   company, you understand that sometimes you would
09:24:06  16   sign documents that were -- which list an effective
09:24:10  17   date that were not the actual date that you signed
09:24:12  18   them; correct?
09:24:16  19   A   Usually it has a date near the signature
09:24:20  20   line so you can put the date that you signed it
09:24:23  21   Q   Is it your understanding that you signed
09:24:25  22   Exhibit 130 on December 15, 2003?
09:24:34  23   A   I guess so.
09:24:36  24        Based on what you are showing me, I do
09:24:37  25   not recall signing this, but I -- I am going to
```

Page 52

```
09:24:42   1   assume I did.
09:24:42   2   Q   And that's your signature; correct?
09:24:44   3   A   That is my signature.
09:24:45   4   Q   And right above where it says "In witness
09:24:52   5   whereof," it says, "Resolved."
09:24:54   6        Do you see that? Do you see the
09:24:57   7   "resolved"?
09:24:58   8   A   Yes
09:24:59   9   Q   "That the stockholders approve" -- can
09:25:02  10   you read that?
09:25:02  11   A   Yes You would like me to read it?
09:25:03  12   Q   Please.
09:25:03  13   A   "Resolved, that the stockholders approve
09:25:05  14   a loan from the corporation to Ilona Kirzhner in the
09:25:08  15   amount of $130,000 for a term of 15 months,
09:25:12  16   beginning on December 15, 2003, and maturing on
09:25:15  17   March 15, 2005, with interest to accrue at a rate of
09:25:20  18   5 percent per annum."
09:25:21  19   Q   And did you ever repay the $130,000 loan
09:25:28  20   that's referred to in Exhibit 130?
09:25:31  21   A   Yeah, that's an interesting question,
09:25:35  22   Marc.
09:25:35  23        Dave had basically called me up about
09:25:57  24   March of 2005 and honestly threw this at me and, to
09:26:14  25   be completely and frankly honest, Marc, I had no
```

Pages 49 to 52

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

## Page 53

1. recollection of this at the time. And Dave
2. basically said, "I am withholding all payments to
3. you, period, until this is taken care of."
4. I did at the time recall that we ran
5. through some financial gymnastics at the end of
6. December 2003, and so I kind of took him at his
7. word.
8. We then proceeded to try to figure out
9. how we could take care of this. Mr. Bob Bulow,
10. B-u-l-o-w, told me that Mr. Silverstein, after my
11. departure in September 2004, took a draw from the
12. company and repaid his obligation and that he was
13. clearly unwilling to do so. I suggested that he --
14. that I repay this obligation by taking it off the
15. tail end of the note, the 2.64 million, versus
16. cutting me off with a new family, a new house, no
17. job, in a new work environment, and basically
18. threatening myself, my family, my ability to move on
19. with life until this was taken care of
20. Through a series of very, very
21. threatening, unfriendly, insulting conversations and
22. e-mails, it was decided that -- we worked out a
23. payment plan.
24. Q In 2005, did you have $130,000 that you
25. were able to pay David Silverstein or pay the

## Page 54

1. company back for the loan referred to in
2. Exhibit 130?
3. A What do you mean "have"? In the bank?
4. Q Yes.
5. A Marc, when you don't have a full-time
6. job, and someone who promised to give you $5 million
7. over six years all of a -- and that promise was used
8. to buy a million-dollar house, to fund a life, and
9. all of a sudden you are required to write a check
10. for $130,000 from savings, that's not something you
11. want to do.
12. Q The question is, in 2005 did you have
13. $130,000 in either bank accounts, in securities or
14. investments with Carlyle Group?
15. A I think Carlyle was after that, but yes,
16. we did.
17. Q And again, it's your understanding that
18. in 2005, David Silverstein took a shareholder
19. distribution and repaid this $130,000 loan referred
20. to in Exhibit 130 for himself; correct?
21. A That is my understanding from Mr. Bulow.
22. Q And it's -- and you would agree with me
23. that you had no right in 2005 to receive a
24. shareholder distribution from the company; correct?
25. A I mean, yes, that's probably accurate.

## Page 55

1. Q And you agreed -- you reached an
2. agreement with Dave Silverstein and the company in
3. 2005 where you would agree to consider this, the
4. loan referred to in Exhibit 130, to be repaid in
5. full by doing an offset with the amount owed under
6. the note; correct?
7. MR. DE VINE: Form.
8. A There wasn't a formal agreement. This
9. was a very painful strong-arming that
10. Mr. Silverstein put Mr. Bulow in the middle of that
11. went back and forth via e-mail and Excel
12. spreadsheets outlining how the payments would be
13. deducted and so on and so forth.
14. I felt it was very unfair that
15. Mr. Silverstein wouldn't push this out till the end
16. of the loan, nor would he consider anything longer
17. term in terms of deductions, and basically
18. threatened me and my family.
19. Q (BY MR. PAPPALARDO) You believe it was
20. unfair that David Silverstein would not allow you to
21. repay the loan referenced in Exhibit 130 until
22. sometime in 2009 or 2010; correct?
23. A Correct.
24. Q And you understood that David Silverstein
25. repaid his $130,000 loan in 2005; correct?

## Page 56

1. A By taking an extra draw from BMG.
2. Q Well, you understood that BMG was his
3. source of income; correct?
4. A Yes.
5. Q And you had sources of income in 2005
6. such as investments; correct?
7. A I wouldn't necessarily call them sources
8. of income. I mean, they -- some go up, some go
9. down, some --
10. Q In 2005, you made over a hundred thousand
11. dollars in income; correct?
12. A Marc, I don't have my tax return in front
13. of me. You know, I know the majority of that was
14. from buyout payments from Mr. Silverstein.
15. Q And again, you said it was unfair that --
16. you believe it was unfair that David Silverstein
17. wanted you to repay the loan referred to in
18. Exhibit 130 in 2005 even though you signed something
19. that indicated that you would repay it in 2005;
20. correct?
21. A Yes. Again, he didn't bother to send
22. this to me at the time of our communication, so --
23. and I honestly did not recall this piece of paper
24. existed, but I did recall that we ran through the
25. scenario at the end of 2003, so I felt that he was

Pages 53 to 56

Court Reporting Videography Digital Reporting Transcription Scanning Copying
Denver (303) 296-0017 Boulder (303) 443-0433 Colorado Springs (719) 635-8328 Greeley (970) 356-3306

Page 57

