# Exhibit L

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:09-cv-2858-CMA-BNB
ILONA KIRZHNER,
  Plaintiff,

v

DAVID SILVERSTEIN, an Individual,
EVERGREEN INDUSTRIES, INC., f/k/a
BREAKTHROUGH MANAGEMENT GROUP INTERNATIONAL, INC.,
f/k/a BREAKTHROUGH MANAGEMENT GROUP, INC., a
Colorado corporation, DAVID SILVERSTEIN
INVESTMENTS, LLC, a Colorado limited liability
company, DSI INVESTMENTS, LLC, a Colorado limited
liability company, BMGI CORPORATION, a Delaware
corporation, and BMGI HOLDINGS, LLC, a Delaware
limited liability company,
  Defendants.

       Videotaped deposition of DAVID
MANSFIELD, taken at the offices of James DeCrescenzo
Reporting, LLC, 1880 JFK Boulevard, 6th Floor,
Philadelphia, Pennsylvania, on Thursday, May 19, 2011,
commencing at 10:02 a.m., before James DeCrescenzo, a
Registered Diplomate Reporter, a Fellow of the Academy
of Professional Reporters, an Approved Reporter of the
United States District Court, and a Notary Public,
pursuant to notice.

Page 2

1  APPEARANCES:
2  ALAN D. SWEETBAUM, ESQUIRE
   asweetbaum@sweetbaumlevinsands.com
3  SWEETBAUM, LEVIN & SANDS, P.C.
   1125 Seventeenth Street, Suite 2100
4  Denver, Colorado 80202
   303.296.3377
5  Attorney for Plaintiff
6
7  MARC F. PAPPALARDO, ESQUIRE
   marcpapp@hotmail.com
8  PAPPALARDO LAW GROUP, LLC
   1921 Corporate Center Circle, 3F
9  Longmont, Colorado 80501
   Attorney for Silverstein Defendants
10
11        ALSO PRESENT:
          Ilona Kirzhner (via teleconference)
12        David Silverstein
          David Williams, Video Operator
13
14          EXAMINATION INDEX
15 DAVID MANSFIELD
     BY MR. SWEETBAUM ........ 5
16
17
          REFUSAL TO ANSWER INDEX
18
       BY THE WITNESS ............... 44
19
20
       ADVISED NOT TO ANSWER INDEX
21
     BY MR. PAPPALARDO ....... 127
22   BY MR. PAPPALARDO ....... 172
23
24
25

Page 3

1       EXHIBIT INDEX
2                    MARKED
  DEPOSITION EXHIBIT
3
  160  SEVEN PAGES RELATED TO BALTIMORE    29
4       CRIMINAL COMPLAINT
5  161  FORTY-ONE PAGES, ASSORTED DOCUMENTS  103
        PRODUCED BY MR. MANSFIELD

Page 4

1       VIDEO OPERATOR:  We're now on the video
2  record.
3       This is the videotape deposition of
4  David Mansfield, taken by the plaintiff in the matter
5  of Ilona Kirzhner versus David Silverstein, an
6  individual, et al., in the United States District
7  Court for the District of Colorado, civil action
8  number 1:09-CV-2858-CMA-BNB, held at the offices of
9  James DeCrescenzo Reporting, LLC, 1880 JFK Boulevard,
10 Philadelphia, Pennsylvania on Thursday, May 19, 2011.
11 The time is 9 -- 10:03 p.m. (sic).
12      I'm David Williams, the videographer.
13 The court reporter is James DeCrescenzo.  We are from
14 the firm of Hunter & Geist, Incorporated, in Denver,
15 Colorado.
16      Counsel, will you now please introduce
17 yourselves for the record.
18      MR. SWEETBAUM:  Yes.  This is Alan
19 Sweetbaum.  I represent the plaintiff, Ilona Kirzhner,
20 and Ms. Kirzhner is attending by telephone.
21      MR. PAPPALARDO:  Marc Pappalardo.  I
22 represent the Silverstein defendants.  And Dave
23 Silverstein is also present.
24      VIDEO OPERATOR:  The reporter will now
25 swear in the witness.