```
09:33:31   1   not dishonest in any way.
09:33:33   2       I just felt he could have been less
09:33:37   3   threatening and more accommodating to how this was
09:33:40   4   paid back.
09:33:41   5   Q   As you sit here today, do you believe
09:33:43   6   that it was unfair that David Silverstein wanted you
09:33:45   7   to repay the loan referred to in Exhibit 130 in
09:33:49   8   2005?
09:33:49   9   A   I do not think it was unfair that he
09:33:52  10   expected me to repay it. I think it was unfair the
09:33:55  11   way he approached the repayment.
09:34:00  12   Q   Again, have you ever repaid the loan
09:34:07  13   referred to in Exhibit 130?
09:34:11  14   A   As I said before, I think that's an
09:34:14  15   interesting question. I think it's -- my feeling is
09:34:25  16   I made a commitment to repay this loan based on
09:34:32  17   Mr. Silverstein's commitment to pay me per the
09:34:38  18   buyout.
09:34:40  19       If Mr. Silverstein is not going to work
09:34:51  20   through payments to me, then I feel that I have
09:34:57  21   not -- that I -- that this has not been taken care
09:35:03  22   of.
09:35:03  23   Q   You understand that the company has sued
09:35:05  24   you for --
09:35:07  25   A   Yes, I do.
```

Page 58