Page 61

1   A.   Early November of last year.
2   Q.   Okay.
3   A.   And so I had, you know, I had four
4   thoughts running through my head when Dave informed me
5   that I had been wiretapped. And my first thought was
6   oh, my God, this could end my career.
7        My second thought was, you know, Ilona
8   is a bigger scum bag than I thought she was before.
9   Q.   Hold on. Let me interrupt just a
10  minute. You thought she was a scum bag before?
11  A.   Absolutely, yes.
12  Q.   Then why were you talking to her?
13  A.   Over my period of time at BMG
14  periodically I had tried to talk to Ilona. The DoD
15  defense conference that we met at was a good example.
16       When she first raised issues about the
17  reorganization BMG was going through and asked me if
18  she had had any concern about it, and I said
19  absolutely not. Dave has told me point blank that,
20  you know, it's the same company.
21       And of course I believe that because,
22  you know, two things. I mean I can't pretend to be a
23  financial novice. You know, I've done a lot of due
24  diligence, I've seen reorgs before.
25       Even though I wasn't involved in the

Page 62

1   transaction because of my mother's cancer, I was very
2   explicit with Ilona that, you know, not only had
3   payroll not been interrupted, that my FICA deduction
4   hadn't restarted.
5        So, you know, I -- as a guy who has done
6   due diligence, right, there are certain things you
7   look at.
8        And any time you have a company do
9   reorganization, to make sure they're telling you the
10  truth about it, what you do is you look at, you know,
11  you look at -- that's the first line you look at.
12       Did the executives, people who would
13  have been over the FICA limit, did they get a restart
14  on their FICA.
15       And, you know, I was able to cite that
16  to Ilona that there was absolutely nothing to worry
17  about with BMG because my FICA didn't restart.
18       You know, the other thing I mentioned to
19  her was that the benefits didn't get restarted, ERISA
20  didn't get restarted, the 401(k).
21       And then, again, very, very importantly,
22  and this applies more to BMG, is that the ESOP didn't
23  get restarted.
24       And, you know, I'm not an expert on
25  ESOPs, but from financial transactions where I've been

Page 63

1   a merchant bank, you know, ESOPs can be quite a
2   headache, because they're a shareholder regulated by
3   the Department of Labor, you know.
4        So, you know, I told Ms. Kirzhner about
5   my mother's cancer, the fact the DoD conference was
6   the first time I had been in an industry event in a
7   year.
8        You know, I explained to her there that
9   I really didn't understand the mechanics. I gave her
10  some ideas on how reorganizations can work.
11       But, you know, her first question to me
12  is, is Dave ever going to pay me again? And I said
13  absolutely, that's my understanding.
14       And she goes, so the company's all
15  right? And I, like I said, for the reasons I just
16  specified, I said the company's fine.
17       And so over the years, you know, like
18  when we had to -- when we all wanted to buy out
19  Ilona's stock, I was the one who did that work. I
20  communicated some of that, not all of that to her.
21       So talking to Ilona to me, I don't have
22  to like her.
23       Matter of fact, at the DoD conference we
24  were talking about Mike Harnell (phonetic), who is an
25  individual I don't think either of us particularly

Page 64

1   love. We were kind of making fun of him.
2        So, you know, I don't have to like
3   somebody.
4        But you've got to remember my first
5   interaction with Ilona, the first time I heard the
6   name Ilona Kirzhner, was when I was at Six Sigma
7   Qualtec and we had a newly acquired company that had
8   an employee where we were bidding for a contract that
9   we had been informed had been given to Ilona, not as
10  an employee of Six Sigma Qualtec.
11       That was back in 1998.
12       So, you know, maybe I was talking to her
13  because I thought I could straighten her out. I mean
14  I knew she had sued Dave.
15       You know, I didn't know the mechanics of
16  it but, you know, I was -- I thought I could do some
17  good out of it I guess.
18       But, I -- you know, clearly I was wrong
19  and the potential for reputational damage that I
20  suffered, obviously I wish I hadn't done it now.
21       I never thought, like I said I've spoken
22  to Ilona dozens of times, I don't know that I was ever
23  wiretapped. You know, but I -- the perception that
24  creates has already cost me one advisory assignment
25  and --