```
09:35:07   1   Q   -- not paying back this $130,000 loan;
09:35:11   2   correct?
09:35:11   3   A   Yes, I do.
09:35:12   4   Q   And you understand that you have not sued
09:35:15   5   David Silverstein, as we sit here today, for not
09:35:17   6   repaying the promissory note; correct?
09:35:19   7       MR. DE VINE: Form.
09:35:19   8   A   Marc, part of our complaints are about
09:35:25   9   nonpayment, their nonpayment and devaluation of
09:35:32  10   collateral.
09:35:32  11       So I would appreciate if you, you know,
09:35:38  12   separate them like that.
09:35:39  13   Q   (BY MR. PAPPALARDO) So do you believe
09:35:40  14   that you have sued David Silverstein for not paying
09:35:43  15   you monies under the promissory note?
09:35:44  16   A   Yes, I believe it's linked with other
09:35:51  17   claims in our lawsuit.
09:35:54  18   Q   My question is, do you believe that you
09:35:57  19   have sued David Silverstein for not paying you under
09:35:59  20   the promissory note?
09:36:01  21   A   I just said I believe it's combined. You
09:36:06  22   can't necessarily separate it out here and here, yes
09:36:10  23   or no, but it's combined with the devaluation of the
09:36:14  24   collateral and the nonpayment.
09:36:17  25   Q   Have you brought a breach of contract
```

Page 59

```
09:36:20   1   claim for violating the promissory note in your
09:36:22   2   amended complaint?
09:36:23   3   A   I believe I have.
09:36:24   4   Q   Can you show me where there is a breach
09:36:26   5   of contract claim for violating the promissory note?
09:36:30   6   I will represent to you there is no claim.
09:36:34   7   A   Marc, I spend a lot of money on
09:36:39   8   attorneys, so if you would like me to step out and
09:36:43   9   consult with my attorney to answer your question
09:36:46  10   correctly, I would be happy to do so.
09:36:49  11       I am not an expert in every single claim,
09:36:54  12   what it includes, what it doesn't include, how it's
09:36:56  13   worded and how it's not worded.
09:36:58  14   Q   You have previously testified that you
09:37:00  15   have never sent a written notice of default to David
09:37:04  16   Silverstein for failing to pay any monies under the
09:37:06  17   promissory note.
09:37:07  18       Do you recall that testimony?
09:37:08  19   A   Yes.
09:37:08  20   Q   And so would you agree with me that you
09:37:12  21   have not brought any claim against David Silverstein
09:37:14  22   for failing to pay monies under the promissory note?
09:37:17  23   A   No, I would not.
09:37:17  24   Q   And you would agree with me that in 2005
09:37:31  25   you agreed that $138,667 of monies that were owed
```

Page 60

```
09:37:40   1   could be used as an offset for monies that were owed
09:37:44   2   under your promissory note?
09:37:46   3   A   That was in 2005, and if I am not
09:37:49   4   mistaken, part of 2006, as well, and, you know, in
09:37:54   5   my view, when you are to get 5 million, I didn't
09:38:00   6   want to fight over 138,000. But if I am not going
09:38:05   7   to get 5 million, then I am not -- then I am going
09:38:09   8   to fight over 138,000.
09:38:15   9   Q   Do you believe you repaid the loan
09:38:25  10   referred to in Exhibit 130?
09:38:28  11   A   I believe, if Mr. Silverstein and I would
09:38:44  12   come to some kind of agreement, that I would support
09:38:52  13   deductions that were made. In absence of that
09:38:57  14   agreement, no.
09:39:01  15   Q   Again, you would agree with me David
09:39:04  16   Silverstein has never told you that you will not be
09:39:06  17   repaid under your promissory note?
09:39:12  18   A   Nor has he told me that he will pay.
09:39:20  19   Q   Let's go back to the stock purchase
09:39:23  20   agreement.
09:39:23  21       You signed it, again, in 2004; correct?
09:39:27  22   A   Yes.
09:39:29  23   Q   And assume that the value of BMGI,
09:39:35  24   Inc. -- the value dipped $1 below the unpaid
09:39:38  25   purchase price but the next day was worth more than
```

Pages 57 to 60

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

Page 61