Page 165

1  Kirzhner, correct?
2    A.   Yes.
3    Q.   And what I'm trying to understand is,
4  isn't -- isn't -- wasn't the purpose that you thought
5  the mezzanine lending would be used for, the mezzanine
6  proceeds would be used for, isn't that out the window
7  when Mr. Silverstein takes the money and puts it in a
8  CD?
9    A.   No.
10   Q.   Or a treasury bill?
11   A.   No.  No.  No.  No.  No.  No.  Matter of
12 fact, any mezzanine lender who wouldn't consider
13 Mr. Silverstein taking a debt was immediately
14 eliminated -- or taking part of the proceeds was
15 immediately, you know...
16   Q.   But that's because, the debt, the
17 distribution to Mr. Silverstein was to be used to pay
18 Ms. Kirzhner, correct?
19   A.   No.  That -- Mr. Sweetbaum, if I may,
20 the use of proceeds to pay Ms. Kirzhner was never even
21 contemplated until all the lenders came back and said,
22 Dave, we'd like to do a 5 to 7 million dollar deal.
23   Q.   Look at Exhibit 58.
24   A.   Okay.
25   Q.   Do you recognize this?

Page 166

1    A.   No.
2    Q.   What's your status with the company in
3  May of '09?
4    A.   I am checked out.  I'm up in Saratoga
5  Springs, my hometown, with my mom sometimes as much as
6  three days a week -- I'm sorry, three weeks a month.
7  I am, you know, trying to be, I guess I'm trying to be
8  helpful.
9         I mean I made the introductions to some
10 of the consultants who, if we -- had -- if the TBA
11 contract had come to fruition, but that was just, you
12 know, phone calls, you know.  So my involvement, you
13 know, was de minimis, I think.
14   Q.   Are you still CFO of the company at this
15 time?
16        MR. PAPPALARDO:  Objection to form.
17        THE WITNESS:  Which company?
18 BY MR. SWEETBAUM:
19   Q.   BMGI.
20        MR. PAPPALARDO:  Same objection.
21        THE WITNESS:  There might be a legal
22 document that proved me wrong, but I'm going to say
23 no, I wasn't.
24 BY MR. SWEETBAUM:
25   Q.   Did you resign?

Page 167

1    A.   I hadn't resigned, no.  I was, I mean I
2  was on a working sabbatical.  My mom -- you know, it
3  had happened to Gail the year before, where her father
4  got cancer.
5         And I had to, you know, step in and
6  help.  And Dave was nice enough to let me go up to
7  Saratoga to help tend to my mother as much as
8  possible.
9    Q.   Were you -- I'm sorry, go ahead.
10   A.   So I didn't resign but I really wasn't
11 functioning.  I'm not even -- you know, I think Dave
12 would periodically use me as a sounding board, would
13 be the best way to describe.
14   Q.   Were you aware of bankruptcy options
15 being discussed?
16   A.   Yeah.  Yeah.  I mean we had discussed I
17 mean a broad range of reorganizations.
18   Q.   Well, Mr. Silverstein had $2 million
19 that had been distributed to him from the proceeds of
20 the FCP loan.  Is that still in a treasury bill?
21   A.   I don't know.  I don't -- again you're
22 telling me he had $2 million.  I don't know if that's
23 the right number.
24        But I know that he chose safe
25 investments, but I don't -- you know, Dave and I talk

Page 168

1  about stocks from time to time but not at that
2  intimate of a level.
3    Q.   Could that have helped the company?
4    A.   I don't understand the question.
5    Q.   Well, was -- you said bankruptcy was
6  being discussed as one of several reorganization
7  options.  Was that your phrase?
8    A.   Yes.
9    Q.   What other reorganization options were
10 being discussed?
11   A.   You know, recapitalization through some
12 other means, either equity or more subordinate debt.
13 We were looking at, you know, consolidating entities.
14        You know, I even went out and looked to
15 see if there were any shell companies that were
16 available for sale that had a large tax loss carry
17 forward.  I -- everything a diligent company would do
18 when it's faced with a recession.
19   Q.   Did anyone tell Ilona that a loan
20 agreement had been reached with FCP?
21   A.   I don't know.
22   Q.   Did you?
23   A.   I -- I know that I had discussed it with
24 her at some point.  I don't think I was the first one
25 to talk to her about it.  Because she asked me a