```
09:39:41  1   the unpaid purchase price.
09:39:43  2        Can you tell me how you were damaged for
09:39:45  3   a violation of Section 2.03's valuation covenant?
09:39:49  4        MR. DE VINE: Form.
09:39:52  5   A   Marc, I have a lot of issues answering
09:39:59  6   hypothetical questions. Either ask me a
09:40:03  7   hypothetical question that is unrelated to what --
09:40:08  8   to any terms of the agreement or ask me a question
09:40:11  9   about the agreement. I am not going to fight -- I
09:40:15 10   don't want to fight over things that you are asking
09:40:17 11   me to assume that I am not prepared to assume or not
09:40:22 12   -- or I don't believe are valid assumptions.
09:40:25 13        So please restate under that note.
09:40:29 14   Q   (BY MR. PAPPALARDO)  Are you saying you
09:40:31 15   cannot answer that or you will not answer the
09:40:32 16   question?
09:40:32 17   A   I am saying that you should split your
09:40:36 18   question into two separate questions, maybe a
09:40:40 19   hypothetical one and maybe one that pertains to
09:40:43 20   Section 2.03 of the agreement, and then maybe I will
09:40:46 21   be able to answer your two questions.
09:40:48 22   Q   Assume the value of Microsoft dipped $1
09:40:53 23   below an agreed upon price and the next day it was
09:40:57 24   over that price.
09:40:58 25        Can you tell me how you were damaged?
```

Page 62

```
09:41:03  1   A   I don't know if I own any stock in
09:41:06  2   Microsoft that I -- I can't answer that question.
09:41:11  3   Q   I am asking you a hypothetical.
09:41:14  4   Remember, you asked me to give you a hypothetical
09:41:16  5   that was not related --
09:41:18  6   A   Yes, but I don't -- how I was damaged
09:41:20  7   relative to Microsoft dipping $1?
09:41:22  8   Q   What stock do you own today? Name one
09:41:25  9   stock.
09:41:26 10   A   My husband manages all of our stock.
09:41:29 11   Q   Are you unfamiliar with any stock that
09:41:31 12   you own here today?
09:41:35 13   A   I have some Hertz Rental Car.
09:41:41 14   Q   Perfect.
09:41:41 15        Assume the David Silverstein promissory
09:41:45 16   note was secured by stock in Hertz.
09:41:48 17   A   See, I don't --
09:41:50 18   Q   Assume you have any promissory note with
09:41:53 19   anybody that is secured by stock in Hertz.
09:41:56 20        If for one day it dips below an agreed
09:42:01 21   upon value and then the day after it's above that,
09:42:04 22   can you tell me how you were damaged?
09:42:07 23   A   I guess it would depend if I sold during
09:42:12 24   that one day.
09:42:17 25        I think -- you know, I think it would
```

Page 63

```
09:42:19  1   depend on other circumstances.
09:42:22  2   Q   Do you understand what collateral is? I
09:42:25  3   am talking about collateral. Assume collateral for
09:42:27  4   a promissory note in Hertz stock.
09:42:31  5        If an agreed upon value of Hertz stock --
09:42:35  6   if for one day it dips below that agreed upon value
09:42:38  7   and the next day it's worth more than that agreed
09:42:41  8   upon value, can you tell me how you were damaged?
09:42:43  9        MR. DE VINE: Form.
09:42:43 10   A   I don't know, Marc.
09:42:46 11   Q   (BY MR. PAPPALARDO)  If the assets of a
09:42:56 12   company were fraudulently transferred to another
09:42:59 13   party but they were returned, they were worth more,
09:43:04 14   can you tell me how you were damaged?
09:43:06 15        MR. DE VINE: Form.
09:43:11 16   A   You can try to restate your question. I
09:43:21 17   am not -- it depends on the time duration, it
09:43:27 18   depends on what else was going on during that time.
09:43:30 19   It depends on if there was a plan to get -- to, you
09:43:34 20   know, have replacement collateral and discussions
09:43:37 21   around those. I mean, it depends.
09:43:39 22        I can't answer that question, Marc.
09:43:40 23   Q   (BY MR. PAPPALARDO)  If the assets of
09:43:42 24   BMGI, Inc. were fraudulently transferred to another
09:43:44 25   party but when they were returned they were worth
```

Page 64