Page 173

1  respond to the extent he's discussing a conversation
2  between BMGI, Inc.'s CPA and him that deals with
3  accounting matters. There's a accountant-client
4  privilege.
5  BY MR. SWEETBAUM:
6  Q.  So Chris Taylor is the -- is Chris
7  Taylor the accountant for the company?
8  A.  Absolutely.
9  Q.  And --
10  A.  I mean that -- I mean just go to -- back
11  to your other question, you know, that's why you
12  insist that you have a CPA as controller.
13  Q.  Why?
14  A.  So you have somebody who can run the
15  accounting department and has all the authority of a
16  CPA.
17  Q.  He was the controller?
18  A.  Yes.
19  MR. SWEETBAUM:  And Marc, is it your
20  position that the controller, that communication
21  between the controller and the CFO are privileged?
22  MR. PAPPALARDO:  It's my position that
23  communications regarding the accounting function or
24  providing accounting or advice relating to that
25  between a CPA and the client, in this case a -- to the

Page 174

1  extent, I mean you can ask for more definite
2  statements from Mr. Mansfield to make sure that my
3  assertion of privilege is correct because I don't know
4  the conversations he's talking about, but I want to
5  make sure that we're protecting statements just like
6  between an attorney and a client, those statements
7  between an accountant and a client, an in-house
8  attorney talking to the CEO is privileged, just as an
9  in-house CPA talking to a person at the company is
10  privileged, it's my understanding.
11  BY MR. SWEETBAUM:
12  Q.  Were -- were your -- is your
13  understanding about the defaults of First National
14  Bank, is that -- come solely from the controller,
15  Chris Taylor?
16  A.  Yes.
17  Q.  You don't have any knowledge other than
18  from talking with Mr. Taylor?
19  A.  No.  I mean I don't -- I don't -- I
20  don't recall any other ones.
21  Q.  You didn't discuss it with
22  Mr. Silverstein?
23  A.  I -- I did call and tell Dave that Chris
24  had called me and was there anything I could do to
25  help.  And he just said no, thank you.  Go take care

Page 175

1  of your mom.
2  Q.  Were you aware that Mr. Silverstein
3  created an entity for the purpose of purchasing the
4  FNB note?
5  MR. PAPPALARDO:  Objection to form.
6  THE WITNESS:  No, I was not.
7  BY MR. SWEETBAUM:
8  Q.  Were you aware that the FNB note was
9  purchased by DSI Investments?
10  A.  Yes, but I mean months later.
11  Q.  When did you find out about it?
12  A.  My mom passed away in April of 2010, so
13  I would guess it would be late April or early May of
14  2010.
15  Q.  Is -- are you saying that essentially
16  from the time your mom got sick, which was in June of
17  2009 until April of 2010, you don't really have any
18  recollection or understanding about what was going on
19  at BMG?
20  A.  I'm going to say that it was definitely
21  not a priority of mine.
22  Q.  I understand.  Listen, as you pointed
23  out in the beginning, there's priorities in life and
24  in business, I think those were your exact words.
25  A.  Right.

Page 176

1  Q.  Just because it's not a priority doesn't
2  mean you're not, you don't know about it, you're not
3  involved in it.
4  A.  I certainly wasn't involved in it.  And
5  what knowledge I had was -- was fragmented.
6  Like I said, every now and then Dave
7  would call me and say hey, do you know an expert on,
8  you know, something else, or hey, are there any
9  individual investors that you know out there that are
10  high net worth that might be looking at a deal, or
11  something like that.
12  I remember one conversation when my mom
13  was in the ICU and, you know, I was just sitting
14  outside and Dave called and, you know, we talked
15  about, you know, letting go a couple of the guys that
16  I had brought on board to BMG.
17  Dave gave me the courtesy to let me know
18  that they were going to be let go.  And we also talked
19  about, you know, are there, you know, what are
20  companies out there doing?  What is, you know, what
21  are you hearing from your buddies?
22  You know, are there any -- this is my
23  word, not his.  Are there any rabbits to pull out of
24  hats?  But, you know, in terms of, you know, like I
25  said, day to day, no.