```
09:43:47  1   more, how were you damaged?
09:43:49  2        MR. DE VINE: Form.
09:43:50  3   A   It depends on, did I know that they were
09:43:57  4   going to be returned? It depends on, was -- you
09:44:03  5   know, what was the plan for understanding ahead of
09:44:10  6   time that this was going to occur, why it was
09:44:13  7   occurring, the communication -- I mean, I had no
09:44:18  8   knowledge at all, had to find out from a competitor
09:44:22  9   that this was actually going on.
09:44:24 10        So I -- there is -- the damages, you
09:44:28 11   know, are nonpayment. The damages are what the
09:44:35 12   Court will decide are damages for fraudulent
09:44:38 13   transfer.
09:44:41 14        I believe, you know -- you rob a bank,
09:44:50 15   take some money and then give the money back, it's
09:44:54 16   still a crime.
09:44:57 17   Q   (BY MR. PAPPALARDO)  You understand that
09:44:58 18   civil claims are different than criminal claims?
09:45:02 19   A   I do.
09:45:02 20   Q   And that in civil claims, there is an
09:45:05 21   element of damages and, in criminal claims, there is
09:45:08 22   no element of damages.
09:45:08 23        Are you aware of that?
09:45:10 24   A   Not in so many words, but okay.
09:45:16 25   Q   And so again, your complaint, in your
```

Pages 61 to 64

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306

AGREN BLANDO COURT REPORTING & VIDEO INC

Page 65

```
09:45:21   1   fraudulent transfer claim, deals with the
09:45:23   2   collateral; correct?
09:45:25   3       A   There is several complaints, one of which
09:45:29   4   is devaluation of the collateral.
09:45:32   5       Q   And if the collateral was worth more
09:45:36   6   after the transfer and it's given back to you, how
09:45:41   7   were you damaged?
09:45:42   8       A   Marc, it was given back to me after
09:45:45   9   November -- after Dave's deposition in
09:45:48  10   November 2010; okay?
09:45:50  11       Between September 2009 and November 2010,
09:45:58  12   I believe there was no intent to ever pay me or
09:46:03  13   provide me any collateral.
09:46:06  14       Q   Between --
09:46:07  15       A   In fact, I believe that the only reason I
09:46:11  16   have collateral today is because I brought this
09:46:14  17   lawsuit against Mr. Silverstein.
09:46:16  18       Q   How was the collateral given back to you?
09:46:22  19       A   You pulled out the memo Mr. Silverstein
09:46:26  20   wrote on April 15, 2011.
09:46:30  21       Q   Did you ever --
09:46:31  22       A   I don't really believe I still have it,
09:46:33  23   but I believe he would sign paperwork and give it
09:46:39  24   back to me.
09:46:40  25       Q   Sometime in October 2009, you believed
```

Page 66

```
09:46:43   1   your collateral was worthless; correct?
09:46:46   2       A   Yes.
09:46:47   3       Q   And when was the first time that you
09:46:49   4   believed your collateral was worthless?
09:46:51   5       A   When Mr. Mansfield told me so at the DoD
09:46:55   6   conference in October 2009.
09:46:56   7       Q   And again, after Mr. Mansfield told
09:46:59   8   you -- allegedly told you that your collateral was
09:47:02   9   worthless at the DoD conference in 2009, did you
09:47:05  10   send Mr. Silverstein a letter asking about the value
09:47:07  11   of your collateral?
09:47:09  12       A   No. I had sent requests before that that
09:47:13  13   he basically chose to, for all intents and purposes,
09:47:19  14   ignore.
09:47:20  15       Q   Did you ever -- in 2009, did you ever
09:47:23  16   send David Silverstein either a letter or an e-mail
09:47:26  17   asking him what the value of your collateral was?
09:47:30  18       A   I don't know if I used the words "value
09:47:32  19   of your collateral."
09:47:33  20       I certainly put up red flags when I sent
09:47:37  21   a cease and desist letter on the auction; I
09:47:41  22   certainly put up red flags when I called him, when I
09:47:44  23   called Mr. Mansfield, when I called Ms. Howard, and
09:47:46  24   couldn't get a return phone call. I certainly put
09:47:49  25   up red flags when, you know, I filed a lawsuit.
```

Page 67