Page 185

1  Q. Were you aware then that David
2  Silverstein Investments declared a default pursuant to
3  that loan that was purchased from FNB?
4  A. I learned about that I'm going to say
5  last summer.
6  Q. The summer of 2010?
7  A. Yeah.
8  Q. Were you talking with Ilona during this
9  period of time that you were caring for your mother?
10 A. I don't believe so.
11 Q. You had a conversation with her at I
12 think a DoD conference; is that right?
13 A. Yeah.
14 Q. When was that?
15 A. September of 2009.
16 Q. And did -- what did you talk about
17 during that telephone -- or that was an actual
18 in-person conference, wasn't it?
19 A. Right. Yeah.
20 Q. What did you talk about?
21 A. She -- she had asked me if she could
22 talk to me privately. And Dave was there, and I said
23 sure. And I had not been to an industry event in
24 quite a while.
25     Like I say, the timing of it was such

Page 186

1  that my mom was in a break with her chemo sessions and
2  so I was really glad just to have something to do.
3  That's my first recollection. And I remember that
4  Ilona and I were talking --
5  Q. And again what's the date of this again?
6  A. I think it's September of 2009.
7  Q. Okay. So this is in September 2009 when
8  you're checked out?
9  A. Yes.
10 Q. Okay. Yet you're down -- where is the
11 DoD conference?
12 A. Virginia.
13 Q. Okay. So this is in Virginia.
14 A. Uh-huh.
15 Q. And you traveled there for this
16 conference?
17 A. Uh-huh.
18 Q. Yes?
19 A. Yes.
20 Q. And you're saying that's because your
21 mom was?
22 A. She had a break in her therapy.
23 Q. She was in between chemo treatments?
24 A. Yeah.
25 Q. Okay.

Page 187

1  A. And Dave asked me if I wanted to go, so
2  I said sure, I'd love to go.
3  Q. And you saw Ilona there?
4  A. Yeah.
5  Q. Whom you didn't like.
6  A. I mean I don't know what your definition
7  of "like" is, but...
8  Q. You called her a scum bag.
9  A. Right. Okay.
10 Q. That's my definition. Let's use that,
11 okay?
12 A. I don't care for Ilona's ethics, I don't
13 care for some of the things I've seen her do. You
14 know, can I be personable to her? Sure.
15 Q. So --
16 A. So -- and I saw that she had some
17 questions, she wanted to talk. And I said I'd be
18 happy to talk to her. I told her, you know, I really
19 didn't know much.
20     She's like, you know, what about the
21 auction? I said I don't really know. You know, when
22 it came up, you know, I mentioned that I had called
23 Dave and he really only confirmed that it happened.
24     I told her that I was still getting
25 paid, I didn't think there wasn't anything to worry

Page 188

1  about. And like I said, I kind of have my litmus
2  test.
3      You know, number one is that because the
4  FICA didn't get reset and because the ESOP didn't get
5  reset, I didn't really think a whole lot had happened,
6  you know.
7      She had asked me about --
8  Q. Wait a minute. Hold on. Mr. Mansfield,
9  this is September of 2009, okay? This is a time
10 period -- was this before or after the auction?
11     MR. PAPPALARDO: Alan, for the record,
12 you know the DoD conference was in October of 2009.
13 He might be mistaken.
14     MR. SILVERSTEIN: Late October.
15 BY MR. SWEETBAUM:
16 Q. So this was after the auction, correct?
17 A. I believe so, yeah.
18 Q. So you've been telling me up until now
19 that you didn't really know of any of this stuff until
20 maybe the summer or May, June of 2010.
21 A. No, I told you --
22     MR. PAPPALARDO: Objection to form.
23     THE WITNESS: I told you I knew the
24 auction occurred, I didn't know the substance of it.
25 I didn't know about DSI at all.