```
09:47:53   1   I could ask you or Mr. Silverstein, why
09:47:56   2   didn't Mr. Silverstein pick up the phone and talk to
09:47:59   3   me like a human being and let me know what was going
09:48:01   4   on?
09:48:02   5       Q   So let's go back to -- let's go back to
09:48:05   6   2009.
09:48:06   7       You had your attorney, Tim Shafer, attend
09:48:09   8   the auction; correct?
09:48:11   9       A   Correct.
09:48:11  10       Q   And Mr. Shafer's office is approximately
09:48:16  11   a 20-minute drive away from BMGI's offices at the
09:48:21  12   time; correct?
09:48:21  13       A   I believe that's close to accurate.
09:48:25  14       Q   And you never had Mr. Shafer identify
09:48:28  15   himself as your attorney and talk to Mr. Silverstein
09:48:31  16   in 2009, did you?
09:48:32  17       MR. DE VINE:  Form.
09:48:35  18       A   I didn't ask him not to --
09:48:41  19       MR. DE VINE:  Okay. Hold on.
09:48:42  20       If you are going to be talking about
09:48:44  21   conversations with Mr. Shafer, we have got the
09:48:45  22   attorney-client privilege involved, and I am going
09:48:47  23   to instruct you not to answer.
09:48:48  24       A   I am not going to answer that question,
09:48:50  25   Marc, unless you would like to restate it.
```

Page 68

```
09:48:53   1       Q   (BY MR. PAPPALARDO)  Did your attorney,
09:48:53   2   Mr. Shafer, ever write a letter to either David
09:48:56   3   Silverstein or the company inquiring about the value
09:48:58   4   of the collateral?
09:49:00   5       A   Not to my recollection.
09:49:02   6       Q   Don't you think, if you had questions
09:49:04   7   about the value of the collateral, one of the things
09:49:07   8   that you could have done is have your attorney write
09:49:09   9   a letter to either David Silverstein or the company?
09:49:12  10       A   Don't you think that, if Mr. Silverstein
09:49:16  11   is going to transfer my collateral to another
09:49:19  12   company and re-collateralize me, that he would have
09:49:23  13   given me the courtesy to let me know? Don't you
09:49:26  14   think that employees of BMGI that became --
09:49:31  15   employees of BMGI, Inc. that became employees of
09:49:33  16   BMGI Corp. that got new agreements with the new
09:49:37  17   company's name on them, don't you think I would be
09:49:39  18   owed a new agreement with the new company's name on
09:49:41  19   it?
09:49:42  20       That's never happened, Mr. Pappalardo.
09:49:45  21       Q   Ms. Kirchner, do you believe it would
09:49:48  22   have been a reasonable thing for you to do to have
09:49:50  23   your attorney send a letter to either David
09:49:52  24   Silverstein or the company to ask about the value of
09:49:54  25   your collateral?
```

Pages 65 to 68

Court Reporting   Videography   Digital Reporting   Transcription   Scanning   Copying
Denver (303) 296-0017   Boulder (303) 443-0433   Colorado Springs (719) 635-8328   Greeley (970) 356-3306

Page 69

```
09:49:55   1    A  I think I tried to approach
09:49:56   2    Mr. Silverstein myself. I think the CFO of BMG told
09:50:01   3    me that my collateral was worthless.
09:50:04   4         I think I had enough data and
09:50:07   5    non-response from Mr. Silverstein to make a valid
09:50:09   6    conclusion without needing my attorney to write a
09:50:11   7    letter to Mr. Silverstein.
09:50:13   8    Q  Ms. Kirzhner, you are not answering my
09:50:14   9    question. I am going to state it one more time. If
           10    you could listen to my question, I am not asking
09:50:18  11    you --
09:50:18  12    A  I think I did.
09:50:19  13    Q  Listen to my question, please.
09:50:20  14         Do you believe it would have been
09:50:22  15    reasonable for your attorney, Mr. Shafer, to send a
09:50:26  16    letter to either David Silverstein or the company to
09:50:30  17    inquire about the value of your collateral?
09:50:34  18    A  Mr. Pappalardo, I believe in -- the cease
09:50:42  19    and desist letter was basically that, in not so many
09:50:48  20    words, and that was drafted by an attorney and sent
09:50:52  21    by me to Mr. Silverstein.
09:50:54  22    Q  And again, do you believe it would have
09:50:56  23    been reasonable for your attorney to have sent a
09:51:00  24    letter to David Silverstein after the auction to ask
09:51:04  25    whether your collateral had been preserved?
```

Page 70