Page 189

1  BY MR. SWEETBAUM:
2     Q.   You didn't know about a default, and you
3  didn't know about BMGI Corp. You also -- you said all
4  those things, correct?
5          MR. PAPPALARDO: Objection to form.
6          THE WITNESS: Yes.
7  BY MR. SWEETBAUM:
8     Q.   Is that right?
9     A.   I didn't have an intimate knowledge of
10 any of it, no.
11    Q.   Well, I've never asked you if you had an
12 intimate knowledge.
13    A.   Okay.
14    Q.   I've asked you if you've known about it.
15    A.   Did -- no, not at that time.
16    Q.   Well, but yet you're having a
17 conversation with Ilona.
18    A.   Right.
19    Q.   And you're offering that you think
20 they're the same entities because the FICA wasn't
21 reset.
22    A.   Well, she had asked me. She goes did
23 the entities change? You know, she goes what
24 changed? I know there's been a change in the
25 corporate structure.

Page 190

1          And I said there might have been. And I
2  think I actually gave her a long-winded example of one
3  or two deals that I had worked on previously that had
4  nothing to do with BMGI, you know.
5     Q.   How were you engaging in a discussion
6  with Ilona where you're now testifying under oath,
7  under penalty of perjury, what you're telling me is
8  that you engaged in a discussion basically trying to
9  defend the fact that BMGI Corp. was the same as BMGI,
10 Inc. because FICA wasn't reset and you've done these
11 deals in the past.
12    A.   No. No. No. No. No. No. I was not
13 trying to defend -- I didn't know the BMGI Corp. I
14 didn't know the names of the entities, and I don't
15 believe Ilona raised the names of the entities.
16         She talked about a reorganization. And
17 I said, you know, I'm aware that there was a
18 reorganization. But her first question to me is is
19 Dave going to pay me? And I'm like everything he's
20 always told me was yes.
21         And then she asked me, you know, what
22 about this reorganization? And I said I don't really
23 know. Why don't you talk to Dave.
24         I probably said that 30 times, you know,
25 and I gave her what I thought was some helpful

Page 191

1  examples from other things.
2          But she said -- she asked some question,
3  and I apologize, I don't know the exact question but
4  like I said I talked about, you know, because I, you
5  know, when Dave said there's going to be an auction I
6  said, you know, selfishly, what about my FICA?
7          And like I said I cited that to Ilona
8  because that's -- maybe that's a merchant banker
9  thing, maybe it's a finance guy thing, but I gave her
10 what I hoped was comforting words that things are
11 fine, or as fine as they could be.
12    Q.   How would you know?
13    A.   I didn't. I told --
14    Q.   So why did you tell her they were fine?
15    A.   No, I was telling her to the best of my
16 ability I thought things were fine, that she should be
17 talking to Dave.
18         Matter of fact, as she was walking out
19 of the conference I said, "Make sure you talk to
20 Dave." That was the last thing I said to her at that
21 conference. I remember her walking down the hallway.
22         MR. PAPPALARDO: Mr. Mansfield, if you
23 can just wait until after he asks the question --
24         THE WITNESS: Okay.
25         MR. PAPPALARDO: -- so if I need to

Page 192

1  raise an objection.
2          THE WITNESS: Okay. I'm sorry.
3          MR. PAPPALARDO: Thanks.
4  BY MR. SWEETBAUM:
5     Q.   You never told her that her stock was
6  worthless?
7     A.   That's preposterous. She has --
8     Q.   Why is that preposterous?
9     A.   Because she hadn't owned stock since
10 2004.
11    Q.   She has a security interest in stock.
12    A.   That's not owning stock.
13    Q.   Okay. Did you tell her her security
14 interest in stock was worthless?
15    A.   Absolutely not.
16    Q.   Would that -- is that preposterous?
17    A.   Is it that I said it, or is it
18 preposterous?
19    Q.   What I'm saying is preposterous.
20         MR. PAPPALARDO: Objection to form.
21 BY MR. SWEETBAUM:
22    Q.   That you -- let me -- let's just start
23 over.
24    A.   Yeah.
25    Q.   Did you tell her that her security