```
09:51:08   1    A  Mr. Pappalardo, I had data from
09:51:12   2    Mr. Mansfield saying that that was, in fact, the
09:51:16   3    case; okay? So whether I needed or felt it
09:51:21   4    necessary, I did not consider it something I chose
09:51:24   5    to do.
09:51:27   6         I chose to take the CFO's word at face
09:51:31   7    value. I chose to take the fact that
09:51:34   8    Mr. Silverstein had no intention of talking to me
09:51:37   9    about what happened as evidence that, you know, in
09:51:41  10    fact, the collateral was worthless.
09:51:44  11    Q  You believe -- your e-mail -- your
09:51:49  12    attorney in September, on September 24th -- your
09:51:53  13    attorney, Tim Shafer, on September 24th, sent an
09:51:56  14    e-mail to you and a third party, which has been
09:51:59  15    produced in this case, concerning what he observed
09:52:02  16    at the auction; correct?
09:52:04  17         THE DEPONENT: Can I answer that
09:52:05  18    question?
09:52:07  19         MR. PAPPALARDO: Yes.
09:52:07  20         MR. DE VINE: Yes, you can answer the
09:52:09  21    question
09:52:09  22    A  Yes
09:52:09  23    Q  (BY MR. PAPPALARDO) And on September 24,
09:52:13  24    2009, you believed your stock might be worthless;
09:52:16  25    correct?
```

Page 71

```
09:52:19   1    A  Around that time, yes.
09:52:21   2    Q  And that was -- and you did not talk to
09:52:25   3    David Mansfield until October of 2009; correct?
09:52:28   4    A  Correct.
09:52:28   5    Q  And so you never sent, between
09:52:32   6    September 24, 2009 --
09:52:33   7    A  Marc --
09:52:33   8    Q  Please let me finish the question.
09:52:35   9    A  Yes. I just want to clarify something.
09:52:38  10    Q  You can clarify when your attorney asks
09:52:39  11    the questions, but between September 24, 2009, and
09:52:41  12    the time of the DoD conference, you never sent a
09:52:44  13    letter to David Silverstein asking about the value
09:52:47  14    of your collateral; correct?
09:52:49  15    A  No, I didn't. I was trying to figure out
09:52:52  16    what happened, and I couldn't get Mr. Silverstein to
09:52:56  17    tell me.
09:52:56  18    Q  And you say you couldn't get him to tell
09:52:59  19    you because you believed that you called
09:53:01  20    Mr. Silverstein; correct?
09:53:03  21    A  I have phone records.
09:53:05  22    Q  Have you produced those phone records?
09:53:07  23    A  I produced them at home. I haven't
09:53:10  24    submitted them, but I am happy to do so.
09:53:12  25    Q  Perfect. We would like to see those.
```

Page 72

```
09:53:14   1         And then, if Mr. Silverstein wasn't
09:53:16   2    answering you, do you think it would have been
09:53:18   3    reasonable for you to send him an e-mail or a letter
09:53:21   4    asking him the question that you wanted to ask?
09:53:23   5    A  Marc, I spent at least one to two weeks
09:53:30   6    shooting up red flags; okay? And I even had an
09:53:37   7    e-mail exchange with Mr. Silverstein post the
09:53:40   8    auction asking about getting back on a payment
09:53:43   9    schedule; okay?
09:53:45  10         The response to all of those was
09:53:49  11    basically, in not so many words, "Good-bye. See you
09:53:57  12    later. Litigation sounds interesting."
09:54:00  13    Q  You never --
09:54:02  14    A  Okay? So, Mr. Pappalardo, I felt I had
09:54:05  15    enough data from CFOs, from Mr. Silverstein's
09:54:11  16    non-response, from, you know, others, that implied
09:54:16  17    Mr. Silverstein really, you know, managed to get out
09:54:22  18    of his obligation to me.
09:54:24  19    Q  That's the key word, isn't it,
09:54:25  20    Ms. Kirzhner, the word "imply," because you never
09:54:28  21    sent Mr. Silverstein an e-mail where you asked about
09:54:30  22    the value of your collateral, did you?
09:54:34  23    A  Marc, it was implied, because I asked him
09:54:39  24    when he was planning to start paying. It was
09:54:42  25    implied because I sent a cease and desist letter on
```

Pages 69 to 72

Court Reporting  Videography  Digital Reporting  Transcription  Scanning  Copying
Denver (303) 296-0017  Boulder (303) 443-0433  Colorado Springs (719) 635-8328  Greeley (970) 356-3306