Page 193

1  interest in the stock was worthless?
2     A.   No.
3     Q.   But yet you do admit having a
4  conversation with her in October 2009?
5     A.   Yes.
6     Q.   Even though you were checked out of the
7  company by then, correct?
8     A.   Yes.
9     Q.   And you remember telling her that
10 everything was fine?
11    A.   Yes.
12    Q.   And even though you didn't know
13 anything -- everything was fine?
14    A.   Well, to the extent that I had asked
15 Dave and he had reassured me.  And like I said, I mean
16 there are a few things.  Like I was still getting a
17 paycheck.
18          You know, a lot of the vendors were
19 people who I have relationships with, none of them
20 were calling me up and saying hey, bills aren't
21 getting paid.
22          So yes, I told her everything was fine,
23 she needed to talk to Dave.  But as far as I knew,
24 everything was fine.
25    Q.   How long did the conversation last?

Page 194

1     A.   About an hour.  But we, but we talked --
2  it wasn't about this.  We talked about people at the
3  conference, the industry, we talked about her -- when
4  you first said stock, we talked about her holdings at
5  Carlyle Group.
6     Q.   So you had an hour conversation with
7  this woman, correct?
8     A.   Plus or minus, yeah.
9     Q.   Well, when you say plus or minus, that
10 means about an hour?
11    A.   I would say closer to 45 minutes, but
12 yes.  It was, it was no more than an hour.
13    Q.   Okay.  You don't like this woman and you
14 were talking about things other than BMGI?
15    A.   Yes.
16    Q.   How much time did you spend talking
17 about BMGI?
18    A.   20, 30 minutes.
19    Q.   And this is, you spent 20 to 30 minutes
20 talking to this woman about what's going on with BMGI
21 even though you hadn't the slightest idea what was
22 going on with BMGI?
23    A.   She just kept -- she kept asking me
24 questions.  She -- I don't think she believed me.  I
25 don't think she believed my mom had cancer; I don't

Page 195

1  know what.
2          I mean we -- we did talk before and I
3  kind of fell off the map.  So I figured she kind of
4  knew.  I mean, I got -- a lot of people in the
5  industry knew that my mom had cancer.
6     Q.   Look at Exhibit 29.  Do you see that's a
7  notice of sale up in the upper right-hand corner --
8          MR. SWEETBAUM:  Oh, sorry, Marc.  Sorry.
9  BY MR. SWEETBAUM:
10    Q.   Do you see that's a notice of sale in
11 the upper right-hand corner?
12    A.   Uh-huh.
13    Q.   Yes?  Did you see this or is this the
14 auction that you heard about from other people in the
15 industry?
16    A.   Yes, the latter.
17    Q.   So you actually didn't see this?
18    A.   No.
19    Q.   Exhibit 30.
20         MS. KIRZHNER:  Alan, can I dial back
21 from my cellphone?
22         MR. SWEETBAUM:  Yeah, I think so.  That
23 would be fine.  Can we keep going?
24         MS. KIRZHNER:  Yes, keep going.
25 BY MR. SWEETBAUM:

Page 196

1     Q.   Exhibit 30, this is a notice of public
2  sale.  Did you ever see this?
3     A.   No.
4     Q.   So you didn't know about the sale at all
5  before it occurred?
6     A.   No.  Well, like I told you, I was aware
7  that there was going to be an auction because somebody
8  called me.  They had seen this.  I Googled it.  I
9  think it was on --
10         (Telephone ringing.)
11         MR. SILVERSTEIN:  Is she back?
12         MR. SWEETBAUM:  No, I think that's just
13 what happens when it disconnects.
14         THE WITNESS:  I Googled it, I called
15 Dave, and he said yeah, I'm having an auction.  And I
16 believe he actually said, you know, is this something
17 you really want to go into now or are you with your
18 mom?
19         And I said, you know what, you're
20 right.  I'm with my mom.  I don't need to know.
21 Everything's okay?  I wanted to help to the extent I
22 could but I really couldn't.
23 BY MR. SWEETBAUM:
24    Q.   Exhibit 34.  A recording, acceptance of
25 bid.  Were you aware that Breakthrough Management